# EXHIBIT A



110 East 59th Street
New York, NY 10022

July 15, 2014

**Via Certified Mail**

Jason Robins
Co-founder and CEO
DraftKings, Inc.
225 Franklin Street
26th Floor
Boston, Massachusetts 02110

Dear Mr. Robins,

Re: Request to Commence Licensing Discussions; Notice of Patent Infringement

Cantor Fitzgerald, L.P. and its affiliates comprise one of the premier global financial services firms. Today, Cantor is a preeminent capital markets investment bank, recognized for its strengths in the equity and fixed income capital markets, its global distribution model, and its expanding presence as the leading independent middle market investment bank, providing the marketplace with services in investment banking, prime brokerage and commercial real estate financing. Cantor's portfolio of businesses includes initiatives in real estate, prime brokerage, insurance, and many other industries and ventures. Cantor operates trading desks in every major financial center in the world, with offices in over 30 locations worldwide and approximately 1,600 employees.

Cantor Fitzgerald, L.P. and its affiliates are collectively the owner of over two thousand patent assets, with applications in various technology areas. Relevant to our future discussions with your company, Cantor holds the premier patent portfolio relating to fantasy sports including, but not limited to, fantasy sports websites and the delivery and creation of fantasy sports related services, applications and platforms. The patent portfolio discloses a wide range of systems, features, apparatuses, methods, and otherwise, relating to the above.

I am writing you because Cantor would like to commence discussions with DraftKings regarding the rationale and terms of a patent license to the Cantor fantasy sports patent portfolio. Our analysis reveals that DraftKings is offering a variety of products and services that infringe Cantor patents. The following is an exemplary list of infringed Cantor patents by DraftKings through its online platform as well as mobile application, both through www.draftkings.com, but please consider that they are part of a much larger portfolio:

| U.S. Patent or Publication Number | Representative Claims Infringed | Infringing Product and/or Feature |
|---|---|---|
| 6,884,166 | 24, 1, 39 | Head-to-Head contests subject to an entry fee |
| 6,887,151 | 34, 1, 20 | Daily fantasy contests subject to an entry fee |
| 6,899,628 | 13 | Daily fantasy contests subject to an entry fee |
| 7,029,394 | 30 | Daily fantasy contests subject to an entry fee |

CGTD00032346

| 7,534,169 | 1 | Qualifier and steps tournament contests |
| 8,142,283 | 1 | Daily fantasy contests |
| 8,342,924 | 11, 16 | Daily fantasy contests |
| 8,512,129 | 1 | Daily fantasy contests subject to an entry fee |
| 8,613,658 | 1 | Qualifier and steps tournament contests |
| 8,641,511 | 16 | Daily fantasy contests subject to an entry fee |
| RE39,818 | 33 | Daily fantasy play |
| 2013-0282551 A1 | 1, 5 | Daily fantasy contests |

The majority of the patent families referenced herein maintain open applications and continuations. Cantor will continue to prosecute the same with the intention to receive additional claims maintaining the original priority.

We are interested in reaching a negotiated non-litigation licensing arrangement with DraftKings for the Cantor patents referenced herein, and would like to commence a near term discussion with you to address this matter. In the course of such discussions, under appropriate nondisclosure conditions, we will provide you with details of our infringement and royalty analysis. We look forward to finalizing a mutually beneficial arrangement with your company regarding our fantasy related intellectual property rights. Upon receipt of this letter, please contact me with a proposed date and time for a call or meeting.

I look forward to hearing from you and thank you for your consideration of these matters.

Sincerely,

Andrew T. Ramer
Managing Director Intellectual Property Division
Cantor Fitzgerald, L.P.
aramer@cantor.com
(212) 829-4750


cc: Ryan Moore

**Notice**
Cantor Fitzgerald, L.P. and its affiliates reserve all rights with regard to the patents referenced herein, including the rights to, at any time and without notice: (1) seek damages for any period within the last six years during which your company made use of Cantor's patented technology in your products; (2) change its royalty rates; and (3) change its licensing program, including variance to conform to applicable laws. No communication from or lack of communication with Cantor Fitzgerald, L.P., its affiliates, agents or representatives shall serve as a notice of relinquishment of any of its or their rights.

CGTD00032347

# EXHIBIT B

Case 1:19-cv-01105-RGA Document 47-1 Filed 05/10/24 Page 5 of 136 PageID #:
Case 2:16-cv-00025-RCJ-WGC Document 294-5 Filed 02/25/17 Page 1 of 4
749

# Exhibit 5

**Assertion Letters**



110 East 59th Street
New York, NY 10022

July 15, 2014

**Via Certified Mail**

Nigel Eccles
Co-founder and CEO
FanDuel, Inc.
41 E. 11th Street, 10th Floor
New York, New York 10003

Dear Mr. Eccles,

Re: Request to Commence Licensing Discussions; Notice of Patent Infringement

Cantor Fitzgerald, L.P. and its affiliates comprise one of the premier global financial services firms. Today, Cantor is a preeminent capital markets investment bank, recognized for its strengths in the equity and fixed income capital markets, its global distribution model, and its expanding presence as the leading independent middle market investment bank, providing the marketplace with services in investment banking, prime brokerage and commercial real estate financing. Cantor's portfolio of businesses includes initiatives in real estate, prime brokerage, insurance, and many other industries and ventures. Cantor operates trading desks in every major financial center in the world, with offices in over 30 locations worldwide and approximately 1,600 employees.

Cantor Fitzgerald, L.P. and its affiliates are collectively the owner of over two thousand patent assets, with applications in various technology areas. Relevant to our future discussions with your company, Cantor holds the premier patent portfolio relating to fantasy sports including, but not limited to, fantasy sports websites and the delivery and creation of fantasy sports related services, applications and platforms. The patent portfolio discloses a wide range of systems, features, apparatuses, methods, and otherwise, relating to the above.

I am writing you because Cantor would like to commence discussions with FanDuel regarding the rationale and terms of a patent license to the Cantor fantasy sports patent portfolio. Our analysis reveals that FanDuel is offering a variety of products and services that infringe Cantor patents. The following is an exemplary list of infringed Cantor patents by FanDuel through its online platform www.fanduel.com, but please consider that they are part of a much larger portfolio:

| U.S. Patent or Publication Number | Representative Claims Infringed | Infringing Product and/or Feature |
|---|---|---|
| 6,884,166 | 24, 1, 39 | Head-to-Head contests subject to an entry fee |
| 6,887,151 | 34, 1, 20 | Daily fantasy contests subject to an entry fee |
| 6,899,628 | 13 | Daily fantasy contests subject to an entry fee |
| 6,979,267 | 23 | Daily fantasy contests subject to an entry fee |
| 7,029,394 | 30 | Daily fantasy contests subject to an entry fee |
| 7,534,169 | 1, 45 | Daily fantasy contests |

| 8,142,283 | 1 | Daily fantasy contests |
| 8,342,924 | 11, 16 | Daily fantasy contests |
| 8,512,129 | 1 | Daily fantasy contests subject to an entry fee |
| 8,613,658 | 1 | Daily fantasy contests |
| 8,641,511 | 16 | Daily fantasy contests subject to an entry fee |
| RE39,818 | 33 | Daily fantasy play |
| 2013-0282551 A1 | 1, 5 | Daily fantasy contests |

The majority of the patent families referenced herein maintain open applications and continuations. Cantor will continue to prosecute the same with the intention to receive additional claims maintaining the original priority.

We are interested in reaching a negotiated non-litigation licensing arrangement with FanDuel for the Cantor patents referenced herein, and would like to commence a near term discussion with you to address this matter. In the course of such discussions, under appropriate nondisclosure conditions, we will provide you with details of our infringement and royalty analysis. We look forward to finalizing a mutually beneficial arrangement with your company regarding our fantasy related intellectual property rights. Upon receipt of this letter, please contact me with a proposed date and time for a call or meeting.

I look forward to hearing from you and thank you for your consideration of these matters.

Sincerely,

Andrew T. Ramer
Managing Director Intellectual Property Division
Cantor Fitzgerald, L.P.
aramer@cantor.com
(212) 829-4750


cc: Paul Martino

**Notice**
Cantor Fitzgerald, L.P. and its affiliates reserve all rights with regard to the patents referenced herein, including the rights to, at any time and without notice: (1) seek damages for any period within the last six years during which your company made use of Cantor's patented technology in your products; (2) change its royalty rates; and (3) change its licensing program, including variance to conform to applicable laws. No communication from or lack of communication with Cantor Fitzgerald, L.P., its affiliates, agents or representatives shall serve as a notice of relinquishment of any of its or their rights.

CGTD00032351



110 East 59th Street
New York, NY 10022

July 15, 2014

**Via Certified Mail**

Jason Robins
Co-founder and CEO
DraftKings, Inc.
225 Franklin Street
26th Floor
Boston, Massachusetts 02110

Dear Mr. Robins,

Re: Request to Commence Licensing Discussions; Notice of Patent Infringement

Cantor Fitzgerald, L.P. and its affiliates comprise one of the premier global financial services firms. Today, Cantor is a preeminent capital markets investment bank, recognized for its strengths in the equity and fixed income capital markets, its global distribution model, and its expanding presence as the leading independent middle market investment bank, providing the marketplace with services in investment banking, prime brokerage and commercial real estate financing. Cantor's portfolio of businesses includes initiatives in real estate, prime brokerage, insurance, and many other industries and ventures. Cantor operates trading desks in every major financial center in the world, with offices in over 30 locations worldwide and approximately 1,600 employees.

Cantor Fitzgerald, L.P. and its affiliates are collectively the owner of over two thousand patent assets, with applications in various technology areas. Relevant to our future discussions with your company, Cantor holds the premier patent portfolio relating to fantasy sports including, but not limited to, fantasy sports websites and the delivery and creation of fantasy sports related services, applications and platforms. The patent portfolio discloses a wide range of systems, features, apparatuses, methods, and otherwise, relating to the above.

I am writing you because Cantor would like to commence discussions with DraftKings regarding the rationale and terms of a patent license to the Cantor fantasy sports patent portfolio. Our analysis reveals that DraftKings is offering a variety of products and services that infringe Cantor patents. The following is an exemplary list of infringed Cantor patents by DraftKings through its online platform as well as mobile application, both through www.draftkings.com, but please consider that they are part of a much larger portfolio:

| U.S. Patent or Publication Number | Representative Claims Infringed | Infringing Product and/or Feature |
|---|---|---|
| 6,884,166 | 24, 1, 39 | Head-to-Head contests subject to an entry fee |
| 6,887,151 | 34, 1, 20 | Daily fantasy contests subject to an entry fee |
| 6,899,628 | 13 | Daily fantasy contests subject to an entry fee |
| 7,029,394 | 30 | Daily fantasy contests subject to an entry fee |

CGTD00032346

| 7,534,169 | 1 | Qualifier and steps tournament contests |
| 8,142,283 | 1 | Daily fantasy contests |
| 8,342,924 | 11, 16 | Daily fantasy contests |
| 8,512,129 | 1 | Daily fantasy contests subject to an entry fee |
| 8,613,658 | 1 | Qualifier and steps tournament contests |
| 8,641,511 | 16 | Daily fantasy contests subject to an entry fee |
| RE39,818 | 33 | Daily fantasy play |
| 2013-0282551 A1 | 1, 5 | Daily fantasy contests |

The majority of the patent families referenced herein maintain open applications and continuations. Cantor will continue to prosecute the same with the intention to receive additional claims maintaining the original priority.

We are interested in reaching a negotiated non-litigation licensing arrangement with DraftKings for the Cantor patents referenced herein, and would like to commence a near term discussion with you to address this matter. In the course of such discussions, under appropriate nondisclosure conditions, we will provide you with details of our infringement and royalty analysis. We look forward to finalizing a mutually beneficial arrangement with your company regarding our fantasy related intellectual property rights. Upon receipt of this letter, please contact me with a proposed date and time for a call or meeting.

I look forward to hearing from you and thank you for your consideration of these matters.

Sincerely,

Andrew T. Ramer
Managing Director Intellectual Property Division
Cantor Fitzgerald, L.P.
aramer@cantor.com
(212) 829-4750


cc: Ryan Moore

**Notice**
Cantor Fitzgerald, L.P. and its affiliates reserve all rights with regard to the patents referenced herein, including the rights to, at any time and without notice: (1) seek damages for any period within the last six years during which your company made use of Cantor's patented technology in your products; (2) change its royalty rates; and (3) change its licensing program, including variance to conform to applicable laws. No communication from or lack of communication with Cantor Fitzgerald, L.P., its affiliates, agents or representatives shall serve as a notice of relinquishment of any of its or their rights.



CANTOR Fitzgerald

November 12, 2014

499 Park Avenue
New York, NY 10022

**<u>Via Certified Mail</u>**

Brian Mattingley
Chief Executive Officer
888 Holdings PLC
Suite 601/701 Europort
Europort Road
Gibraltar

Dear Mr. Mattingley,

Re: Request to Commence Licensing Discussions; Notice of Patent Infringement

Cantor Fitzgerald, L.P. and its affiliates comprise one of the premier global financial services firms. Today, Cantor is a preeminent capital markets investment bank, recognized for its strengths in the equity and fixed income capital markets, its global distribution model, and its expanding presence as the leading independent middle market investment bank, providing the marketplace with services in investment banking, prime brokerage and commercial real estate financing. Cantor's portfolio of businesses includes initiatives in real estate, prime brokerage, insurance, and many other industries and ventures. Cantor operates trading desks in every major financial center in the world, with offices in over 30 locations worldwide and approximately 1,600 employees.

Cantor Fitzgerald, L.P. and its affiliates are collectively the owner of over two thousand patent assets, with applications in various technology areas. Relevant to our future discussions with your company, Cantor holds the premier patent portfolio relating to online casino and poker platforms including, but not limited to, their websites and the delivery and creation of online casino and online poker related services, applications and platforms. The patent portfolio discloses a wide range of systems, features, apparatuses, methods, and otherwise, relating to the above.

I am writing you because Cantor would like to commence discussions with 888 Holdings ("888") regarding the rationale and terms of a patent license to the Cantor online casino patent portfolio. Our analysis reveals that 888 is offering a variety of products and services that infringe Cantor patents. The following is an exemplary list of infringed Cantor patents by 888 through its 888 poker platform http://us.888poker.com/, the WSOP poker platform www.wsop.com, as well as each of their respective mobile applications, but please consider that they are part of a much larger portfolio:

| U.S. Patent or Publication Number | Representative Claims Infringed | Infringing Product and/or Feature |
|---|---|---|
| 6,979,267 | 14, 15, 23, 24, 28 | us.888poker.com platform; wsop.com platform |
| 8,342,924 | 1, 2, 3, 8, 9, 10, 11, 12, 15, 16, 17, 20 | us.888poker.com platform; wsop.com platform |
| 8,512,129 | 1 | us.888poker.com platform; wsop.com platform |

CGTD00032342

| 8,771,058 | 1, 17, 19 | us.888poker.com platform; wsop.com platform |
| 8,814,664 | 1 | us.888poker.com platform; wsop.com platform |
| RE39,818 | 33 | us.888poker.com platform; wsop.com platform |

The majority of the patent families referenced herein maintain open applications and continuations. Cantor will continue to prosecute the same with the intention to receive additional claims maintaining the original priority.

We are interested in reaching a negotiated non-litigation licensing arrangement with 888 for the Cantor patents referenced herein, and would like to commence a near term discussion with you to address this matter. In the course of such discussions, under appropriate nondisclosure conditions, we will provide you with details of our infringement and royalty analysis. We look forward to finalizing a mutually beneficial arrangement with your company regarding our online casino and poker platforms related intellectual property rights. Upon receipt of this letter, please contact me with a proposed date and time for a call or meeting.

I look forward to hearing from you and thank you for your consideration of these matters.

Sincerely,

Andrew T. Ramer
Managing Director Intellectual Property Division
Cantor Fitzgerald, L.P.
aramer@cantor.com
(212) 829-4750


cc: Aviad Kobrine

**Notice**
Cantor Fitzgerald, L.P. and its affiliates reserve all rights with regard to the patents referenced herein, including the rights to, at any time and without notice: (1) seek damages for any period within the last six years during which your company made use of Cantor's patented technology in your products; (2) change its royalty rates; and (3) change its licensing program, including variance to conform to applicable laws. No communication from or lack of communication with Cantor Fitzgerald, L.P., its affiliates, agents or representatives shall serve as a notice of relinquishment of any of its or their rights.

CGTD00032343

# EXHIBIT C

Case 1:19-cv-01405-RGA   Document 47-1   Filed 05/10/24   Page 13 of 136 PageID #:
757
Case 2:16-cv-00801-RCJ-VCF   Document 219   Filed 07/27/17   Page 1 of 6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

|  |  |
|---|---|
| CG TECHNOLOGY DEVELOPMENT, LLC et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| FANDUEL, INC., | ) ) ) |
| Defendant. | ) ) |

2:16-cv-00801-RCJ-VCF

**ORDER**

These seven consolidated cases arise out of the alleged infringement of several patents relating to online sports gambling. Defendants in Case Nos. 2:16-cv-801 (FanDuel, Inc.) and 2:16-cv-781 (DraftKings, Inc.) filed a joint motion to transfer those cases to the District of Delaware (where they are incorporated) for improper venue under 28 U.S.C. § 1406, arguing that the Complaints allege no facts indicating that Movants reside in or have any regular and established places of business in Nevada. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1516–18 (2017) (holding that 28 U.S.C. § 1400(b) governs venue in patent infringement actions, not § 1391). The Court ordered all Defendants in the consolidated cases to either join the motion or waive the issue. Defendant Zynga, Inc. has filed a motion requesting transfer of Case No. 2:16-cv-859 to the San Francisco Division of the Northern District of California. Defendant Big Fish Games, Inc. has filed a motion requesting transfer of Case No. 2:16-cv-857 to the Western District of Washington. Defendant Double Down Interactive, LLC

1   has filed a notice of waiver.  Defendants 888 Holdings PLC, bwin.party (USA), Inc., Bwin.Party

2   Digital Entertainment, PLC, and bwin.party entertainment (NJ), LLC have waived the issue by

3   their silence.

4           Movants are correct that the allegations in the respective Complaints do not support

5   venue in this District under § 1400(b).  Plaintiffs do not appear to disagree but argue that

6   Movants waived the venue defense by failing to include it in their previous motions under Rule

7   12.  With some exceptions not applicable here, a party waives available defenses under Rule 12

8   by omitting them from a motion thereunder. Fed. R. Civ. P. 12(g)(2).  Plaintiffs argue the venue

9   defense was available when Movants filed their previous Rule 12 motions, noting that TC

10  Heartland filed such a motion. *See TC Heartland LLC*, 137 S. Ct. at 1517.  Although the Federal

11  Circuit had ruled that a 1988 amendment to § 1391 had abrogated 1957 Supreme Court

12  precedent on patent venue, *see VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574,

13  1584 (Fed. Cir. 1990), TC Heartland filed its § 1406 motion to preserve the issue for a petition

14  for writ of certiorari to the Supreme Court.  Plaintiffs argue that Movants here could have done

15  the same but did not.

16          The courts of appeals to address the "availability" issue, however, have held that a

17  defense is not "available" where circuit precedent forecloses it simply because the Supreme

18  Court later issues a ruling to the contrary. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135–

19  36 (2nd Cir. 2014); *GenCorp., Inc. v. Olin Corp.*, 477 F.3d 368, 374 (6th Cir. 2007); *Bennett v.*

20  *City of Holyoke*, 362 F.3d 1, 7 (1st Cir. 2004); *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 814

21  n.9 (D.C. Cir. 1988) (en banc) (Starr, J.) (citing *Holzsager v. Valley Hosp.*, 646 F.2d 792, 796

22  (2d Cir. 1981)) ("[A] defense is unavailable if its legal basis did not exist at the time of the

23  answer or pre-answer motion. . . . In those cases, it was for all practical purposes impossible for

24  the defendants to interpose their respective defenses at the time of the answer." (citations

1   omitted)).  A defense is "available" where circuit precedent does not foreclose it at the relevant

2   time, regardless of any later Supreme Court ruling resolving a circuit split. *See Am. Fid. Assur.*

3   *Co. v. Bank of N.Y. Mellon*, 810 F.3d 1234, 1241 (10th Cir. 2016).  Here, Federal Circuit

4   precedent clearly foreclosed the venue defense.  It would be inequitable to expect Movants to

5   have objected to venue, especially where the Supreme Court had already denied certiorari on the

6   exact question in *VE Holding* itself. *See Johnson Gas Appliance Co. v. VE Holding Corp.*, 499

7   U.S. 922 (1991) (denying certiorari); Pet. Writ Cert., No. 90-1186, 1991 WL 11176603, at *1

8   (Jan. 22, 1991) (asking, "Was it proper for the Court of Appeals for the Federal Circuit to

9   disregard the decisions of the United States Supreme Court in *Fourco Glass Co. v. Transmirra*

10  *Prods. Corp.*, 353 U.S. 222 (1957) and *Stonite Products Co. v. Melvin Lloyd Co.*, 315 U.S. 561

11  (1942) and rule that the definition of corporate residence in amended 28 U.S.C. § 1391(c), the

12  general venue statute, applies to 28 U.S.C. § 1400(b), the special patent venue statute?").[1]

13         The Court respectfully disagrees with a district court that has ruled that a venue defense

14  was available post-*VE Holding* and pre-*TC Heartland* based on the theory that the *TC Heartland*

---

16  [1] A denial of a petition for a writ of certiorari is not an expression of any opinion on the merits.
17  *United States v. Carver*, 260 U.S. 482, 490 (1923).  But for the purposes of the equitable doctrine
    of waiver, which concerns the reasonableness of a party's inaction, a denial of certiorari may
18  provide relevant implications even if it provides no direct legal authority on the underlying
    question.  The Supreme Court has promulgated rules guiding its decisions whether to grant
19  certiorari.  Those rules are of course intended for an external audience of attorneys and judges, or
    there would be no utility in publishing them.  Because there can be no split of authority with
20  another state or federal court as to patent issues over which the Federal Circuit has exclusive
    appellate jurisdiction, the considerations guiding a decision on certiorari in such cases focus on
21  whether the Federal Circuit has decided an important federal issue that should be but has not yet
    been decided by the Supreme Court, or whether the Federal Circuit has decided an important
22  question of federal law in a way that conflicts with Supreme Court precedent. *See* Sup. Ct. R.
    10(c) (1989).  Movants therefore could not have been fairly expected to think the Supreme Court
23  might grant certiorari on the issue after having earlier denied it, because the typical bases for
    denial implied that even if the Supreme Court believed *VE Holding* was wrong, the issue was not
24  important enough for Supreme Court intervention.  The Supreme Court owes no explanation for
    changing its evaluation of these considerations (or other, unenumerated considerations), but
    Movants likewise needn't blush for their inability to divine the change.

Court simply reaffirmed *Fourco Glass* such that there was no intervening change in the law. *See*

*Cobalt Boats, LLC v. Sea Ray Boats, Inc.*, --- F. Supp. 3d ----, 2017 WL 2556679, at *3 (E.D.

Va. 2017). The Court believes that is an unfair characterization of the effect of *TC Heartland* on

the state of the law, at least for the purposes of waiver. The Federal Circuit's *VE Holding*

decision required the Supreme Court to engage the question (and only the question) of whether

the 1988 amendment to § 1391 had abrogated *Fourco Glass*. *See TC Heartland LLC*, 137 S. Ct.

at 1519–21 ("Congress has not amended § 1400(b) since *Fourco*, and neither party asks us to

reconsider our holding in that case. Accordingly, the only question we must answer is whether

Congress changed the meaning of § 1400(b) when it amended § 1391."). Before *TC Heartland*,

the law litigants faced was *VE Holding*. As noted, *supra*, the Courts of Appeals to have decided

the issue appear to have uniformly held that under such circumstances a circuit-precluded

defense is not "available" for the purposes of waiver.

Even if *TC Heartland* had simply reaffirmed the Court's interpretation of § 1400(b) while

ignoring § 1391 and *VE Holding*, a finding that Movants should also have done so would not

give fair consideration to the practical realities upon which the equitable concept of waiver is

based. The possibility of a grant of certiorari after denial of certiorari on the same question three

decades earlier, while lower courts have been routinely applying the relevant precedent in

thousands of cases in the meantime, is not totally nonexistent. In the most technical sense of the

word, the argument is "available." But so is an argument that the Supreme Court might grant

certiorari and reverse itself on an issue it has actually decided; it has done so before. Both

reconsideration of certiorari and reconsideration of merits rulings are, strictly speaking,

possibilities, so arguments directed to those results are, strictly speaking, available. But in

fairness, neither possibility is great enough upon which to base a finding of waiver where circuit

precedent forecloses an argument, particularly in cases such as this one where the relevant circuit

1  is the only one with jurisdiction over the issue, such that even the possibility of a future circuit

2  split does not exist.  Last month's *TC Heartland* decision was the first indication that the

3  Supreme Court had developed any misgivings about the Federal Circuit's decades-old,

4  "unsplittable" ruling that the 1988 amendment to § 1391 had abrogated *Fourco Glass*, after

5  refusing to address the question in the very case that created the circuit precedent.  In the

6  meantime, patent litigants and every court in the nation had been operating under the

7  presumption that a *Fourco Glass*-based venue defense was unviable.

8      The Court agrees with the courts of appeals that have decided the waiver issue in

9  procedurally analogous cases, as well as another district court to decide the present issue directly,

10 that under circumstances such as these, "[t]he clairvoyance demanded . . . of [Movants] is

11 inconsistent with the doctrine of waiver." *Holzsager*, 646 F.2d at 796; *accord Westech Aerosol*

12 *Corp. v. 3M Co.*, No. C17-5067, 2017 WL 2671297, at *2 (W.D. Wash. June 21, 2017) (holding

13 that a § 1400(b)-based venue defense was not available between the denial of certiorari in *VE*

14 *Holding Corp.* and the issuance of the *TC Heartland* decision) ("Defendants could not have

15 reasonably anticipated this sea change, and so did not waive the defense of improper venue by

16 omitting it from their initial pleading and motions.").  Movants here could not reasonably have

17 been expected to raise the venue defense prior to the *TC Heartland* decision, they brought the

18 present motions promptly after *TC Heartland* was decided, and the Court's duty to dismiss or

19 transfer under §§ 1400 and 1406 is clear under *TC Heartland*.  The Court therefore grants the

20 motions.

21 ///

22 ///

23 ///

24 ///

Case 1:19-cv-01405-RGA  Document 47-1  Filed 05/10/24  Page 18 of 136 PageID #:
Case 2:16-cv-00801-RCC-WGC  Document 219  Filed 07/27/17  Page 6 of 6
762

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to File Surreply (ECF No. 195) and the Motion to Seal (ECF No. 196) are GRANTED.

IT IS FURTHER ORDERED that the Stipulation to Lift Stay (ECF No. 188) is GRANTED, and the stay in Case No. 2:16-cv-859 is LIFTED.

IT IS FURTHER ORDERED that the Motions to Transfer for Improper Venue (ECF Nos. 168, 179, 180) are GRANTED.

IT IS FURTHER ORDERED that the Clerk shall TRANSFER Case Nos. 2:16-cv-781 and 2:16-cv-801 to the District of Delaware, TRANSFER Case No. 2:16-cv-857 to the Western District of Washington, and TRANSFER Case No. 2:16-cv-859 to the San Francisco Division of the Northern District of California under 28 U.S.C. § 1406.

IT IS FURTHER ORDERED that the Clerk shall TERMNIATE the Motion to Compel (ECF No. 182), the Motion to Strike (ECF No. 185), and the Stipulation (ECF No. 197). The Court expresses no opinion on the merits of those filings.

IT IS FURTHER ORDERED that the remaining cases shall remain consolidated, with Case No. 2:16-cv-856 as the Lead Case and Case Nos. 2:16-cv-858 and 2:16-cv-871 as Member Cases. The present order shall be filed into the dockets of Case Nos. 2:16-cv-801 and 2:16-cv-856. All further filings shall be made only into the docket of Case No. 2:16-cv-856.

IT IS FURTHER ORDERED that the Clerk shall close Case Nos. 2:16-cv-781, 2:16-cv-801, 2:16-cv-857, and 2:16-cv-859.

IT IS SO ORDERED.

Dated this 24th day of July, 2017.

ROBERT C. JONES
United States District Judge

# EXHIBIT D

US008974302C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (12574th)

# United States Patent
Amaitis et al.

(10) **Number:** US 8,974,302 C1
(45) **Certificate Issued:** Apr. 12, 2024

(54) **MULTI-PROCESS COMMUNICATION REGARDING GAMING INFORMATION**

(75) Inventors: **Lee Amaitis**, New York, NY (US); **Paul Williams**, New York, NY (US); **Sunny Tara**, Henderson, NV (US); **Matthew Morrissette**, New York, NY (US)

(73) Assignee: **INTERACTIVE GAMES LLC**

**Reexamination Request:**
No. 90/015,151, Nov. 4, 2022

**Reexamination Certificate for:**
Patent No.: **8,974,302**
Issued: **Mar. 10, 2015**
Appl. No.: **13/080,098**
Filed: **Apr. 5, 2011**

### Related U.S. Application Data

(63) Continuation-in-part of application No. 13/070,893, filed on Mar. 24, 2011, now Pat. No. 8,956,231.

(60) Provisional application No. 61/413,098, filed on Nov. 12, 2010, provisional application No. 61/413,089, filed on Nov. 12, 2010, provisional application No. 61/405,309, filed on Oct. 21, 2010, provisional application No. 61/405,439, filed on Oct. 21, 2010, provisional application No. 61/373,435, filed on Aug. 13, 2010.

(51) **Int. Cl.**
*A63F 13/35* (2014.01)
*G07F 17/32* (2006.01)

(52) **U.S. Cl.**
CPC .......... *A63F 13/35* (2014.09); *G07F 17/3218* (2013.01); *G07F 17/3237* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/015,151, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Jeffrey D Carlson

(57) **ABSTRACT**

Various embodiments that may generally relate to mobile gaming, location determination, mobile devices, authentication, and so on are described. Various methods are described. Various apparatus are described. Further embodiments are described.



US 8,974,302 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1-14** and **16-25** is confirmed.

Claim **15** is determined to be patentable as amended.

New claims **26-40** are added and determined to be patentable.

**15**. The apparatus of claim **13**, in which the direction includes a direction relative to [a] *the* direction of travel of the mobile device.

*26. The apparatus of claim 1, wherein the instructions are further configured to cause the processor to:*
*receive a unique session identifier.*

*27. The apparatus of claim 26, wherein the instructions are configured to cause the processor to receive the unique session identifier in response to the mobile device being within the gaming-allowed geographical area.*

*28. The apparatus of claim 26, wherein the determination of whether the user of the mobile device is authorized to use the gaming service comprises instructions that cause the processor to:*
*determine whether the unique session identifier is valid.*

*29. The apparatus of claim 28, wherein the instructions are further configured to cause the processor to repeatedly determine whether the unique session identifier is valid.*

*30. The apparatus of claim 1, wherein the determination of whether the user of the mobile device is authorized to use the gaming service comprises instructions that cause the processor to:*
*receive a username and password from the user; and*
*check whether the username and password are valid.*

*31. The apparatus of claim 30, wherein the instructions are further configured to cause the processor to repeatedly check whether the username and password are valid.*

*32. The apparatus of claim 28, wherein the instructions are further configured to cause the processor to receive the unique session identifier in response to a determination that a username and password are valid.*

*33. The apparatus of claim 26, wherein the unique session identifier includes a random number.*

*34. The apparatus of claim 1, wherein the determination of whether the mobile device is authorized to use the gaming service comprises instructions that cause the processor to:*
*access a list of applications installed on the mobile device;*

**2**

*determine whether an application in the list of installed applications is disallowed from being installed; and*
*disallow the user's gaming activity based on determining that at least one of the installed applications in the list of installed applications is disallowed from being installed.*

*35. The apparatus of claim 34, wherein the determination of whether an application in the list of applications is disallowed from being installed comprises instructions that cause the processor to:*
*determine whether the application is configured to enable remote access to the mobile device.*

*36. The apparatus of claim 34, wherein the instructions are further configured to cause the processor to, while the user is engaged in the gaming activity:*
*repeatedly access the list of applications; and*
*repeatedly determine whether an application in the list of installed applications is disallowed from being installed.*

*37. The apparatus of claim 1, wherein the determination of whether the mobile device is authorized to use the gaming service comprises instructions that cause the processor to:*
*access a list of running processes on the mobile device;*
*determine whether at least one of the running processes is disallowed; and*
*disallow the user's gaming activity based on determining that at least one of the running processes is disallowed.*

*38. The apparatus of claim 37, wherein the instructions are further configured to cause the processor to, while the user is engaged in the gaming activity:*
*repeatedly access the list of running processes; and*
*repeatedly determine whether at least one of the running processes is disallowed.*

*39. The apparatus of claim 26, wherein the instructions are further configured to cause the processor to:*
*receive, from the user of the mobile device, a request to place a wager;*
*determine whether the unique session identifier is valid in response to receiving the request to place a wager; and*
*disallow the user from placing the wager in response to determining that the unique session identifier is invalid.*

*40. The apparatus of claim 1, wherein to determine whether the user of the mobile device is authorized to use the gaming service, the instructions are further configured to cause the processor to:*
*receive a username and a password, and determine whether the username and password are valid;*
*receive information about the user of the mobile device, and compare the received information to stored information about the user in a database;*
*determine whether an account associated with the user of the mobile device includes a threshold amount of money; or*
*determine whether the user has reached an age that is eligible for wagering.*

\* \* \* \* \*

# EXHIBIT E

5/6/24, 12:36 AM   Case 1:19-cv-01105-RGA   Document 47-1   Filed 05/10/24   Page 23 of 36 PageID #: 767
Ex-Cantor Gaming executive pleads guilty to conspiracy charge | Las Vegas Review-Journal
767

# Ex-Cantor Gaming executive pleads guilty to conspiracy charge



JEFF SCHEID/LAS VEGAS REVIEW-JOURNAL FILE PHOTO Former Cantor Gaming sports book director Michael Colbert, shown here at an October 2012 court appearance, has pleaded guilty to a single felony charge of conspiracy.

## By CHRIS SIEROTY LAS VEGAS REVIEW-JOURNAL

  

October 3, 2013 - 5:23 am

Don't miss the big stories. Like us on Facebook.    Like 316K

 **Listen to this article now**

-02:45      

Presented by NAQVI INJURY LAW

Michael Colbert, a former director of risk management and vice president with Cantor Gaming in Las Vegas who was arrested last year in connection with a nationwide illegal bookmaking ring, has pleaded guilty to a single felony charge of conspiracy.

Colbert, 33, entered his plea Sept. 21 in District Court for the Eastern District of New York. He is scheduled to be sentenced Dec. 9, according to court documents released Wednesday.

Colbert entered his plea in federal court after felony charges filed by the Queens County, N.Y., district attorney were dismissed and his case was referred to the U.S. Attorney's office.

Before his arrest in October 2012, Colbert was considered one of the sports betting industry's most respected personalities. Since January, Colbert has been CEO of his own Las Vegas–based firm, Mike Colbert Sports Consulting, according to his LinkedIn profile.

His arrest was a result of an indictment that charged Colbert and 24 other people in Las Vegas and New York with illegal bookmaking and money laundering. In the Queens County district attorney's indictment, Colbert faced 25 years in prison if convicted of enterprise corruption, money laundering and conspiracy charges.

Phone calls Wednesday to Colbert's attorney Murray Richman in New York were not returned. At the time of Colbert's arrest, he was based at Cantor Gaming's race and sports book at the M Resort in Henderson.

A state investigation into Cantor Gaming, launched after his arrest, is still open.

The lone conspiracy charge accuses Colbert of knowing that "runners" were being compensated for placing bets for the head of an illegal gambling operation based in Queens, N.Y.

The use of runners to place bets on behalf of another person for compensation, or knowingly taking bets from runners, is illegal under Nevada state law.

The gambling operation was known as the "Jersey Boys." U.S. Attorney
Loretta Lynch said the identity of the leader of the Jersey Boys "is known to
the United States Attorney."

In a four-page document, Lynch wrote that "the leader of the Jersey Boys …
attempted to hide the operation's illegal gambling activity, income and
source of funds from law enforcement, tax authorities and other
regulators."

Colbert knew that runners were being compensated and allowed them to be
used at sports books knowing it was illegal. Lynch wrote that between
January 2010 and October 2012, Colbert and others conspired to run part of
an illegal gambling business that generated at least $2,000 a day.

Contact reporter Chris Sieroty at csieroty@reviewjournal.com or 702-477-
3893. Follow @sierotyfeatures on Twitter.

## MORE STORIES

VICTOR JOECKS: President's border policies produce deadly results

# EXHIBIT F

# INSIDE GAMING: $5.5 million fine keeps CG alive



Howard Lutnick, Chairman and Chief Executive Officer of Cantor Fitzgerald, that lost 658 employees in the Sept. 11, 2001 attack on the World Trade Center, looks at names inscribed at one of the reflecting pools at the National September 11 Memorial, during…

By HOWARD STUTZ LAS VEGAS REVIEW-JOURNAL      

January 22, 2014 - 11:36 am

Don't miss the big stories. Like us on Facebook.    Like 316K

 **Listen to this article now**                        -06:12    

Presented by NAQVI INJURY LAW

There is a reason officials from CG Technology (formerly Cantor Gaming) said they were "glad to have reached a resolution" with Nevada gaming regulators and will pay the largest fine ever leveled against a casino or affiliated company.

The Las Vegas-based bookmaker — a subsidiary of Wall Street financial giant Cantor Fitzgerald LP — faced a potential death sentence by the state Gaming Control Board.

That prospect gave CG/Cantor's leadership a "Sophie's Choice" quandary.

Instead of watching a decadelong, billion-dollar investment go down the drain, CG Technology CEO Lee Amaitis and Cantor Fitzgerald Chairman Howard Lutnick accepted the stipulated agreement to the 18-count complaint, which included the $5.5 million fine.

The deal amounted to a plea of "nolo contendere" on the four most egregious charges. Gaming regulators said CG/Cantor leadership should have known the company's top race and sports book official was also an agent for an illegal betting operation and had accepted almost $35 million in illegal wagers.

CG/Cantor admitted guilt to the other 14 counts.

The settlement requires approval from the Nevada Gaming Commission at a public hearing Thursday. The five commissioners may also exact their own pound of flesh from the company.

By the time a deal was hashed out more than a week ago, CG was humbled.

The company, coincidentally, changed its name from Cantor Gaming on the same day the control board handed down the complaint. It took a week for the settlement to be finalized as lawyers argued over language.

CG/Cantor Gaming reportedly still faces a federal investigation over potential illegal wagering activities, so the settlement with Nevada needed to be crafted in a way to avoid the all-out admittance of guilt.

More than a year ago, New York state and federal authorities uncovered the illegal betting ring run out of Cantor's Las Vegas sports book operations.

New York authorities charged Michael Colbert, the company's now-former risk management director and vice president, with seven felony counts ranging from enterprise corruption to money laundering for his role in recruiting and retaining bettors, collecting losses and paying out winnings. Most of the action was run out of the M Resort sports book.

At the time of his arrest, an outside public relations representative for Cantor tried to paint Colbert as a minor player within the company. But Colbert, who in August pleaded guilty in a New York federal court to a single charge of conspiracy, nearly brought down the entire company.

Colbert is finished in Nevada's legal sports wagering business.

CG/Cantor, which operates race and sports books at eight Las Vegas casinos and claims more than 30 percent of Nevada's sports wagering market, lived to see another day.

Future endeavors by the company, including its mobile wagering technology and a potential initial public offering, will be heavily scrutinized.

Some observers wondered how Amaitis survived with his job intact. He isn't the most popular person in the state's bookmaking industry and was dinged in the complaint for not better supervising Colbert.

He also at the center of two Cantor Gaming lawsuits.

Cantor sued former Cantor managing director Joe Asher four years after he left the company and created Brandywine Bookmaking, which he built into a network of 16 Nevada race and sports books in Nevada under the Lucky's label.

The lawsuit claims Asher stole trade secrets, but the action was filed only after London-based William Hill PLC bought Brandywine for $15.7 million in 2011 and named Asher as CEO for its U.S. operations.

In 2013, Cantor Gaming sued William Hill for stealing trade secrets and potential clients in buying Brandywine.

Amaitis' depositions could be a fun read, especially when the $5.5 million settlement comes up.

Asher in court papers said his final year at Cantor was marred by "vitriolic tirades" from Amaitis in a disagreement over regulatory matters. Court filings describe Amaitis' "history of being intolerable, hostile and abusive towards subordinates."

It's unclear whether Lutnick will attend the Gaming Commission settlement hearing. He became a national figure following the Sept. 11, 2001, terrorist attacks. Almost 700 of the firm's employees — including Lutnick's brother — died in the collapse of the north tower of the World Trade Center. He took care of the families of those who perished.

Amaitis was running Cantor's operations in London in 2001. Lutnick was at the forefront of rebuilding the company.

The casino industry is seeing the CG/Cantor complaint and settlement as a sign of a new direction by the Gaming Control Board under A.G. Burnett's the chairmanship.

Many wonder whether a bigger case might soon eclipse the $5.5 million fine.

The nightclub business continues to put casinos under an unwelcome spotlight. There were two high-profile Strip shootings last year, one at a nightclub at Bally's, the other with roots in a club at Aria. Four years ago, Planet Hollywood Resort paid a $750,000 fine because the resort was lax in policing illegal activity in the now-closed Privé nightclub.

In the past few months, the control board has settled complaints with Bally Technologies and Golden Gaming. But the fines were a pittance compared

5/6/24, 12:3... INSIDE GAMING: $5 million fine keeps CG alive | Las Vegas ... Gaming | Business | ...

Case 1:19-cv-01105-RGA Document 47-1 Filed 05/10/24 Page 31 of 136 PageID #: 775

with what CG/Cantor will fork over.

In August, Las Vegas Sands Corp. paid U.S. officials $47.4 million to end a federal money-laundering investigation and avoid criminal charges over the casino play of a Chinese-Mexican businessman linked to international drug trafficking in 2006 and 2007.

Las Vegas Sands and Wynn Resorts Ltd. have been under investigation for the past two years by the U.S. Justice Department and the Securities and Exchange Commission for possible violations of the Foreign Corrupt Practices Act.

Time will tell how long CG/Cantor keeps the record for Nevada's largest gaming fine.

Howard Stutz's Inside Gaming column appears Sundays. He can be reached at hstutz@reviewjournal.com or 702-477-3871. Follow @howardstutz on Twitter.

**MORE STORIES**

Former MGM exec faces sanctions; gaming license could be revoked

# EXHIBIT G

# CG Technology agrees to pay $1.5 million fine and pay bettors who were shorted



Lee Amaitis (Las Vegas Review-Journal)

## By RICHARD N. VELOTTA LAS VEGAS REVIEW-JOURNAL

  

July 21, 2016 - 3:28 pm

Don't miss the big stories. Like us on Facebook.    Like 316K

 **Listen to this article now**

  -05:59 

Presented by NAQVI INJURY LAW

CG Technology, a sports book manager at seven Las Vegas casinos, would be fined $1.5 million and required to establish an escrow account to pay bettors who were shorted in the calculation of player winnings under a stipulation agreed to Wednesday by the state Gaming Control Board and the company.

In addition, CG Technology President and CEO Lee Amaitis is being forced to resign, effective Aug. 31, under terms of the settlement.

The settlement must be approved by the five-member Nevada Gaming Commission, which is expected to take up the matter at its July 28 meeting.

CG Technology, formerly known as Cantor Sports Book, was accused in a Control Board complaint in May of underpaying bettors by more than $700,000 on an estimated 20,000 wagers.

CG admitted the company's software miscalculated payouts, and that they failed to notify patrons and the board of the miscalculations in a timely manner, but they denied not cooperating in the Control Board's investigation, admitting there was sufficient evidence to warrant a settlement.

"Public confidence and trust can only be maintained by strict gaming regulation," Control Board Chairman A.G. Burnett said in a statement. "The board will not tolerate improper or incorrect payments to patrons by gaming licensees, and therefore takes this matter extremely seriously. This settlement contains several harsh punishments and requirements for remediation that reflect those concerns."

CG Technology also overpaid about 11,000 bets a total of $100,000 because of a computer software glitch that the company didn't fix for years. The company never notified gamblers of the problem in paying out some parlays.

CG Technology manages race and sports books at the M Resort, the Hard Rock Hotel, Tropicana, The Cosmopolitan of Las Vegas, The Venetian, the Palms and the Silverton. The casinos lease space to CG Technology and have management agreements to split profits but are not subject to disciplinary action.

## ESCROW ACCOUNT ADVISED

The stipulation that will be considered by the Gaming Commission orders that CG establish a $25,000 escrow account to pay claims of individuals who can establish that, between August 2011 and March 2015, they were underpaid by the company on a winning single or round-robin parlay wager and who have not already been paid.

CG will be required to notify potential winners with seven consecutive days of newspaper advertising twice in the next year. The claims period will last a year from the commission's approval and any remaining money in the escrow account would be donated to the Nevada Council on Problem Gambling.

The stipulation also orders that CG hire an independent third party to evaluate the company's wagering software for a year with written reports from the consultant after two weeks, six months and a year.

The order doesn't prevent individual bettors from filing civil lawsuits against the company.

Amaitis, 66, has been a driving force for CG, a subsidiary of the Cantor Fitzgerald investment company that developed sports wagering software similar to what stock brokers use for electronic trading. Amaitis is credited with rebuilding Cantor Fitzgerald, which had offices in the World Trade Center when terrorists attacked Sept. 11, 2001, killing 658 Cantor employees.

The state stipulation requires that Amaitis' successor submit a licensing application within 30 days of the commission ruling.

A spokeswoman for CG had no comment on the naming of a potential successor. The company is terming Amaitis' departure as a retirement.

The Control Board's action was the second time the state has sought to discipline the company over failures within its Cantor Sports Book computerized bookmaking system. Two years ago, the Nevada Gaming Commission warned CG Technology that any future complaints could prompt a license revocation.

**REPORTS OF REPEATED UNDERPAYMENTS**

The Control Board's six-count complaint said an enforcement division agent responded to a concern at the Silverton in March 2015 from a gambler who said he was underpaid on a winning round-robin parlay wager. The player told the agent he was correctly paid after pointing out the error but that it was the fifth time he had been underpaid on that type of bet.

The board's investigation found recurring incorrect payments on various winning parlay wagers and that companywide errors occurred for several years because of software issues known by the company.

The company began operating a computerized bookmaking system known as Cantor Sports Book for its mobile sports wagering in August 2011, the complaint said, and the company miscalculated winning parlay bets for several years.

In April 2014 the company expanded the system beyond mobile gaming and began using the software for counter wagers, but gamblers continued to be incorrectly paid. CG Technology only paid the correct amount to gamblers who brought the error to the company's attention and made no effort to contact bettors about the miscalculated winnings, the complaint said.

The complaint said CG Technology "effectively ignored a group of several thousand patrons who had won their parlay wagers but who had underpaid their winnings and left responsibility to those patrons to bring an underpayment to the attention of (the company)." The complaint said the

company took steps to identify all parlay wagers and patrons affected by the software issue only after the board investigation started. The board issued an industrywide notice in February 2010 about the software issue.

*The Review-Journal is owned by the family of Sheldon Adelson, chairman and CEO of Las Vegas Sands Corp., which operates The Venetian.*

Contact Richard N. Velotta at rvelotta@reviewjournal.com or 702-477-3893. Find him on Twitter: [@RickVelotta](#)

## MORE STORIES

Nevada records first decline in gaming win in 8 months

Bettor needs team to win NBA title to turn $100 parlay into $1.7M

# EXHIBIT H



**United States
Attorney's Office**
Eastern District of New York

**PRESS RELEASE**

# Cantor Fitzgerald Affiliate To Pay More Than $16 Million In Penalties And Forfeiture For Engaging In Illegal Gambling And Money Laundering Schemes

Monday, October 3, 2016

**For Immediate Release**

U.S. Attorney's Office, Eastern District of New York

CG Technology, LP, formerly doing business as Cantor Gaming (CG Technology and Cantor Gaming),[1] one of the largest race and sports book operators in the United States, has entered into a non-prosecution agreement and agreed to pay $16.5 million in penalties and forfeiture to the federal government to resolve a criminal investigation into the company's past involvement in illegal gambling and money laundering schemes.  In addition, pursuant to the agreement, CG Technology will provide continuing cooperation and has undertaken far-reaching reforms to its business and compliance operations.  Michael Colbert, a former senior executive officer at Cantor Gaming, who was the Director of Risk Management, previously pleaded guilty in the United States District Court for the Eastern District of New York to conspiring to participate in an illegal gambling business.  Colbert faces up to five years' imprisonment for his involvement in criminal activity at Cantor Gaming.

The resolution was announced by Robert L. Capers, United States Attorney for the Eastern District of New York; Daniel G. Bogden, United States Attorney for the District of Nevada; Philip Bartlett, Inspector in Charge, United States Postal Inspection Service, New York Division (USPIS); Richard Weber, Chief, Internal Revenue Service, Criminal Investigation (IRS-CI); and James P. O'Neill, Commissioner, New York City Police Department (NYPD).

"Cantor Gaming quickly grew into one of the largest race and sports book operators in the United States. Unacceptably, this growth came at the expense of compliance with the law, and as a result Cantor Gaming became a place where at least two large-scale illegal bookmakers could launder their ill-gotten proceeds.  The Cantor Gaming senior officer who oversaw the illegal conduct has pleaded guilty for his involvement in this criminal activity.  The non-prosecution agreement recognizes Cantor Gaming's decision to accept full responsibility, provide complete cooperation, and take remedial measures to enforce best industry practices going forward," stated U.S. Attorney Capers.  Mr. Capers thanked the investigative agencies for their outstanding commitment and dedication over the course of this investigation.  Mr. Capers also thanked the District Attorney's Office for Queens County, the Financial Crimes Enforcement Network of the Department of the Treasury, and the Nevada Gaming Control Board, Enforcement Division for their assistance with the investigation.

"CG Technology's admissions that it violated federal laws by accepting messenger betting, out-of-state betting, and processing large amounts of monies which were the proceeds of illegal activities, are significant victories for the government," said U.S. Attorney Bogden.

"CG Technology, formerly Cantor Gaming, ran its enterprise with total disregard for government regulations and the penalties associated with breaking the law.  As Postal Inspectors and their law enforcement partners continue to prove, greed and eagerness to 'game' the system will never be tolerated, and those who choose to ignore the law will be brought to justice," said USPIS Inspector Bartlett.

"Cantor Gaming bet on never getting caught but this wager didn't pay off," said Chief Weber, IRS Criminal Investigation.  "Financial transactions always leave a money trail and IRS-CI Special Agents relentlessly follow that trail.  This large scale illegal bookmaking investigation uncovered the kind of widespread corruption that is too often associated with criminal enterprises.  Working with our law enforcement partners, we will continue to pursue these types of investigations to keep the books clean for consumers and corporations who are following the law."

"Illegal sports betting is a multi-million-dollar business often involving other illicit activity.  There is good reason why this activity needs to be regulated and operated according to the law and industry standards.  The illegal conduct forming the basis for this investigation was clearly motivated by greed and deliberate disregard for the rules of the gaming industry.  This settlement should serve as a message to those who try to beat the system," stated NYPD Commissioner O'Neill.

Pursuant to the non-prosecution agreement signed today, Cantor Gaming, which is now known as CG Technology, acknowledged and accepted responsibility for aiding and abetting the operation of an illegal gambling business and money laundering from approximately 2009 through 2013.  Cantor Gaming, an affiliate of the financial services company Cantor Fitzgerald, LP, operates race and sports books in the following eight casinos all located in Las Vegas, Nevada: the Venetian, the Palazzo, the M Resort Spa Casino, the Hard Rock Hotel and Casino, the Tropicana, the Cosmopolitan, the Palms Casino Resort, and the Silverton Casino Hotel.

Cantor Gaming's strategy to grow its business required it to attract and retain bettors who frequently placed large wagers on sporting contests.  To do so, Cantor Gaming offered higher betting limits than other sports books and gave the important bettors preferential treatment, including direct access to Michael Colbert, whose job was to set the lines and odds for the betting contests.  Important bettors interacted with Colbert and his staff rather than the "front of the house" staff that was under the supervision of Cantor Gaming's chief operating officer, which normally handled interactions with bettors.  To accommodate some of the important bettors, Colbert and his staff facilitated violations of state and federal laws, including: (a) knowingly accepting and facilitating "messenger betting"[2] in its sports books on repeated occasions; (b) knowingly accepting and facilitating out-of-state betting activity through wire communications; and (c) processing large cash deposits and withdrawals and third-party wire transfers, knowing that the property involved represented the proceeds of some form of illegal activity.  As set forth in the Statement Facts, which is attached to the non-prosecution agreement, two of these important high volume bettors ran illegal bookmaking operations and were able to launder their illegal proceeds through Cantor Gaming wagering accounts.

On or about August 21, 2013, Michael Colbert pleaded guilty in the Eastern District of New York to conspiracy to conduct an illegal gambling business, in violation of Title 18, United States Code, Section 371, and faces a term of imprisonment of up to five years when sentenced.

In light of CG Technology's complete acceptance of responsibility for the full breadth of its unlawful conduct, cooperation, and far-reaching remedial measures, the government has agreed not to prosecute CG Technology for its criminal conduct, provided that CG Technology complies for two years with all the terms of the agreement executed today.

The government's case is being handled by the Office's Business and Securities Fraud Section.  Assistant United States Attorneys James P. Loonam and Matthew Amatruda are in charge of the case, with assistance from Assistant United States Attorney Brian Morris of the Office's Civil Division, which is responsible for the forfeiture of assets, as well as Assistant United States Attorney Nicholas Dickinson of the District of Nevada.

*     *     *

This resolution was the result of efforts by the President's Financial Fraud Enforcement Task Force.  The task force was established to wage an aggressive, coordinated, and proactive effort to investigate and prosecute financial crimes.  With more than 20 federal agencies, 94 U.S. attorneys' offices, and state and local partners, it is the broadest coalition of law enforcement, investigatory, and regulatory agencies ever assembled to combat fraud.  Since its formation, the task force has made great strides in facilitating increased investigation and prosecution of financial crimes; enhancing coordination and cooperation among federal, state, and local authorities; addressing discrimination in the lending and financial markets; and conducting outreach to the public, victims, financial institutions, and other organizations.  Since fiscal year 2009, the Justice Department has filed over 18,000 financial fraud cases against more than 25,000 defendants.  For more information on the task force, please visit www.StopFraud.gov.

[1] Cantor Gaming changed its name to CG Technology, LP in January 2014.  The conduct which was the subject of the criminal investigation occurred while the company was doing business as Cantor Gaming.

[2] The practice of having an agent or "runner" place a bet on behalf of a third-party in exchange for compensation is known as "messenger betting."  It is illegal for a licensed sports book in Nevada to knowingly accept wagers from compensated agents.

*Updated October 3, 2016*

---

**Topics**

| SECURITIES, COMMODITIES, & INVESTMENT FRAUD | STOPFRAUD |

**Component**

USAO - New York, Eastern

# Related Content

**PRESS RELEASE**

## Corporate Insider Sentenced to 60 Months in Prison for Conspiring With Long Island Boiler Room to Pump and Dump Stock on Elderly Investors

Earlier today, in federal court in Central Islip, Michael Watts, a former registered broker who participated in a criminal conspiracy to promote and manipulate the price of shares in Hydrocarb...

March 8, 2024

PRESS RELEASE

## Creator of International Digital-Asset Exit Schemes Pleads Guilty to Defrauding Investors

Earlier today, Ivars Auzins, a Latvian national, pleaded guilty at the federal courthouse in Brooklyn to conspiring to commit securities fraud in connection with defrauding investors in a series of...

December 15, 2023

**PRESS RELEASE**

## United Kingdom National Pleads Guilty to Hacking, Securities Fraud, and other Cybercrimes

Earlier today, Idris Dayo Mustapha, a national of Nigeria and the United Kingdom, pleaded guilty to charges of computer intrusion, securities fraud, wire fraud and access device fraud based on...

November 28, 2023



**Eastern District of New York**

Main Office

271 Cadman Plaza East

Brooklyn NY 11201

Telephone: 718-254-7000

Fax Line: 718-254-7508

# EXHIBIT I

# FinCEN Fines Cantor Gaming $12 Million for Egregious and Systemic Violations of Anti-Money Laundering Rules

**Contact:**  Steve Hudak
703-905-3770
**Immediate Release:**  October 03, 2016

**WASHINGTON, DC** – FinCEN today assessed a civil money penalty (/sites/default/files/shared/20161003%20Cantor%20Assessment%20Final.pdf) of $12 million against CG Technology, L.P., doing business as Cantor Gaming, for egregious and systemic violations of the anti-money laundering (AML) provisions of the Bank Secrecy Act (BSA).  FinCEN's analysis of reports filed under the BSA and information obtained from a 2010 examination by the Internal Revenue Service's Small Business/Self-Employed Division (IRS SB/SE), as well as a 2014 follow up audit by FinCEN, support this action.  Additional supporting information concerning illegal gambling and money laundering surfaced stemming from a criminal investigation and indictment of 25 individuals, known as the "Jersey Boys," conducted by the U.S Attorney's Office for the Eastern District of New York.

FinCEN's assessment is concurrent with the U.S. Attorney's Offices for the Eastern District of New York (https://www.justice.gov/usao-edny/pr/cantor-fitzgerald-affiliate-pay-more-16-million-penalties-and-forfeiture-engaging) and District of Nevada's announcement of a non-prosecution agreement with Cantor Gaming.  In that settlement, Cantor Gaming resolved possible criminal charges, agreeing to a forfeiture of $6 million and a criminal fine of $10.5 million.  Six million dollars of the criminal fine and forfeiture will be credited to partially satisfy FinCEN's $12 million civil money penalty.

Pursuant to the settlement, Cantor Gaming admitted that it willfully violated the BSA and its implementing regulations.  These violations are described in an accompanying Statement of Facts (/sites/default/files/shared/20161003%20Cantor%20Attachment%20A%20(Statement%20of%20Facts)%20Final.pdf).  Cantor Gaming facilitated high risk and high dollar wagering on sporting events representing over 30% of all sports wagers in Nevada.  At the same time, it failed to have an appropriate AML program in place.  Cantor Gaming failed to have sufficient internal controls and mandatory independent audits; it failed to have sufficient AML training for its officers and employees; and it failed to use all available information to detect and report suspicious transactions.  In addition to these extensive, years-long program violations, Cantor Gaming failed to properly and timely report currency transactions.  Cantor Gaming also failed to file required suspicious activity reports (SARs) on several transactions, including transactions by customers who were involved in blatantly suspicious activity, those who were involved in criminal activity, and those who had no legitimate source of funds.  And finally, Cantor Gaming committed thousands of recordkeeping violations, including by failing to keep required records on its highest-volume patron who placed more than $300 million in wagers between 2010 and 2013.

Part of FinCEN's action also stemmed from a criminal investigation relating to Cantor Gaming's involvement with the "Jersey Boys," an illegal gambling operation that employed "runners," or individuals who opened wagering accounts and placed bets with Cantor Gaming's sports books.  These runners were paid for illegally placing bets on behalf of others, including out-of-state bettors.  Cantor Gaming's Vice President, Michael Colbert, facilitated this illegal activity, and was indicted for his involvement with the Jersey Boys operation.  Colbert was aware of the arrangement with the Jersey Boys runners, and facilitated its operation.  Colbert was charged in the Eastern District of New York with a felony count of participating in an illegal gambling conspiracy and pled guilty on August 21, 2013.

Both FinCEN's Assessment and the Non-Prosecution Agreement filed by the U.S. Attorney's Offices were accompanied by Cantor Gaming's commitment to perform a series of required Remedial Measures (/sites/default/files/shared/20161003%20Cantor%20Attachment%20B%20(Remedial%20Framework)%20Final.pdf) to ensure forward-looking compliance.  Cantor Gaming will also conduct a look-back review of transactions conducted between 2010 and 2013 to ensure that suspicious transactions and attempted transactions were properly reported.

"Compliance with AML laws has to be considered part of the deal when allowing the lucrative business of gaming in the United States," said FinCEN Acting Director Jamal El-Hindi.  "When greed clouds judgment within the leadership of an organization, and when even explicit warnings are ignored, it is a sign that the organization's compliance culture is damaged or nonexistent.  Failure to focus on developing a strong compliance culture is not only short-sighted for an institution in terms of potential penalties, it also undercuts its stature within the financial community where many others are committed to supporting AML measures—not just because of the requirements, but because it's the right thing to do."

FinCEN thanks the IRS SB/SE, which performed the examination of Cantor Gaming, for its extensive work in the investigation.  FinCEN also recognizes and extends its thanks to the United States Postal Inspection Service and to the Criminal Investigations Division of the IRS for their contributions to the investigation, and to the U.S. Attorney's Offices for the Eastern District of New York and District of Nevada for their strong partnership with FinCEN.

5/6/24, 12:33 PM    FinCEN Fines Cantor Gaming/CG Technologies for Egregious and Systemic Violations of Anti-Money Laundering Laws | FinCEN.gov

Case 1:19-cv-01105-RGA   Document 47-1   Filed 05/10/24   Page 46 of 136 PageID #: 790

*FinCEN's mission is to safeguard the financial system from illicit use and combat money laundering and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.*

**Financial Institution:**
Casinos



Home (/)

Resources (/resources)

Contact (/contact)

About (/what-we-do)

Careers (/cutting-edge-opportunities)

Newsroom (/news-room)

Contract Opportunities (/about/contract-opportunities)

Get News Updates (https://service.govdelivery.com/accounts/USFINCEN/subscriber/new)

Languages

(https://www.facebook.com/fincentreasury)(https://www.linkedin.com/company/fincen)(https://twitter.com/FinCENnews)(https://www.youtube.com/@fincentreasury)

USA.gov (https://www.USA.gov) | Regulations.gov (https://www.Regulations.gov) | Treasury.gov (https://www.treasury.gov) | IRS.gov (https://www.IRS.gov) | Freedom of Information Act (FOIA) (/freedom-information-act-foia-and-guide-accessing-fincen-information) | NO FEAR Act (https://home.treasury.gov/footer/no-fear-act) | Vote.gov (https://vote.gov/) | Accessibility (/accessibility) | EEO & Diversity Policy (/equal-employment-opportunity-and-diversity-policy) | Privacy Policy (/privacy-security) | Public Posting Notice of Finding of Discrimination (https://home.treasury.gov/footer/no-fear-act) | Security and Vulnerability Disclosure Policies (VDP) (/security-and-vulnerability-disclosure-policies) | Office of Inspector General (https://oig.treasury.gov/)

# EXHIBIT J

5/6/24, 12:42 PM   Case 1:19-cv-01105-RGA   Document 47-1   Filed 05/10/24   Page 48 of 136 PageID #:
792
CG Technology Swerves License Revocation With $2 million fine



[News](#) > [Regulation](#)

# CG Technology Swerves License Revocation With $2 Million Fine After Regulators Make Company Sweat

Posted on: November 19, 2018, 03:46h.
Last updated on: November 19, 2018, 04:10h.



Philip Conneller
Read More

Nevada sports book operator CG Technology — formerly Cantor Gaming — breathed a sigh of relief on Thursday when the Nevada Gaming Commission (NGC) accepted the company's **offer** of $2 million to settle serious compliance failures but left its gaming license intact.



What were the odds of that? CG Technology gets away with a $2 million fine after sweating the revocation of its license by the NGC. It's the sixth-highest such fine ever imposed. In five years, CGT has also paid the first and

seventh-highest. (Image: ThoughtCo)

According to the *Las Vegas Review-Journal*, the NGC took two hours to unanimously accept the operator's revised offer after initially rejecting a $250,000 proposal by the company in August.

The payment will settle the latest episode of rule violations in CGT's long history of upsetting Nevada gaming regulators.

> **The company has now paid three of the top ten-highest penalties ever imposed on gaming companies in Nevada, and that includes the number-one spot: a $5.5 million fine in 2014 to settle charges that included illegal gambling and money laundering.**

CGT was fined a further $22.5 million by the federal government over the same incident.

## Three Strikes, Not Out

CGT operates sports books at major Strip casinos, including The Cosmopolitan, The Hard Rock, The Palms, The Tropicana and The Venetian. This was the third time the company had been hauled in front of Nevada regulators in five years. The NGC had made it clear that this could be a case of three strikes and you're out and was prepared to make CGT sweat.

**Its most recent infractions include accepting bets from outside the state on its Nevada-only mobile sports betting app, taking wagers after events had finished, making incorrect payouts to 1,483 customers, and "misconfiguring" a satellite sports betting station for a Super Bowl party at an unnamed Las Vegas casino.**

The regulator broke with protocol in August when it rejected the $250,000 settlement that had been recommended for approval by the Nevada Gaming Control Board (NGCB).

It was the first time in 10 years that the NGC had rejected an NGCB recommendation in a disciplinary matter.

## Appetites Satisfied

In doing so, NGC Chairman Tony Alamo said his comfort level with CGT was "zero" and he had "zero appetite to move forward with this settlement."

Two million dollars helped Alamo regain his appetite.

**Under the new settlement, CGT has agreed to hire a corporate social responsibility officer, who will report to the CEO. The NGCB has also recommended that the company scrap "every component" of its wagering technology and partner with a third-party provider within the next six months.**

Of the $2 million payment, $1.75 million will go to the NGC and $250,000 to the Nevada Council on Problem Gambling.

"We are satisfied with the resolution agreed to today by the commission," CGT CEO Parikshat Khanna said in an official statement.

"We remain committed to the Nevada sports book business and the long-term partnerships we have established with some of the finest resort operators in the world. Additionally, we look forward to the growth prospects of the industry nationwide," Khanna added.

## No comments yet

**Write a comment**

**Write a comment**

Your email address will not be published.

Comment *

Comment

Name *

Name

Email *

# EXHIBIT K

Gaming license for Nevada sportsbook operator CG Technology in jeopardy after regulators reject $250K fine as 'too low'

## August 24, 2018 4:01 AM


Howard Stutz, CDC
Gaming Reports

August 24, 2018 4:01 AM

The future of Nevada sportsbook operator CG Technology was thrown into disarray Thursday after the Nevada Gaming Commission took an unusual move and unanimously rejected a stipulated agreement that would have settled disciplinary action with the troubled company.

Commissioners said during an hour-long hearing in Las Vegas that the $250,000 fine agreed upon with the Gaming Control Board was "too low" and the four-count complaint – the third such disciplinary action against the company in five years – amounted to a potential license "revocation."



[(https://www.cdcgamingreports.com/wp-content/uploads/CG-Technology-Hearing.jpg)](https://www.cdcgamingreports.com/wp-content/uploads/CG-Technology-Hearing.jpg)

*CG Technology CEO Parikshat Khanna (center at podium) answers questions from the Nevada Gaming Commission Thursday.*

CG Technology operates the sportsbooks at seven Las Vegas Strip and Las Vegas-area casinos. The company will now have to renegotiate a settlement with the Gaming Control Board that could lead to a seven-figure fine or face a disciplinary hearing in front of the Gaming Commission, which could cost the company its license to operate in Nevada.

Senior Deputy Attorney General Michael Somps said it had been "eight or nine years" since the commission rejected a stipulated settlement between the control board and a licensee.

"I have zero appetite to move forward with this settlement with CG Technology," Gaming Commission Chairman Tony Alamo said at the hearing, which was being viewed nationally because of the growth of legal sports betting.

"My comfort level with CG Technology is zero," Alamo said before the commission voted 5-0 to reject the settlement. "The country is watching. Frankly, we are the gold standard. Our licenses go out and do the job in every state. They have to be perfect."

CG Technology paid multi-million-dollar fines for previous disciplinary actions; $5.5 million in 2014 and $1.5 million in 2016, which led to the ouster of former CEO Lee Amaitis.

In a four-count complaint, CG Technology was accused between 2016 and 2017 of accepting multiple wagers on the company's mobile betting application placed by customers outside Nevada – including from Maryland, Texas, Arizona and California; accepting bets on games and events that had already concluded, miscalculating payouts on single game and round robin parlay wagers, and incorrectly setting up a satellite sports betting station at an undisclosed casino's Super Bowl party.

The Control Board said a mitigating circumstance for the amount of the fine was the company's self-reporting of the missteps.

"I'm not at all impressed that they self-reported," said Gaming Commission Member Philip Pro, a former federal judge. "That's not a mitigating factor in my view. That's what you're supposed to do."

Pro suggested the fine be at least $1.5 million "as a starting point."

Gaming Commission Member John Moran Jr., who, along with Alamo, participated in all the CG Technology disciplinary settlements, said, "This is not a fine issue. It's a revocation issue."

Gaming Commission Member Deborah Fuetsch likened a third disciplinary complaint as being "called into the principal's office three times." Commission Member Sandra Morgan had "a lot of unanswered questions" and wasn't willing to accept the settlement as written.

Following the hearing, Gaming Control Board Chairwoman Becky Harris said the commission was within its rights to make "an independent evaluation of what they think is appropriate." She said the board would most likely reopen settlement discussions with CG Technology, based on the recommendations commissioners made during the hearing.

"I understand that it is not uncommon for the commission to disagree with the board's settlement agreement," Harris said. "While it was not unexpected, they are their own independent decision-making body and are free to do what they want."

In the stipulated settlement, CG Technology agreed to transition within six months "to an unaffiliated third party's sports pool wagering system." All components that make up the company's Cantor Sport Book have been "deemed permanently disapproved… and will not be considered for future approval" by gaming regulators.

Harris said CG Technologies is no longer bound to the settlement agreement.

The company will continue to operate the sportsbooks at the Venetian, Tropicana, Cosmopolitan of Las Vegas, M Resort, Palms, Hard Rock and Silverton.

CG Technology CEO Parikshat Khanna declined comment while leaving the hearing room after the vote. An employee of CG Technology since 2010, he became interim CEO following the departure of Amaitis and permanent CEO a year later.

Board members questioned Khanna on why a fix in the company's technology was not utilized after the glitches were discovered that allowed bets from customers outside Nevada.

"It was deployed but it wasn't properly deployed," he said.

Attorney Mark Clayton, CG Technology's outside legal counsel, told the commission there were changes in the "culture of the company" when the new CEO came aboard, a compliance officer was added, and a decision to move to a new wagering system was made "six to seven months before the disciplinary complaint was filed."

*Howard Stutz is the executive editor of CDC Gaming Reports. He can be reached at hstutz@cdcgamingreports.com (mailto:hstutz@cdcgamingreports.com). Follow @howardstutz on Twitter.*

© 2024 CDC Gaming Reports Inc.

# EXHIBIT L



William Hill Eyes Caesars Online Gaming After Cantor Sports Deal

**Printed By:**     CMARKANTONIS on Tue, 16 Apr 2024 10:58:57 -0400

Bloomberg Law News 2024-04-16T10:58:57766995053-04:00

# William Hill Eyes Caesars Online Gaming After Cantor Sports Deal

By Christopher Palmeri2020-09-01T07:00:00001-04:00

- British firm seeks growth in online blackjack, slots, poker
- CG takeover adds sportsbooks in well-known Las Vegas hotels

British bookmaker William Hill Plc completed its purchase of CG Technology, the sports-betting outfit spun off from Cantor Fitzgerald LP, and will now shift its focus to merging its U.S. business with the online casino operations of longtime partner Caesars Entertainment Inc.

**Joe Asher**, U.S. chief executive officer for William Hill, confirmed the company is in discussions with Caesars about combining their sports-betting and online-gaming businesses. Caesars already owned 20% of William Hill's U.S. arm under in a deal cut two years with Eldorado Resorts Inc., which took over Caesars in July.

"There's a lot of opportunity in there, and we think that we've got some really powerful assets in this space, so obviously it's an ongoing subject of discussion," Asher said in an interview.

Combined, the U.S. sports and online-gaming operations of the two could generate $700 million in revenue next year, Caesars said previously. As a separately listed entity, it could sport an attractive market valuation at a time when DraftKings Inc., an industry leader, is worth more than $12 billion.

"William Hill is our partner solely on sports betting," Caesars CEO **Tom Reeg** said in a July interview. "You'd be gathering all our your mobile assets, both sports and online. That would be ideal."

## Exclusive Deal

William Hill acquired exclusive rights to run the sports-betting operations at Eldorado's casinos in September 2018. The latter's takeover of Caesars in July extended their deal to iconic properties like Caesars Palace. About 15 additional locations should be added in coming weeks, including the Horseshoe in Council Bluffs, Iowa, and the Harrah's in Atlantic City, New Jersey. They would bring



© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

William Hill Eyes Caesars Online Gaming After Cantor Sports Deal

William Hill's total to 170 retail locations in 13 states, the company said.

William Hill always assumed Eldorado might end up owning Caesars, Asher said. "We've been riding on their coattails as they've been growing. Clearly, we bet on the right horse."

**Jared Shojaian**, an analyst with Wolfe Research, said Caesars and William Hill's combined U.S. online operations could be worth $7 billion. Another option would be for Caesars to acquire all of William Hill, Shojaian said, but a more likely outcome would be a publicly traded joint venture.

"We think creating a separate entity with a public float helps showcase a valuation not currently in the stock," the analyst said in a research note Monday.

# Online Casino

Recently, London-based William Hill introduced online casino betting in New Jersey. With sports betting challenged by the Covid-19 pandemic and many colleges canceling fall football, online gaming has proved to a big winner. Through July, online casino betting produced $510 million in revenue in New Jersey, for example, more three times that of sports betting at $138 million.

The CG Technology purchase, which took effect Tuesday, was valued at less than $50 million, according to people familiar with the terms, and included funds related to previous litigation between the companies.

While the deal ends the sports-betting aspirations of a storied Wall Street firm, it represents a new chapter for William Hill and Asher, who used to work at Cantor, giving the company sportsbooks in some of Las Vegas's better-known resorts, including the Cosmopolitan, the Venetian and the Tropicana.

"We didn't have a big footprint on the Strip," Asher said. "Now we'll have a much bigger presence and some of the top properties."

To contact the reporter on this story:
**Christopher Palmeri** in Los Angeles at cpalmeri1@bloomberg.net



© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

William Hill Eyes Caesars Online Gaming After Cantor Sports Deal

To contact the editors responsible for this story:
**Nick Turner** at nturner7@bloomberg.net

Rob Golum

© 2020 Bloomberg L.P. All rights reserved. Used with permission.

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# EXHIBIT M

# File Copy



# CERTIFICATE OF INCORPORATION
# OF A
# PRIVATE LIMITED COMPANY

## Company Number  **9871841**

The Registrar of Companies for England and Wales, hereby certifies that

IAGL LIMITED

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales

Given at Companies House, Cardiff, on **13th November 2015**



\*N09871841P\*

The above information was communicated by electronic means and authenticated by the Registrar of Companies under section 1115 of the Companies Act 2006



Companies House



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES

# IN01(ef)

**Companies House**

| Application to register a company |
| --- |

*Received for filing in Electronic Format on the:* **13/11/2015**

X4K2Y6TO

---

*Company Name in full:* **IAGL LIMITED**

*Company Type:* **Private limited by shares**

*Situation of Registered Office:* **England and Wales**

*Proposed Register Office Address:* **ONE CHURCHILL PLACE CANARY WHARF**
**LONDON**
**UNITED KINGDOM**
**E14 5RB**

*I wish to partially adopt the following model articles:* **Private (Ltd by Shares)**

---

Proposed Officers

## *Company Secretary 1*

| | |
|---|---|
| *Type:* | **Person** |
| *Full forename(s):* | **MR ROBERT MARK** |

*Surname:*               **SNELLING**

*Former names:*

*Service Address recorded as Company's registered office*

The subscribers confirm that the person named has consented to act as a secretary.

---

## Company Director 1

| | |
|---|---|
| *Type:* | **Person** |
| *Full forename(s):* | **MARK ANTHONY JOHN** |
| *Surname:* | **COOPER** |
| *Former names:* | |

*Service Address recorded as Company's registered office*

*Country/State Usually Resident:* **UNITED KINGDOM**

*Date of Birth:* **\*\*/02/1971**          *Nationality:* **BRITISH**
*Occupation:* **DIRECTOR**

The subscribers confirm that the person named has consented to act as a director.

------------------------------------------------------------------------------------------

## Company Director 2

| | |
|---|---|
| *Type:* | **Person** |
| *Full forename(s):* | **ANTHONY GRAHAM** |
| *Surname:* | **SADLER** |
| *Former names:* | |

*Service Address recorded as Company's registered office*

*Country/State Usually Resident:* **UNITED KINGDOM**

*Date of Birth:* **\*\*/05/1956**          *Nationality:* **BRITISH**
*Occupation:* **DIRECTOR**

The subscribers confirm that the person named has consented to act as a director.

------------------------------------------------------------------------------------------

# Company Director  3

| | |
|---|---|
| *Type:* | **Person** |
| *Full forename(s):* | **STEPHEN MARCUS** |
| *Surname:* | **MERKEL** |

*Former names:*

*Service Address recorded as Company's registered office*

*Country/State Usually Resident:*  **USA**

*Date of Birth:*  **\*\*/06/1958**          *Nationality:* **AMERICAN**
*Occupation:*  **DIRECTOR**

The subscribers confirm that the person named has consented to act as a director.

## Statement of Capital  (Share Capital)

| **Class of shares** | **ORDINARY** | *Number allotted* | **100** |
|---|---|---|---|
| | | *Aggregate nominal value* | **100** |
| *Currency* | **USD** | *Amount paid per share* | **1** |
| | | *Amount unpaid per share* | **0** |

*Prescribed particulars*

**VOTING RIGHTS - SHARES RANK EQUALLY FOR VOTING PURPOSES. ON A SHOW OF HANDS EACH MEMBER SHALL HAVE ONE VOTE AND ON A POLL EACH MEMBER SHALL HAVE ONE VOTE PER SHARE HELD. DIVIDEND RIGHTS - EACH SHARE RANKS EQUALLY FOR ANY DIVIDEND DECLARED. DISTRIBUTION RIGHTS ON A WINDING UP - EACH SHARE RANKS EQUALLY FOR ANY DISTRIBUTION MADE ON A WINDING UP. REDEEMABLE SHARES - THE SHARES ARE NOT REDEEMABLE.**

## Statement of Capital  (Totals)

| *Currency* | **USD** | *Total number of shares* | **100** |
|---|---|---|---|
| | | *Total aggregate nominal value* | **100** |

---

*Electronically Filed Document for Company Number:* **09871841**                    *Page:***5**

# Initial Shareholdings

*Name:*  **CANTOR INDEX LIMITED**

| | | | |
|---|---|---|---|
| *Address:* | **ONE CHURCHILL PLACE CANARY WHARF LONDON UNITED KINGDOM E14 5RD** | *Class of share:* | **ORDINARY** |
| | | *Number of shares:* | **100** |
| | | *Currency:* | **USD** |
| | | *Nominal value of each share:* | **1** |
| | | *Amount unpaid:* | **0** |
| | | *Amount paid:* | **1** |

## Statement of Compliance

*I confirm the requirements of the Companies Act 2006 as to registration have been complied with.*

*Name:*              **CANTOR INDEX LIMITED**

*Authenticated:*      **YES**

## *Authorisation*

*Authoriser Designation:* **subscriber**                    *Authenticated:* **Yes**

*End of Electronically Filed Document for Company Number:* **09871841**                    *Page:*7

COMPANY HAVING A SHARE CAPITAL

Memorandum of Association of

IAGL LIMITED

Each subscriber to this Memorandum of Association wishes to form a company under the Companies Act 2006 and agrees to become a member of the company and to take at least one share.

| Name of each subscriber | Authentication by each subscriber |
|---|---|
| CANTOR INDEX LIMITED | CANTOR INDEX LIMITED |

Dated 13/11/2015

**Company Number:**

**The Companies Act 2006**

**PRIVATE COMPANY LIMITED BY SHARES**

---

# ARTICLES
# OF ASSOCIATION

**IAGL LIMITED**

**Incorporated on**

---

**THE COMPANIES ACT 2006**

**PRIVATE COMPANY LIMITED BY SHARES**

**ARTICLES OF ASSOCIATION OF**

**IAGL LIMITED**

1.    **PRELIMINARY**

1.1    The model articles of association for private companies limited by shares contained in Schedule 1 to the Companies (Model Articles) Regulations 2008 (SI 2008 No. 3229) (the "Model Articles") shall apply to the Company save in so far as they are excluded or modified hereby and such Model Articles and the articles set out below shall be the Articles of Association of the Company (the "Articles").

1.2    In these Articles, any reference to a provision of the Companies Act 2006 shall be deemed to include a reference to any statutory modification or re-enactment of that provision for the time being in force.

1.3    Model Articles 7(2), 9(2), 14, 19(5), 21, 24, 26(5), 28(3), 36(4) and 44(4) do not apply to the Company.

1.4    The headings used in these Articles are included for the sake of convenience only and shall be ignored in construing the language or meaning of these Articles.

1.5    In these Articles, unless the context otherwise requires, references to nouns in the plural form shall be deemed to include the singular and vice versa, references to one gender include all genders and references to persons include bodies corporate and unincorporated associations.

2.    **DEFINED TERMS**

2.1    Model Article 1 shall be varied by the inclusion of the following definitions:-

"appointor" has the meaning given in Article 7.1;

"call" has the meaning given in Article 10.1;

"call notice" has the meaning given in Article 10.1;

"call payment date" has the meaning given in Article 10.4;

"forfeiture notice" has the meaning given in Article 10.4;

"lien enforcement notice" has the meaning given in Article 9.4;

"relevant rate" has the meaning given in Article 10.4;

"secretary" means the secretary of the Company, if any, appointed in accordance with Article 6.1 or any other person appointed to perform the duties of the secretary of the Company, including a joint, assistant or deputy secretary; and

"working day" means a day that is not a Saturday or Sunday, Christmas Day, Good Friday or any day that is a bank holiday under the Banking and Financial Dealings Act 1971 in the part of the United Kingdom where the Company is registered.

3.    **PROCEEDINGS OF DIRECTORS**

3.1    The maximum and minimum number of directors may be determined from time to time by ordinary resolution.  Subject to and in default of any such determination there shall be no maximum number of directors and the minimum number of directors shall be one.  Whenever the minimum number of directors is one, the general rule about decision-making by the directors does not apply, and the sole director may take decisions without regard to any of the provisions of the Articles (including Model Article 11(2)) relating to directors' decision-making.

3.2    Subject to Article 3.3, notwithstanding the fact that a proposed decision of the directors concerns or relates to any matter in which a director has, or may have, directly or indirectly, any kind of interest whatsoever, that director may participate in the decision-making process for both quorum and voting purposes.

3.3    If the directors propose to exercise their power under section 175(4)(b) of the Companies Act 2006 to authorise a director's conflict of interest, the director facing the conflict is not to be counted as participating in the decision to authorise the conflict for quorum or voting purposes.

3.4    Subject to the provisions of the Companies Act 2006, and provided that (if required  to do so by the said Act) he has declared to the directors the nature and extent of any direct or indirect interest of his, a director, notwithstanding his office:-

(a)    may be a party to or otherwise interested in, any transaction or arrangement with the Company or in which the Company is otherwise interested;

(b)    may be a director or other officer or an employee of, or a party to any transaction or arrangement with, or otherwise interested in, any subsidiary of the Company or body corporate in which the Company is interested; and

(c)    is not accountable to the Company for any remuneration or other benefits which he derives from any such office or employment or from any such transaction or arrangement or from any interest in any such body corporate and no transaction or arrangement is liable to be avoided on the ground of any such remuneration, benefit or interest.

4.    **UNANIMOUS DECISIONS**

4.1    Model Article 8(2) shall be amended by the deletion of the words "copies of which have been signed by each eligible director" and the substitution of the following "where each eligible director has signed one or more copies of it" in its place. Model Article 8(2) shall be read accordingly.

5.    **TERMINATION OF DIRECTOR'S APPOINTMENT**

5.1    In addition to the events terminating a director's appointment set out in Model Article 18, a person ceases to be a director as soon as that person has for more than six consecutive months been absent without permission of the directors from meetings of directors held during that period and the directors make a decision to vacate that person's office.

6.    **SECRETARY**

6.1    The directors may appoint a secretary to the Company for such period, for such remuneration and upon such conditions as they think fit; and any secretary so appointed by the directors may be removed by them.

7.    **ALTERNATE DIRECTORS**

7.1    (a)    Any director (the "appointor") may appoint as an alternate any other director, or any other person approved by a decision of the directors, to:-

(i)    exercise that director's powers; and

(ii)    carry out that director's responsibilities,

in relation to the taking of decisions by the directors in the absence of the alternate's appointor.

(b)    Any appointment or removal of an alternate must be effected by notice in writing to the Company signed by the appointor, or in any other manner approved by the directors.  The notice must:-

(i)    identify the proposed alternate; and

(ii)    in the case of a notice of appointment, contain a statement signed by the proposed alternate that he is willing to act as the alternate of his appointor.

7.2    (a)    An alternate director has the same rights to participate in any directors' meeting or decision of the directors reached in accordance with Model Article 8, as the alternate's appointor.

(b)    Except as these Articles specify otherwise, alternate directors:-

(i)    are deemed for all purposes to be directors;

(ii)    are liable for their own acts or omissions;

(iii)    are subject to the same restrictions as their appointors; and

(iv)    are not deemed to be agents of or for their appointors.

(c)    A person who is an alternate director but not a director:-

(i)    may be counted as participating for the purposes of determining whether a quorum is participating (but only if that person's appointor is not participating); and

(ii)    may sign or otherwise signify his agreement in writing to a written resolution in accordance with Model Article 8 (but only if that person's appointor has not signed or otherwise signified his agreement to such written resolution).

No alternate may be counted as more than one director for such purposes.

(d)    An alternate director is not entitled to receive any remuneration from the Company for serving as an alternate director except such part of the remuneration payable to that alternate's appointor as the appointor may direct by notice in writing made to the Company.

(e)     Model Article 20 is modified by the deletion of each of the references to "directors" and the replacement of each such reference with "directors and/or any alternate directors".

7.3     An alternate director's appointment as an alternate terminates:-

(a)     when his appointor revokes the appointment by notice to the Company in writing specifying when it is to terminate;

(b)     on the occurrence in relation to the alternate of any event which, if it occurred in relation to the alternate's appointor would result in the termination of the appointor's office as director;

(c)     on the death of his appointor; or

(d)     when his appointor's appointment as a director terminates.

## 8.     ISSUE OF SHARES

8.1     Shares may be issued as nil, partly or fully paid.

8.2     (a)     Unless the members of the Company by special resolution direct otherwise, all shares which the directors propose to issue must first be offered to the members in accordance with the following provisions of this Article.

(b)     Shares must be offered to members in proportion as nearly as may be to the number of existing shares held by them respectively.

(c)     The offer shall be made by notice specifying the number of shares offered, and limiting a period (not being less than 14 days) within which the offer, if not accepted, will be deemed to be declined.

(d)     After the expiration of the period referred to in (c) above, those shares so deemed to be declined shall be offered in the proportion aforesaid to the persons who have, within the said period, accepted all the shares offered to them; and such further offer shall be made in the like terms in the same manner and limited by a like period as the original offer.

(e)     Any shares not accepted pursuant to the offer referred to in (c) and the further offer referred to in (d) or not capable of being offered as aforesaid except by way of fractions and any shares released from the provisions of this Article by any such special resolution as aforesaid shall be under the control of the directors, who may allot, grant options over or dispose of the same to such persons, on such terms, and in such manner as they think fit.

8.3     In accordance with section 567 of the Companies Act 2006, sections 561 and 562 of the said Act are excluded.

## 9.     LIEN

9.1     The Company has a first and paramount lien on all shares (whether or not such shares are fully paid) standing registered in the name of any person indebted or under any liability to the Company, whether he is the sole registered holder thereof or is one of two or more joint holders, for all moneys payable by him or his estate to the Company (whether or not such moneys are presently due and payable).

9.2     The Company's lien over shares:-

MG13

      (a)      takes priority over any third party's interest in such shares; and

      (b)      extends to any dividend or other money payable by the Company in respect of such shares and (if the Company's lien is enforced and such shares are sold by the Company) the proceeds of sale of such shares.

9.3    The directors may at any time decide that a share which is or would otherwise be subject to the Company's lien shall not be subject to it, either wholly or in part.

9.4    (a)    Subject to the provisions of this Article, if:-

      (i)      a notice of the Company's intention to enforce the lien ("lien enforcement notice") has been sent in respect of the shares; and

      (ii)     the person to whom the lien enforcement notice was sent has failed to comply with it,

the Company may sell those shares in such manner as the directors decide.

    (b)    A lien enforcement notice:-

      (i)      may only be sent in respect of shares if a sum is payable to the Company by the sole registered holder or one of two or more joint registered holders of such shares and the due date for payment of such sum has passed;

      (ii)     must specify the shares concerned;

      (iii)    must include a demand for payment of the sum payable within 14 days;

      (iv)    must be addressed either to the holder of such shares or to a person entitled to such shares by reason of the holder's death, bankruptcy or otherwise; and

      (v)     must state the Company's intention to sell the shares if the notice is not complied with.

    (c)    If shares are sold under this Article:-

      (i)      the directors may authorise any person to execute an instrument of transfer of the shares to the purchaser or a person nominated by the purchaser; and

      (ii)     the transferee is not bound to see to the application of the consideration, and the transferee's title is not affected by any irregularity in or invalidity of the process leading to the sale.

    (d)    The net proceeds of any such sale (after payment of the costs of sale and any other costs of enforcing the lien) must be applied:-

      (i)      first, in payment of so much of the sum for which the lien exists as was payable at the date of the lien enforcement notice; and

      (ii)     second, in payment to the person entitled to the shares at the date of the sale, but only after the certificate for the shares sold has been surrendered to the company for cancellation or a suitable indemnity has been given for any lost certificates, and subject to a lien equivalent to the company's lien over the shares before the

sale for any money payable in respect of the shares after the date of the lien enforcement notice.

(e) A statutory declaration by a director or the secretary that the declarant is a director or the secretary and that a share has been sold to satisfy the Company's lien on a specified date:-

(i) is conclusive evidence of the facts stated in it as against all persons claiming to be entitled to the share; and

(ii) subject to compliance with any other formalities of transfer required by these Articles or by law, constitutes a good title to the share.

## 10. CALLS ON SHARES AND FORFEITURE

10.1 (a) Subject to these Articles and the terms on which shares are allotted, the directors may send a notice (a "call notice") to a member requiring the member to pay the Company a specified sum of money (a "call") which is payable in respect of shares which that member holds at the date when the directors decide to send the call notice.

(b) A call notice:-

(i) may not require a member to pay a call which exceeds the total sum unpaid on that member's shares (whether as to the share's nominal value or any amount payable to the Company by way of premium);

(ii) must state when and how any call to which it relates is to be paid; and

(iii) may permit or require the call to be paid by instalments.

(c) A member must comply with the requirements of a call notice, but no member is obliged to pay any call before 14 days have passed since the call notice was sent.

(d) Before the Company has received any call due under a call notice the directors may:-

(i) revoke it wholly or in part; or

(ii) specify a later time for payment than is specified in the call notice,

by a further notice in writing to the member in respect of whose shares the call was made.

10.2 (a) Liability to pay a call is not extinguished or transferred by transferring the shares in respect of which the call is required to be paid.

(b) Joint holders of a share are jointly and severally liable to pay all calls in respect of that share.

(c) Subject to the terms on which shares are allotted, the directors may, when issuing shares, make arrangements for a difference between the holders in the amounts and times of payment of calls on their shares.

10.3 (a) A call notice need not be issued in respect of sums which are specified, in the terms on which a share is allotted, as being payable to the Company in respect of that share (whether in respect of nominal value or premium):-

  (i) on allotment;

  (ii) on the occurrence of a particular event; or

  (iii) on a date fixed by or in accordance with the terms of issue.

 (b) But if the due date for payment of such a sum has passed and it has not been paid, the holder of the share concerned is treated in all respects as having failed to comply with a call notice in respect of that sum, and is liable to the same consequences as regards the payment of interest and forfeiture.

10.4 (a) If a person is liable to pay a call and fails to do so by the call payment date:-

  (i) the directors may send a notice of forfeiture (a "forfeiture notice") to that person; and

  (ii) until the call is paid, that person must pay the Company interest on the call from the call payment date at the relevant rate.

 (b) For the purposes of this Article:-

  (i) the "call payment date" is the date on which the call notice states that a call is payable, unless the directors give a notice specifying a later date, in which case the "call payment date" is that later date; and

  (ii) the "relevant rate" is the rate fixed by the terms on which the share in respect of which the call is due was allotted or, if no such rate was fixed when the share was allotted, five percent per annum.

 (c) The relevant rate must not exceed by more than five percentage points the base lending rate most recently set by the Monetary Policy Committee of the Bank of England in connection with its responsibilities under Part 2 of the Bank of England Act 1998.

 (d) The directors may waive any obligation to pay interest on a call wholly or in part.

10.5 A forfeiture notice:-

 (a) may be sent in respect of any share in respect of which a call has not been paid as required by a call notice;

 (b) must be sent to the holder of that share or to a person entitled to it by reason of the holder's death, bankruptcy or otherwise;

 (c) must require payment of a call and any accrued interest by a date which is not less than 14 days after the date of the forfeiture notice;

 (d) must state how the payment is to be made; and

 (e) must state that if the forfeiture notice is not complied with, the shares in respect of which the call is payable will be liable to be forfeited.

MG13

10.6 If a forfeiture notice is not complied with before the date by which payment of the call is required in the forfeiture notice, the directors may decide that any share in respect of which it was given is forfeited and the forfeiture is to include all dividends or other moneys payable in respect of the forfeited shares and not paid before the forfeiture.

10.7 (a) Subject to the following provisions of this Article 10.7, the forfeiture of a share extinguishes:-

 (i) all interests in that share, and all claims and demands against the Company in respect of it; and

 (ii) all other rights and liabilities incidental to the share as between the person in whose name the share is registered and the Company.

(b) Any share which is forfeited:-

 (i) is deemed to have been forfeited when the directors decide that it is forfeited;

 (ii) is deemed to be the property of the Company; and

 (iii) may be sold, re-allotted or otherwise disposed of as the directors think fit.

(c) If a person's shares have been forfeited:-

 (i) the Company must send that person notice that forfeiture has occurred and record it in the register of members;

 (ii) that person ceases to be a member in respect of those shares;

 (iii) that person must surrender the certificate for the shares forfeited to the Company for cancellation;

 (iv) that person remains liable to the Company for all sums due and payable by that person at the date of forfeiture in respect of those shares, including any interest (whether accrued before or after the date of forfeiture); and

 (v) the directors may waive payment of such sums wholly or in part or enforce payment without any allowance for the value of the shares at the time of forfeiture or for any consideration received on their disposal.

(d) At any time before the Company disposes of a forfeited share, the directors may decide to cancel the forfeiture on such terms as they think fit.

10.8 (a) If a forfeited share is to be disposed of by being transferred, the Company may receive the consideration for the transfer and the directors may authorise any person to execute the instrument of transfer.

(b) A statutory declaration by a director or the secretary that the declarant is a director or the secretary and that a share has been forfeited on a specified date:-

 (i) is conclusive evidence of the facts stated in it as against all persons claiming to be entitled to the share; and

MG13

(ii)    subject to compliance with any other formalities of transfer required by these Articles or by law, constitutes a good title to the share.

(c)    A person to whom a forfeited share is transferred is not bound to see to the application of the consideration (if any) nor is that person's title to the share affected by any irregularity in or invalidity of the process leading to the forfeiture or transfer of the share.

(d)    If the company sells a forfeited share, the person who held it prior to its forfeiture is entitled to receive from the Company the proceeds of such sale, net of any commission, and excluding any amount which:-

(i)    was, or would have become, payable; and

(ii)    had not, when that share was forfeited, been paid by that person in respect of that share,

but no interest is payable to such a person in respect of such proceeds and the Company is not required to account for any money earned on them.

10.9    (a)    A member may surrender any share:-

(i)    in respect of which the directors may issue a forfeiture notice;

(ii)    which the directors may forfeit; or

(iii)    which has been forfeited.

(b)    The directors may accept the surrender of any such share.

(c)    The effect of surrender on a share is the same as the effect of forfeiture on that share.

(d)    A share which has been surrendered may be dealt with in the same way as a share which has been forfeited.

## 11.    SHARE CERTIFICATES

11.1    (a)    The Company must issue each member with one or more certificates in respect of the shares which that member holds.

(b)    Except as is otherwise provided in these Articles, all certificates must be issued free of charge.

(c)    No certificate may be issued in respect of shares of more than one class.

(d)    A member may request the Company, in writing, to replace:-

(i)    the member's separate certificates with a consolidated certificate; or

(ii)    the member's consolidated certificate with two or more separate certificates.

(e)    When the Company complies with a request made by a member under (d) above, it may charge a reasonable fee as the directors decide for doing so.

11.2    (a)    Every certificate must specify:-

      (i)      in respect of how many shares, of what class, it is issued;

      (ii)     the nominal value of those shares;

      (iii)    whether the  shares are nil, partly or fully paid; and

      (iv)    any distinguishing numbers assigned to them.

(b)    Certificates must:-

      (i)      have affixed to them the Company's common seal; or

      (ii)     be otherwise executed in accordance with the Companies Acts.

## 12.    CONSOLIDATION OF SHARES

12.1   (a)    This Article applies in circumstances where:-

      (i)      there has been a consolidation of shares; and

      (ii)     as a result, members are entitled to fractions of shares.

(b)    The directors may:-

      (i)      sell the shares representing the fractions to any person including the Company for the best price reasonably obtainable; and

      (ii)     authorise any person to execute an instrument of transfer of the shares to the purchaser or a person nominated by the purchaser.

(c)    Where any holder's entitlement to a portion of the proceeds of sale amounts to less than a minimum figure determined by the directors, that member's portion may be distributed to an organisation which is a charity for the purposes of the law of England and Wales, Scotland or Northern Ireland.

(d)    A person to whom shares are transferred is not obliged to ensure that any purchase money is received by the person entitled to the relevant fractions.

(e)    The transferee's title to the shares is not affected by any irregularity in or invalidity of the process leading to their sale.

## 13.    DIVIDENDS

13.1   (a)    Except as otherwise provided by these Articles or the rights attached to the shares, all dividends must be:-

      (i)      declared and paid according to the amounts paid up on the shares on which the dividend is paid; and

      (ii)     apportioned and paid proportionately to the amounts paid up on the shares during any portion or portions of the period in respect of which the dividend is paid.

(b)    If any share is issued on terms providing that it ranks for dividend as from a particular date, that share ranks for dividend accordingly.

(c)    For the purpose of calculating dividends, no account is to be taken of any amount which has been paid up on a share in advance of the due date for payment of that amount.

MG13

14.    **CAPITALISATION OF PROFITS**

14.1    A capitalised sum which was appropriated from profits available for distribution may be applied:-

(a)    in or towards paying up any amounts unpaid on any existing nil or partly paid shares held by the persons entitled; or

(b)    in paying up new debentures of the Company which are then allotted credited as fully paid to the persons entitled or as they may direct.

14.2    Model Article 36(5)(a) is modified by the deletion of the words "paragraphs (3) and (4)" and their replacement with "Model Article 36(3) and Article 14.1".

15.    **WRITTEN RESOLUTIONS OF MEMBERS**

15.1    (a)    Subject to Article 15.1(b), a written resolution of members passed in accordance with Part 13 of the Companies Act 2006 is as valid and effectual as a resolution passed at a general meeting of the Company.

(b)    The following may not be passed as a written resolution and may only be passed at a general meeting:-

(i)    a resolution under section 168 of the Companies Act 2006 for the removal of a director before the expiration of his period of office; and

(ii)    a resolution under section 510 of the Companies Act 2006 for the removal of an auditor before the expiration of his period of office.

15.2    (a)    Subject to Article 15.2(b), on a written resolution, a member has one vote in respect of each share held by him.

(b)    No member may vote on a written resolution unless all moneys currently due and payable in respect of any shares held by him have been paid.

16.    **NOTICE OF GENERAL MEETINGS**

16.1    (a)    Every notice convening a general meeting of the Company must comply with the provisions of:-

(i)    section 311 of the Companies Act 2006 as to the provision of information regarding the time, date and place of the meeting and the general nature of the business to be dealt with at the meeting; and

(ii)    section 325(1) of the Companies Act 2006 as to the giving of information to members regarding their right to appoint proxies.

(b)    Every notice of, or other communication relating to, any general meeting which any member is entitled to receive must be sent to each of the directors and to the auditors (if any) for the time being of the Company.

17.    **QUORUM AT GENERAL MEETINGS**

17.1    (a)    If and for so long as the Company has one member only who is entitled to vote on the business to be transacted at a general meeting, that member present at   the meeting in person or by one or more proxies or, in the event that the member is a corporation, by one or more corporate representatives, is a quorum.

(b)     If and for so long as the Company has two or more members entitled to vote on the business to be transacted at a general meeting, two of such members, each of whom is present at the meeting in person or by one or more proxies or, in the event that any member present is a corporation, by one or more corporate representatives, are a quorum.

(c)     Model Article 41(1) is modified by the addition of a second sentence as follows:-

"If, at the adjourned general meeting, a quorum is not present within half an hour from the time appointed therefor or, alternatively, a quorum ceases to be present, the adjourned meeting shall be dissolved.".

## 18.    VOTING AT GENERAL MEETINGS

18.1    (a)     Subject to Article 18.2 below, on a vote on a resolution at a general meeting on a show of hands:-

(i)      each member who, being an individual, is present in person has one vote;

(ii)     if a member (whether such member is an individual or a corporation) appoints one or more proxies to attend the meeting, all proxies so appointed and in attendance at the meeting have, collectively, one vote; and

(iii)    if a corporate member appoints one or more persons to represent it at the meeting, each person so appointed and in attendance at the meeting has, subject to section 323(4) of the Companies Act 2006, one vote.

(b)     Subject to Article 18.2 below, on a resolution at a general meeting on a poll, every member (whether present in person, by proxy or authorised representative) has one vote in respect of each share held by him.

18.2    No member may vote at any general meeting or any separate meeting of the holders of any class of shares in the Company, either in person, by proxy or, in the event that the member is a corporation, by corporate representative in respect of shares held by that member unless all moneys currently due and payable by that member in respect of any shares held by that member have been paid.

18.3    (a)     Model Article 44(2) is amended by the deletion of the word "or" in Model Article 44(2)(c), the deletion of the "." after the word "resolution" in Model Article 44(2)(d) and its replacement with "; or" and the insertion of a new Model Article 44(2)(e) in the following terms:-

"by a member or members holding shares conferring a right to vote at the meeting being shares on which an aggregate sum has been paid up equal to not less than one-tenth of the total sum paid up on all shares conferring that right".

(b)     A demand for a poll made by a person as proxy for a member is the same as a demand made by the member.

18.4    Polls must be taken at the general meeting at which they are demanded and in such manner as the chairman directs.

## 19.   DELIVERY OF PROXY NOTICES

19.1   Model Article 45(1) is modified, such that a "proxy notice" (as defined in Model Article 45(1)) and any authentication of it demanded by the directors must be received at an address specified by the Company in the proxy notice not less than 48 hours before the time for holding the meeting or adjourned meeting at which the proxy appointed pursuant to the proxy notice proposes to vote; and any proxy notice received at such address less than 48 hours before the time for holding the meeting or adjourned meeting shall be invalid.

## 20.   COMMUNICATIONS

20.1   Subject to the provisions of the Companies Act 2006, a document or information may be sent or supplied by the Company to a person by being made available on a website.

20.2   (a)   A member whose registered address is not within the United Kingdom and who gives to the Company an address within the United Kingdom at which notices may be sent to him or an address to which notices may be sent by electronic means is entitled to have notices sent to him at that address, but otherwise no such member is entitled to receive any notices from the Company.

(b)   If any share is registered in the name of joint holders, the Company may send notices and all other documents to the joint holder whose name stands first in the register of members in respect of the joint holding and the Company is not required to serve notices or other documents on any of the other joint holders.

20.3   (a)   If the Company sends or supplies notices or other documents by first class post and the Company proves that such notices or other documents were properly addressed, prepaid and posted, the intended recipient is deemed to have received such notices or other documents 48 hours after posting.

(b)   If the Company sends or supplies notices or other documents by electronic means and the Company proves that such notices or other documents were properly addressed, the intended recipient is deemed to have received such notices or other documents 24 hours after they were sent or supplied.

(c)   If the Company sends or supplies notices or other documents by means of a website, the intended recipient is deemed to have received such notices or other documents when such notices or other documents first appeared on the website or, if later, when the intended recipient first received notice of the fact that such notices or other documents were available on the website.

(d)   For the purposes of this Article 20.3, no account shall be taken of any part of a day that is not a working day.

## 21.   COMPANY SEALS

21.1   Model Article 49(1) is modified, such that any common seal of the Company may be used by the authority of the directors or any committee of directors.

21.2   Model Article 49(3) is modified by the deletion of all words which follow the "," after the word "document" and their replacement with "the document must also be signed by:-

MG13

(a)    one authorised person in the presence of a witness who attests the signature; or

(b)    two authorised persons".

## 22.    TRANSMISSION OF SHARES

22.1    Model Article 27 is modified by the addition of new Model Article 27(4) in the following terms:-

"Nothing in these Articles releases the estate of a deceased member from any liability in respect of a share solely or jointly held by that member".

22.2    All the Articles relating to the transfer of shares apply to:-

(a)    any notice in writing given to the Company by a transmittee in accordance with Model Article 28(1); and

(b)    any instrument of transfer executed by a transmittee in accordance with Model Article 28(2),

as if such notice or instrument were an instrument of transfer executed by the person from whom the transmittee derived rights in respect of the share, and as if the event which gave rise to the transmission had not occurred.

## 23.    WINDING UP

23.1    If the Company is wound up, the liquidator may, with the sanction of a special resolution of the Company and any other sanction required by law, divide among the members in specie the whole or any part of the assets of the Company and may, for that purpose, value any assets and determine how the division shall be carried out as between the members or different classes of members.    The liquidator may, with the like sanction, vest the whole or any part of the assets in trustees upon such trusts for the benefit of the members as he may determine, but no member shall be compelled to accept any assets upon which there is a liability.

## 24.    SHARE TRANSFERS

24.1    (a)    Model Article 26(1) is modified by the addition of the words "and, if any of the shares is nil or partly paid, the transferee" after the word "transferor".

(b)    The directors may refuse to register the transfer of a share, and, if they do so, the instrument of transfer must be returned to the transferee together with a notice of refusal giving reasons for such refusal as soon as practicable and in any event within two months after the date on which the instrument of transfer was lodged for registration, unless the directors suspect that the proposed transfer may be fraudulent.

# EXHIBIT N

**ENTITY INFORMATION**

**ENTITY INFORMATION**

**Entity Name:**

INTERACTIVE GAMES LLC

**Entity Number:**

E0517812015-2

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Active

**Formation Date:**

11/02/2015

**NV Business ID:**

NV20151656830

**Termination Date:**

**Annual Report Due Date:**

11/30/2024

**Compliance Hold:**

**Series LLC:**

☐ **Restricted LLC:** ☐

**REGISTERED AGENT INFORMATION**

**Name of Individual or Legal Entity:**

CORPORATION SERVICE COMPANY*

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Commercial Registered Agent

**NV Business ID:**

NV20101844335

**Office or Position:**

**Jurisdiction:**

DELAWARE

**Street Address:**

112 NORTH CURRY STREET, Carson City, NV, 89703, USA

**Mailing Address:**

---

**OFFICER INFORMATION**

☐ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Managing Member | CFPH, LLC | 110 EAST 59TH STREET, New York, NY, 10022, USA | 11/25/2022 | Active |

**Page 1 of 1, records 1 to 1 of 1**

Filing History          Name History          Mergers/Conversions

Return to Search          Return to Results

# EXHIBIT O

US009355518B2

(12) **United States Patent**
Amaitis et al.

(10) Patent No.: **US 9,355,518 B2**
(45) Date of Patent: **May 31, 2016**

(54) **GAMING SYSTEM WITH LOCATION DETERMINATION**

(75) Inventors: **Lee M. Amaitis**, London (GB); **Joseph M. Asher**, New York, NY (US); **Robert E. Bahrampour**, New York, NY (US); **Darrin M. Mylet**, Tampa, FL (US); **Alan B. Wilkins**, Raleigh, NC (US); **Howard W. Lutnick**, New York, NY (US)

(73) Assignee: **Interactive Games LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/616,356**

(22) Filed: **Sep. 14, 2012**

(65) **Prior Publication Data**

US 2013/0012324 A1    Jan. 10, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/247,623, filed on Oct. 8, 2008, which is a continuation of application No. 11/199,835, filed on Aug. 9, 2005, now Pat. No. 7,534,169.

(60) Provisional application No. 60/697,861, filed on Jul. 8, 2005.

(51) **Int. Cl.**
A63F 9/24 (2006.01)
A63F 13/00 (2014.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ **G07F 17/3237** (2013.01); **G07F 17/32** (2013.01); **G07F 17/3239** (2013.01); **A63F 2003/086** (2013.01)

(58) **Field of Classification Search**
CPC . G07F 17/3237; G07F 17/3239; G07F 17/16; G06Q 30/0242
USPC ................ 463/25, 29, 40, 41, 42; 705/64, 67; 715/753
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,580,581 A    5/1971    Raven
3,838,259 A    9/1974    Kortenhaus
(Continued)

FOREIGN PATENT DOCUMENTS

CN        1346549        4/2002
DE    31 29 550 A1    4/1982
(Continued)

OTHER PUBLICATIONS

PR Newswire; *M7 Networks Partners With Terraplay to Deliver Real-Time Multiplayer Gaming Functionality to Its Community Services Offerings*; 2 pages; Jun. 1, 2004.
(Continued)

*Primary Examiner* — Adetokunbo O Torimiro
(74) *Attorney, Agent, or Firm* — Glen R. Farbanish

(57) **ABSTRACT**

A gaming system is provided. The gaming system allows users to access applications via gaming communication devices coupled to a communication network. At least a portion of the network may be wireless. The gaming applications include gambling, financial, entertainment service, and other types of transactions. The system may include a user location determination feature to prevent users from conducting transactions from unauthorized areas. The gaming system may incorporate a user profile feature according to which certain information regarding users of the system may be maintained. Such information can include, without limitation, information relating to preferences, finances, activities participated in by the users, and trends and habits of the users.

**25 Claims, 5 Drawing Sheets**



US 9,355,518 B2

Page 2

(51) **Int. Cl.**
| | | |
|---|---|---|
| G06F 17/00 | (2006.01) | |
| G06F 19/00 | (2011.01) | |
| G07F 17/32 | (2006.01) | |
| A63F 3/08 | (2006.01) | |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,876,208 | A | 4/1975 | Wachtler et al. |
| 3,929,338 | A | 12/1975 | Busch |
| 4,101,129 | A | 7/1978 | Cox |
| 4,120,294 | A | 10/1978 | Wolfe |
| 4,157,829 | A | 6/1979 | Goldman et al. |
| 4,206,920 | A | 6/1980 | Weatherford et al. |
| 4,216,965 | A | 8/1980 | Morrison et al. |
| 4,238,127 | A | 12/1980 | Lucero et al. |
| 4,240,635 | A | 12/1980 | Brown |
| 4,266,214 | A | 5/1981 | Peters, Jr. |
| 4,335,809 | A | 6/1982 | Wain |
| 4,448,419 | A | 5/1984 | Telnaes |
| 4,467,424 | A | 8/1984 | Hedges et al. |
| 4,492,379 | A | 1/1985 | Okada |
| 4,527,798 | A | 7/1985 | Siekierski et al. |
| 4,572,509 | A | 2/1986 | Stirick |
| 4,573,681 | A | 3/1986 | Okada |
| 4,614,342 | A | 9/1986 | Takashima |
| 4,624,459 | A | 11/1986 | Kaufman |
| 4,636,951 | A | 1/1987 | Harlick |
| 4,648,600 | A | 3/1987 | Olliges |
| 4,652,998 | A | 3/1987 | Koza et al. |
| 4,692,863 | A | 9/1987 | Moosz |
| 4,760,527 | A | 7/1988 | Sidley |
| 4,805,907 | A | 2/1989 | Hagiwara |
| 4,810,868 | A | 3/1989 | Drexler |
| 4,817,951 | A | 4/1989 | Crouch et al. |
| 4,838,552 | A | 6/1989 | Hagiwara |
| 4,853,884 | A | 8/1989 | Brown et al. |
| 4,856,787 | A | 8/1989 | Itkis |
| 4,858,932 | A | 8/1989 | Keane |
| 4,880,237 | A | 11/1989 | Kishishita |
| 4,909,516 | A | 3/1990 | Kolinsky |
| 4,926,327 | A | 5/1990 | Sidley |
| 4,959,783 | A | 9/1990 | Scott et al. |
| 4,964,638 | A | 10/1990 | Ishida |
| 5,007,087 | A | 4/1991 | Bernstein et al. |
| 5,024,441 | A | 6/1991 | Rousseau |
| 5,048,833 | A | 9/1991 | Lamle |
| 5,050,881 | A | 9/1991 | Nagao |
| 5,055,662 | A | 10/1991 | Hasegawa |
| 5,056,141 | A | 10/1991 | Dyke |
| 5,074,559 | A | 12/1991 | Okada |
| 5,083,785 | A | 1/1992 | Okada |
| 5,096,195 | A | 3/1992 | Gimmon |
| 5,096,202 | A | 3/1992 | Hesland |
| 5,102,134 | A | 4/1992 | Smyth |
| 5,151,684 | A | 9/1992 | Johnsen |
| 5,192,076 | A | 3/1993 | Komori |
| 5,229,764 | A | 7/1993 | Matchett et al. |
| 5,242,163 | A | 9/1993 | Fulton |
| 5,251,165 | A | 10/1993 | James, III |
| 5,251,898 | A | 10/1993 | Dickenson et al. |
| 5,263,716 | A | 11/1993 | Smyth |
| 5,265,874 | A | 11/1993 | Dickinson et al. |
| 5,280,426 | A | 1/1994 | Edmonds |
| 5,280,909 | A | 1/1994 | Tracy |
| 5,298,476 | A | 3/1994 | Hotta et al. |
| 5,324,035 | A | 6/1994 | Morris et al. |
| 5,326,104 | A | 7/1994 | Pease et al. |
| 5,344,199 | A | 9/1994 | Carstens et al. |
| 5,351,970 | A | 10/1994 | Fioretti |
| 5,359,183 | A | 10/1994 | Skodlar |
| 5,370,306 | A | 12/1994 | Schulze et al. |
| 5,380,007 | A | 1/1995 | Travis et al. |
| 5,380,008 | A | 1/1995 | Mathis et al. |
| 5,393,061 | A | 2/1995 | Manship et al. |
| 5,398,932 | A | 3/1995 | Eberhardt et al. |
| 5,415,416 | A | 5/1995 | Scagnelli et al. |
| 5,421,576 | A | 6/1995 | Yamazaki et al. |
| 5,429,361 | A | 7/1995 | Raven et al. |
| 5,471,044 | A | 11/1995 | Hotta et al. |
| 5,476,259 | A | 12/1995 | Weingardt |
| 5,505,449 | A | 4/1996 | Eberhardt et al. |
| 5,507,485 | A | 4/1996 | Fisher |
| 5,511,784 | A | 4/1996 | Furry et al. |
| 5,524,888 | A | 6/1996 | Heidel |
| 5,534,685 | A | 7/1996 | Takemoto et al. |
| 5,551,692 | A | 9/1996 | Pettit et al. |
| 5,569,083 | A | 10/1996 | Fioretti |
| 5,569,084 | A | 10/1996 | Nicastro et al. |
| 5,580,309 | A | 12/1996 | Piechowiak et al. |
| 5,586,937 | A | 12/1996 | Menashe |
| 5,588,913 | A | 12/1996 | Hecht |
| 5,613,912 | A | 3/1997 | Slater |
| 5,618,232 | A | 4/1997 | Martin |
| 5,653,634 | A | 8/1997 | Hodges |
| 5,654,746 | A | 8/1997 | McMulan, Jr. et al. |
| 5,655,961 | A | 8/1997 | Acres et al. |
| 5,675,828 | A | 10/1997 | Stoel et al. |
| 5,697,844 | A | 12/1997 | Von Kohorn |
| 5,702,302 | A | 12/1997 | Gauselman |
| 5,707,286 | A | 1/1998 | Carlson |
| 5,738,583 | A | 4/1998 | Comas et al. |
| 5,745,102 | A | 4/1998 | Bloch et al. |
| 5,762,552 | A | 6/1998 | Vuong et al. |
| 5,764,789 | A | 6/1998 | Pare, Jr. et al. |
| 5,766,076 | A | 6/1998 | Pease et al. |
| 5,768,382 | A | 6/1998 | Schneier et al. |
| 5,772,508 | A | 6/1998 | Sugita et al. |
| 5,785,595 | A | 7/1998 | Gauselman |
| 5,816,920 | A | 10/1998 | Hanai |
| 5,833,536 | A | 11/1998 | Davids et al. |
| 5,835,722 | A | 11/1998 | Bradshaw et al. |
| 5,836,817 | A | 11/1998 | Acres et al. |
| 5,851,148 | A | 12/1998 | Brune et al. |
| 5,857,911 | A | 1/1999 | Fioretti |
| 5,871,398 | A | 2/1999 | Schneier et al. |
| 5,878,211 | A | 3/1999 | Delagrange |
| 5,889,474 | A | 3/1999 | LaDue |
| 5,902,983 | A | 5/1999 | Crevelt et al. |
| 5,904,619 | A | 5/1999 | Scagnelli et al. |
| 5,904,620 | A | 5/1999 | Kujawa |
| 5,907,282 | A | 5/1999 | Tuorto et al. |
| 5,910,047 | A | 6/1999 | Scagnelli et al. |
| 5,920,640 | A | 7/1999 | Salatino et al. |
| 5,921,865 | A | 7/1999 | Scagnelli |
| 5,931,764 | A | 8/1999 | Freeman et al. |
| 5,935,005 | A | 8/1999 | Tsuda et al. |
| 5,951,397 | A | 9/1999 | Dickinson |
| 5,954,583 | A | 9/1999 | Green |
| 5,955,961 | A | 9/1999 | Wallerstein |
| 5,959,596 | A | 9/1999 | McCarten et al. |
| 5,970,143 | A | 10/1999 | Schneier et al. |
| 5,977,957 | A | 11/1999 | Miller et al. |
| 5,987,611 | A | 11/1999 | Freund |
| 5,991,431 | A | 11/1999 | Borza et al. |
| 5,995,630 | A | 11/1999 | Borza et al. |
| 5,999,808 | A | 12/1999 | LaDue |
| 6,001,016 | A | 12/1999 | Walker et al. |
| 6,003,013 | A | 12/1999 | Boushy et al. |
| 6,011,973 | A | 1/2000 | Valentine et al. |
| 6,012,636 | A | 1/2000 | Smith |
| 6,012,982 | A | 1/2000 | Piechowiak et al. |
| 6,019,284 | A | 2/2000 | Freeman et al. |
| 6,022,274 | A | 2/2000 | Takeda et al. |
| 6,027,115 | A | 2/2000 | Griswold et al. |
| 6,048,269 | A | 4/2000 | Burns et al. |
| 6,050,622 | A | 4/2000 | Gustafson |
| 6,065,056 | A | 5/2000 | Bradshaw et al. |
| 6,080,061 | A | 6/2000 | Watanabe et al. |
| 6,098,985 | A | 8/2000 | Moody |
| 6,099,408 | A | 8/2000 | Schneier et al. |
| 6,100,804 | A | 8/2000 | Brady et al. |
| 6,104,295 | A | 8/2000 | Gaisser et al. |
| 6,104,815 | A | 8/2000 | Alcorn |
| 6,117,011 | A | 9/2000 | Lvov |

## US 9,355,518 B2
Page 3

(56)          **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,135,884 A | 10/2000 | Hedrick et al. |
| 6,139,431 A | 10/2000 | Walker et al. |
| 6,146,270 A | 11/2000 | Huard et al. |
| 6,148,094 A | 11/2000 | Kinsella |
| 6,177,905 B1 | 1/2001 | Welch |
| 6,178,255 B1 | 1/2001 | Scott et al. |
| 6,178,510 B1 | 1/2001 | O'Connor et al. |
| 6,183,366 B1 | 2/2001 | Goldberg et al. |
| 6,193,153 B1 | 2/2001 | Lambert |
| 6,196,920 B1 | 3/2001 | Spaur et al. |
| 6,210,274 B1 | 4/2001 | Carlson |
| 6,212,392 B1 | 4/2001 | Fitch et al. |
| 6,219,439 B1 | 4/2001 | Burger |
| 6,233,448 B1 | 5/2001 | Alperovich et al. |
| 6,248,017 B1 | 6/2001 | Roach |
| 6,251,014 B1 | 6/2001 | Stockdale et al. |
| 6,251,017 B1 | 6/2001 | Leason et al. |
| 6,264,560 B1 | 7/2001 | Goldberg et al. |
| 6,265,973 B1 | 7/2001 | Brammall et al. |
| 6,272,223 B1 | 8/2001 | Carlson |
| 6,277,026 B1 | 8/2001 | Archer |
| 6,277,029 B1 | 8/2001 | Hanley |
| 6,280,325 B1 | 8/2001 | Fisk |
| 6,287,202 B1 | 9/2001 | Pascal et al. |
| 6,290,601 B1 | 9/2001 | Yamazaki et al. |
| RE37,414 E | 10/2001 | Harlick |
| 6,309,307 B1 | 10/2001 | Krause et al. |
| 6,320,495 B1 | 11/2001 | Sporgis |
| 6,325,285 B1 | 12/2001 | Baratelli |
| 6,325,292 B1 | 12/2001 | Sehr |
| 6,331,148 B1 | 12/2001 | Krause et al. |
| 6,386,976 B1 | 5/2002 | Yamazaki et al. |
| 6,388,612 B1 | 5/2002 | Neher |
| 6,409,602 B1 | 6/2002 | Wiltshire et al. |
| 6,424,029 B1 | 7/2002 | Giesler |
| 6,425,828 B1 | 7/2002 | Walker et al. |
| 6,428,413 B1 | 8/2002 | Carlson |
| 6,441,752 B1 | 8/2002 | Fomukong |
| RE37,885 E | 10/2002 | Acres et al. |
| 6,468,155 B1 | 10/2002 | Zucker |
| 6,507,279 B2 | 1/2003 | Loof |
| 6,508,709 B1 | 1/2003 | Karmarkar |
| 6,508,710 B1 * | 1/2003 | Paravia et al. .................. 463/42 |
| 6,509,217 B1 | 1/2003 | Reddy |
| 6,520,853 B2 | 2/2003 | Suzuki |
| 6,524,189 B1 | 2/2003 | Rautila |
| 6,527,641 B1 | 3/2003 | Sinclair et al. |
| 6,542,750 B2 | 4/2003 | Hendrey et al. |
| 6,554,705 B1 | 4/2003 | Cumbers |
| 6,554,707 B1 | 4/2003 | Sinclair |
| 6,556,819 B2 | 4/2003 | Irvin |
| 6,575,834 B1 | 6/2003 | Lindo |
| 6,577,733 B1 | 6/2003 | Charrin |
| 6,582,302 B2 | 6/2003 | Romero |
| 6,585,597 B2 | 7/2003 | Finn |
| 6,604,980 B1 | 8/2003 | Jurmain |
| 6,612,928 B1 | 9/2003 | Bradford et al. |
| 6,614,350 B1 | 9/2003 | Lunsford |
| 6,618,706 B1 | 9/2003 | Rive et al. |
| 6,622,157 B1 | 9/2003 | Heddaya et al. |
| 6,628,939 B2 | 9/2003 | Paulsen |
| 6,631,849 B2 | 10/2003 | Blossom |
| 6,634,942 B2 | 10/2003 | Walker |
| 6,652,378 B2 | 11/2003 | Cannon et al. |
| 6,676,522 B2 | 1/2004 | Rowe et al. |
| 6,680,675 B1 | 1/2004 | Suzuki |
| 6,682,421 B1 | 1/2004 | Rowe et al. |
| 6,691,032 B1 | 2/2004 | Irish et al. |
| 6,709,333 B1 | 3/2004 | Bradford et al. |
| 6,719,631 B1 | 4/2004 | Tulley et al. |
| 6,721,542 B1 | 4/2004 | Anttila et al. |
| 6,729,956 B2 | 5/2004 | Wolf et al. |
| 6,743,098 B2 | 6/2004 | Urie et al. |
| 6,745,011 B1 | 6/2004 | Hendrickson |
| 6,749,505 B1 | 6/2004 | Kunzle |
| 6,754,210 B1 | 6/2004 | Ofek |
| 6,755,742 B1 | 6/2004 | Hartman |
| 6,756,882 B2 | 6/2004 | Benes |
| 6,761,638 B1 | 7/2004 | Narita |
| 6,773,350 B2 | 8/2004 | Yoshimi et al. |
| 6,778,820 B2 | 8/2004 | Tendler |
| 6,793,580 B2 | 9/2004 | Sinclair |
| 6,800,029 B2 | 10/2004 | Rowe et al. |
| 6,800,031 B2 | 10/2004 | Di Cesare |
| 6,801,934 B1 | 10/2004 | Eranko |
| 6,802,772 B1 | 10/2004 | Kunzle |
| 6,806,889 B1 | 10/2004 | Malaure et al. |
| 6,812,824 B1 | 11/2004 | Goldinger et al. |
| 6,834,195 B2 | 12/2004 | Brandenberg et al. |
| 6,837,789 B2 | 1/2005 | Garahi et al. |
| 6,839,560 B1 | 1/2005 | Bahl et al. |
| 6,843,412 B1 | 1/2005 | Sanford |
| 6,843,725 B2 | 1/2005 | Nelson |
| 6,846,238 B2 | 1/2005 | Wells et al. |
| 6,857,959 B1 | 2/2005 | Nguyen |
| 6,863,610 B2 | 3/2005 | Vancraeynest |
| 6,868,396 B2 | 3/2005 | Smith et al. |
| 6,884,162 B2 | 4/2005 | Raverdy |
| 6,884,166 B2 | 4/2005 | Leen et al. |
| 6,887,151 B2 | 5/2005 | Leen et al. |
| 6,887,159 B2 | 5/2005 | Leen et al. |
| 6,892,218 B2 | 5/2005 | Heddaya et al. |
| 6,892,938 B2 | 5/2005 | Solomon |
| 6,893,347 B1 | 5/2005 | Zilliacus |
| 6,896,618 B2 | 5/2005 | Benoy et al. |
| 6,898,299 B1 | 5/2005 | Brooks |
| 6,899,628 B2 | 5/2005 | Leen et al. |
| 6,904,520 B1 | 6/2005 | Rosset |
| 6,908,387 B2 | 6/2005 | Hedrick et al. |
| 6,908,391 B2 | 6/2005 | Gatto et al. |
| 6,923,724 B2 | 8/2005 | Williams |
| 6,935,952 B2 | 8/2005 | Walker et al. |
| 6,935,958 B2 | 8/2005 | Nelson |
| 6,942,574 B1 | 9/2005 | Lemay et al. |
| 6,945,870 B2 | 9/2005 | Gatto et al. |
| RE38,812 E | 10/2005 | Acres et al. |
| 6,966,832 B2 | 11/2005 | Leen et al. |
| 6,979,264 B2 | 12/2005 | Chatigny et al. |
| 6,979,267 B2 | 12/2005 | Leen et al. |
| 6,984,175 B2 | 1/2006 | Nguyen et al. |
| 6,986,055 B2 | 1/2006 | Carlson |
| 6,997,810 B2 | 2/2006 | Cole |
| 7,021,623 B2 | 4/2006 | Leen et al. |
| 7,022,017 B1 | 4/2006 | Halbritter et al. |
| 7,029,394 B2 | 4/2006 | Leen et al. |
| 7,033,276 B2 | 4/2006 | Walker et al. |
| 7,034,683 B2 | 4/2006 | Ghazarian |
| 7,035,653 B2 | 4/2006 | Simon et al. |
| 7,040,987 B2 | 5/2006 | Walker et al. |
| 7,042,360 B2 | 5/2006 | Light et al. |
| 7,042,391 B2 | 5/2006 | Meunier et al. |
| 7,043,641 B1 | 5/2006 | Martinek et al. |
| 7,047,197 B1 | 5/2006 | Bennett |
| 7,056,217 B1 | 6/2006 | Pelkey et al. |
| 7,081,815 B2 | 7/2006 | Runyon et al. |
| 7,097,562 B2 | 8/2006 | Gagner |
| 7,102,507 B1 | 9/2006 | Lauren |
| 7,102,509 B1 | 9/2006 | Anders et al. |
| 7,124,947 B2 | 10/2006 | Storch |
| 7,125,334 B2 | 10/2006 | Yamazaki et al. |
| 7,128,482 B2 | 10/2006 | Meyerhofer et al. |
| 7,144,011 B2 | 12/2006 | Asher et al. |
| 7,147,558 B2 | 12/2006 | Giobbi |
| 7,158,798 B2 | 1/2007 | Lee et al. |
| 7,168,626 B2 | 1/2007 | Lerch et al. |
| 7,185,360 B1 | 2/2007 | Anton et al. |
| 7,194,273 B2 | 3/2007 | Vaudreuil |
| 7,207,885 B2 | 4/2007 | Longman |
| 7,228,651 B1 | 6/2007 | Saari |
| 7,229,354 B2 | 6/2007 | McNutt et al. |
| 7,229,385 B2 | 6/2007 | Freeman et al. |
| 7,233,922 B2 | 6/2007 | Asher et al. |
| 7,248,852 B2 | 7/2007 | Cabrera et al. |
| 7,270,605 B2 | 9/2007 | Russell et al. |

## US 9,355,518 B2
Page 4

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,284,708 B2 | 10/2007 | Martin |
| 7,288,025 B1 | 10/2007 | Cumbers |
| 7,288,028 B2 | 10/2007 | Rodriquez et al. |
| 7,290,264 B1 | 10/2007 | Powers et al. |
| 7,297,062 B2 | 11/2007 | Gatto et al. |
| 7,306,514 B2 | 12/2007 | Amaitis et al. |
| 7,311,605 B2 | 12/2007 | Moser |
| 7,311,606 B2 | 12/2007 | Amaitis et al. |
| 7,316,619 B2 | 1/2008 | Nelson |
| 7,341,517 B2 | 3/2008 | Asher et al. |
| 7,357,717 B1 | 4/2008 | Cumbers |
| 7,394,405 B2 | 7/2008 | Godden |
| 7,413,513 B2 | 8/2008 | Nguyen et al. |
| 7,429,215 B2 | 9/2008 | Rozkin |
| 7,435,179 B1 | 10/2008 | Ford |
| 7,437,147 B1 | 10/2008 | Luciano, Jr. |
| 7,442,124 B2 | 10/2008 | Asher et al. |
| 7,452,273 B2 | 11/2008 | Amaitis et al. |
| 7,452,274 B2 | 11/2008 | Amaitis et al. |
| 7,458,891 B2 | 12/2008 | Asher et al. |
| 7,458,894 B2 | 12/2008 | Danieli et al. |
| 7,460,863 B2 | 12/2008 | Steelberg et al. |
| 7,479,065 B1 | 1/2009 | McAllister et al. |
| 7,506,172 B2 | 3/2009 | Bhakta |
| 7,510,474 B2 | 3/2009 | Carter |
| 7,534,169 B2 | 5/2009 | Amaitis et al. |
| 7,546,946 B2 | 6/2009 | Hefner et al. |
| 7,549,576 B2 | 6/2009 | Alderucci et al. |
| 7,549,756 B2 | 6/2009 | Willis et al. |
| 7,562,034 B2 | 7/2009 | Asher et al. |
| 7,566,270 B2 | 7/2009 | Amaitis et al. |
| 7,637,810 B2 | 12/2009 | Amaitis et al. |
| 7,665,668 B2 | 2/2010 | Phillips |
| 7,686,687 B2 | 3/2010 | Cannon et al. |
| 7,689,459 B2 | 3/2010 | Capurso et al. |
| 7,736,221 B2 | 6/2010 | Black et al. |
| 7,742,972 B2 | 6/2010 | Lange et al. |
| 7,744,002 B2 | 6/2010 | Jones et al. |
| 7,819,749 B1 | 10/2010 | Fish et al. |
| 7,828,652 B2 | 11/2010 | Nguyen et al. |
| 7,828,661 B1 | 11/2010 | Fish et al. |
| 7,867,083 B2 | 1/2011 | Wells et al. |
| 7,946,917 B2 | 5/2011 | Kaminkow et al. |
| 7,967,682 B2 | 6/2011 | Huizinga |
| 8,016,667 B2 | 9/2011 | Benbrahim |
| 8,047,914 B2 | 11/2011 | Morrow |
| 8,123,616 B2 | 2/2012 | Wells et al. |
| 8,142,283 B2 | 3/2012 | Lutnick |
| 8,162,756 B2 | 4/2012 | Amaitis et al. |
| 8,267,789 B2 | 9/2012 | Nelson |
| 8,285,484 B1 | 10/2012 | Lau |
| 8,298,078 B2 | 10/2012 | Sutton et al. |
| 8,306,830 B1 | 11/2012 | Renuart |
| 8,425,314 B2 | 4/2013 | Benbrahim |
| 8,968,077 B2 | 3/2015 | Weber et al. |
| 2001/0018663 A1 | 8/2001 | Dusell et al. |
| 2001/0026240 A1 | 10/2001 | Neher |
| 2001/0026610 A1 | 10/2001 | Katz et al. |
| 2001/0026632 A1 | 10/2001 | Tamai |
| 2001/0027130 A1 | 10/2001 | Namba et al. |
| 2001/0028308 A1 | 10/2001 | De La Huerga |
| 2001/0031663 A1 | 10/2001 | Johnson |
| 2001/0034237 A1 | 10/2001 | Garahi |
| 2001/0034268 A1 | 10/2001 | Thomas et al. |
| 2001/0036858 A1 | 11/2001 | McNutt et al. |
| 2001/0049275 A1 | 12/2001 | Pierry et al. |
| 2001/0055991 A1 | 12/2001 | Hightower |
| 2002/0002075 A1 | 1/2002 | Rowe |
| 2002/0013827 A1 | 1/2002 | Edstrom et al. |
| 2002/0034978 A1 | 3/2002 | Legge et al. |
| 2002/0037767 A1 | 3/2002 | Ebin |
| 2002/0049909 A1 | 4/2002 | Jackson et al. |
| 2002/0052231 A1 | 5/2002 | Fioretti |
| 2002/0065097 A1 | 5/2002 | Brockenbrough |
| 2002/0068631 A1 | 6/2002 | Raverdy |

| | | | |
|---|---|---|---|
| 2002/0073021 A1 | 6/2002 | Ginsberg et al. |
| 2002/0074725 A1 | 6/2002 | Stern |
| 2002/0087505 A1 | 7/2002 | Smith |
| 2002/0095586 A1 | 7/2002 | Doyle et al. |
| 2002/0111210 A1 | 8/2002 | Luciano |
| 2002/0111213 A1 | 8/2002 | McEntee et al. |
| 2002/0119817 A1 | 8/2002 | Behm |
| 2002/0123377 A1 | 9/2002 | Shulman |
| 2002/0124182 A1 | 9/2002 | Bacso |
| 2002/0125886 A1 | 9/2002 | Bates et al. |
| 2002/0128057 A1 | 9/2002 | Walker et al. |
| 2002/0132663 A1 | 9/2002 | Cumbers |
| 2002/0138461 A1 | 9/2002 | Sinclair et al. |
| 2002/0142839 A1 | 10/2002 | Wolinsky |
| 2002/0142844 A1 | 10/2002 | Kerr |
| 2002/0142846 A1 | 10/2002 | Paulsen |
| 2002/0143960 A1 | 10/2002 | Goren |
| 2002/0143991 A1 | 10/2002 | Chow et al. |
| 2002/0147047 A1 | 10/2002 | Letovsky et al. |
| 2002/0147049 A1 | 10/2002 | Carter, Sr. |
| 2002/0151344 A1 | 10/2002 | Tanskanen |
| 2002/0155884 A1 | 10/2002 | Updike |
| 2002/0157090 A1 | 10/2002 | Anton, Jr. |
| 2002/0160834 A1 | 10/2002 | Urie et al. |
| 2002/0160838 A1 | 10/2002 | Kim |
| 2002/0165020 A1 | 11/2002 | Koyama |
| 2002/0174336 A1 | 11/2002 | Sakakibara et al. |
| 2002/0183105 A1 | 12/2002 | Cannon et al. |
| 2002/0184653 A1 | 12/2002 | Pierce et al. |
| 2002/0191017 A1 | 12/2002 | Sinclair |
| 2002/0198044 A1 | 12/2002 | Walker |
| 2002/0198051 A1 | 12/2002 | Lobel et al. |
| 2003/0003988 A1 | 1/2003 | Walker et al. |
| 2003/0003997 A1 | 1/2003 | Vuong et al. |
| 2003/0006931 A1 | 1/2003 | Mages |
| 2003/0008662 A1 | 1/2003 | Stern et al. |
| 2003/0009603 A1 | 1/2003 | Ruths et al. |
| 2003/0013438 A1 | 1/2003 | Darby |
| 2003/0013513 A1 | 1/2003 | Rowe |
| 2003/0014639 A1 | 1/2003 | Jackson et al. |
| 2003/0017871 A1 | 1/2003 | Urie et al. |
| 2003/0027631 A1 | 2/2003 | Hedrick et al. |
| 2003/0028567 A1 | 2/2003 | Carlson |
| 2003/0031321 A1 | 2/2003 | Mages |
| 2003/0032407 A1 | 2/2003 | Mages |
| 2003/0032434 A1 | 2/2003 | Willner et al. |
| 2003/0032474 A1* | 2/2003 | Kaminkow ...................... 463/25 |
| 2003/0036425 A1 | 2/2003 | Kaminkow et al. |
| 2003/0036428 A1 | 2/2003 | Aasland |
| 2003/0040324 A1 | 2/2003 | Eldering et al. |
| 2003/0045353 A1 | 3/2003 | Paulsen et al. |
| 2003/0045354 A1 | 3/2003 | Globbi |
| 2003/0045358 A1 | 3/2003 | Leen et al. |
| 2003/0050115 A1 | 3/2003 | Leen et al. |
| 2003/0054878 A1* | 3/2003 | Benoy et al. ...................... 463/29 |
| 2003/0060286 A1 | 3/2003 | Walker |
| 2003/0064712 A1 | 4/2003 | Gaston |
| 2003/0064798 A1 | 4/2003 | Grauzer et al. |
| 2003/0064805 A1 | 4/2003 | Wells |
| 2003/0064807 A1 | 4/2003 | Walker et al. |
| 2003/0065805 A1 | 4/2003 | Barnes, Jr. |
| 2003/0069071 A1 | 4/2003 | Britt et al. |
| 2003/0069940 A1 | 4/2003 | Kavacheri et al. |
| 2003/0078101 A1 | 4/2003 | Schneider et al. |
| 2003/0087652 A1 | 5/2003 | Simon et al. |
| 2003/0087701 A1 | 5/2003 | Paravia et al. |
| 2003/0104851 A1 | 6/2003 | Merari |
| 2003/0104865 A1 | 6/2003 | Itkis et al. |
| 2003/0109306 A1 | 6/2003 | Karmarkar |
| 2003/0109310 A1 | 6/2003 | Heaton et al. |
| 2003/0114218 A1 | 6/2003 | McClintic |
| 2003/0130032 A1 | 7/2003 | Martinek et al. |
| 2003/0139190 A1 | 7/2003 | Steelberg |
| 2003/0140131 A1 | 7/2003 | Chandrashekhar |
| 2003/0144047 A1* | 7/2003 | Sprogis ............................. 463/9 |
| 2003/0148809 A1 | 8/2003 | Nelson |
| 2003/0148812 A1 | 8/2003 | Paulsen et al. |
| 2003/0157976 A1 | 8/2003 | Simon |
| 2003/0162580 A1 | 8/2003 | Cousineau |

US 9,355,518 B2

Page 5

(56)            References Cited

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2003/0162593 A1 | 8/2003 | Griswold et al. |
| 2003/0162594 A1 | 8/2003 | Rowe |
| 2003/0165293 A1 | 9/2003 | Abeles et al. |
| 2003/0173408 A1 | 9/2003 | Mosher et al. |
| 2003/0176162 A1 | 9/2003 | Planki |
| 2003/0176218 A1 | 9/2003 | LeMay |
| 2003/0177187 A1 | 9/2003 | Levine et al. |
| 2003/0177347 A1 | 9/2003 | Schneier et al. |
| 2003/0190944 A1 | 10/2003 | Manfredi et al. |
| 2003/0195037 A1 | 10/2003 | Vuong et al. |
| 2003/0195043 A1 | 10/2003 | Shinners et al. |
| 2003/0195841 A1 | 10/2003 | Ginsberg et al. |
| 2003/0208684 A1 | 11/2003 | Camacho et al. |
| 2003/0212996 A1 | 11/2003 | Wolzien |
| 2003/0224855 A1* | 12/2003 | Cunningham .................. 463/41 |
| 2003/0228895 A1 | 12/2003 | Edelson |
| 2003/0228898 A1 | 12/2003 | Rowe |
| 2003/0228901 A1 | 12/2003 | Walker et al. |
| 2003/0228907 A1 | 12/2003 | Gatto et al. |
| 2003/0228910 A1 | 12/2003 | Jawaharla et al. |
| 2003/0236120 A1 | 12/2003 | Reece |
| 2004/0002355 A1 | 1/2004 | Spencer |
| 2004/0002383 A1 | 1/2004 | Lundy |
| 2004/0002386 A1 | 1/2004 | Wolfe et al. |
| 2004/0002843 A1 | 1/2004 | Robarts |
| 2004/0009812 A1 | 1/2004 | Scott et al. |
| 2004/0014522 A1 | 1/2004 | Walker et al. |
| 2004/0029635 A1 | 2/2004 | Giobbi |
| 2004/0029638 A1 | 2/2004 | Hytcheson et al. |
| 2004/0034775 A1 | 2/2004 | Desjardins et al. |
| 2004/0038734 A1 | 2/2004 | Adams |
| 2004/0044774 A1 | 3/2004 | Mangalik et al. |
| 2004/0048613 A1 | 3/2004 | Sayers |
| 2004/0053692 A1 | 3/2004 | Chatigny et al. |
| 2004/0061646 A1 | 4/2004 | Andrews et al. |
| 2004/0063497 A1 | 4/2004 | Gould |
| 2004/0066296 A1 | 4/2004 | Atherton |
| 2004/0068441 A1 | 4/2004 | Werbitt |
| 2004/0068532 A1 | 4/2004 | Dewing |
| 2004/0083394 A1 | 4/2004 | Brebner et al. |
| 2004/0092306 A1 | 5/2004 | George et al. |
| 2004/0092311 A1 | 5/2004 | Weston |
| 2004/0097283 A1 | 5/2004 | Piper |
| 2004/0097287 A1 | 5/2004 | Postrel |
| 2004/0104274 A1 | 6/2004 | Kotik et al. |
| 2004/0104845 A1 | 6/2004 | McCarthy |
| 2004/0110565 A1 | 6/2004 | Levesque |
| 2004/0111369 A1 | 6/2004 | Lane et al. |
| 2004/0118930 A1 | 6/2004 | Berardi et al. |
| 2004/0127277 A1 | 7/2004 | Walker et al. |
| 2004/0127289 A1 | 7/2004 | Davis |
| 2004/0132530 A1 | 7/2004 | Rutanen |
| 2004/0137983 A1 | 7/2004 | Kerr et al. |
| 2004/0137987 A1 | 7/2004 | Nguyen et al. |
| 2004/0142744 A1 | 7/2004 | Atkinson et al. |
| 2004/0147323 A1 | 7/2004 | Cliff et al. |
| 2004/0162124 A1 | 8/2004 | Barton |
| 2004/0162144 A1 | 8/2004 | Loose |
| 2004/0185881 A1 | 9/2004 | Lee et al. |
| 2004/0186768 A1 | 9/2004 | Wakim et al. |
| 2004/0189470 A1 | 9/2004 | Girvin et al. |
| 2004/0192438 A1 | 9/2004 | Wells et al. |
| 2004/0192442 A1 | 9/2004 | Wells et al. |
| 2004/0193469 A1 | 9/2004 | Amaitis et al. |
| 2004/0193531 A1 | 9/2004 | Amaitis et al. |
| 2004/0198386 A1 | 10/2004 | Dupray |
| 2004/0198396 A1 | 10/2004 | Fransioli |
| 2004/0198398 A1 | 10/2004 | Amir et al. |
| 2004/0198403 A1 | 10/2004 | Pedersen et al. |
| 2004/0198483 A1 | 10/2004 | Amaitis et al. |
| 2004/0209660 A1 | 10/2004 | Carlson |
| 2004/0209690 A1 | 10/2004 | Bruzzese |
| 2004/0219961 A1 | 11/2004 | Ellenby |
| 2004/0224769 A1 | 11/2004 | Hansen |
| 2004/0225565 A1 | 11/2004 | Selman |
| 2004/0229685 A1 | 11/2004 | Smith |
| 2004/0229699 A1 | 11/2004 | Gentles et al. |
| 2004/0242297 A1 | 12/2004 | Walker |
| 2004/0242332 A1 | 12/2004 | Walker et al. |
| 2004/0243504 A1 | 12/2004 | Asher et al. |
| 2004/0248637 A1 | 12/2004 | Liebenberg et al. |
| 2004/0248653 A1 | 12/2004 | Barros et al. |
| 2004/0259626 A1 | 12/2004 | Akram |
| 2004/0259631 A1 | 12/2004 | Katz et al. |
| 2004/0266533 A1 | 12/2004 | Gentles et al. |
| 2005/0001711 A1 | 1/2005 | Doughty et al. |
| 2005/0003881 A1 | 1/2005 | Byng |
| 2005/0003888 A1 | 1/2005 | Asher et al. |
| 2005/0003893 A1 | 1/2005 | Hogwood et al. |
| 2005/0009600 A1 | 1/2005 | Rowe et al. |
| 2005/0014554 A1 | 1/2005 | Walker et al. |
| 2005/0020336 A1 | 1/2005 | Cesare |
| 2005/0020340 A1 | 1/2005 | Cannon |
| 2005/0026670 A1 | 2/2005 | Lardie |
| 2005/0026697 A1 | 2/2005 | Balahura |
| 2005/0027643 A1 | 2/2005 | Amaitis et al. |
| 2005/0043996 A1 | 2/2005 | Silver |
| 2005/0049022 A1 | 3/2005 | Mullen |
| 2005/0049949 A1 | 3/2005 | Asher et al. |
| 2005/0054439 A1 | 3/2005 | Rowe et al. |
| 2005/0059397 A1 | 3/2005 | Zhao |
| 2005/0059485 A1 | 3/2005 | Paulsen |
| 2005/0064934 A1 | 3/2005 | Amaitis et al. |
| 2005/0071481 A1 | 3/2005 | Danieli |
| 2005/0086301 A1 | 4/2005 | Eichler et al. |
| 2005/0090294 A1 | 4/2005 | Narasimhan |
| 2005/0096109 A1 | 5/2005 | McNutt et al. |
| 2005/0096133 A1 | 5/2005 | Hoefelmeyer et al. |
| 2005/0101383 A1 | 5/2005 | Wells |
| 2005/0107022 A1 | 5/2005 | Wichelmann |
| 2005/0107156 A1 | 5/2005 | Potts et al. |
| 2005/0108365 A1 | 5/2005 | Becker et al. |
| 2005/0113172 A1 | 5/2005 | Gong |
| 2005/0116020 A1 | 6/2005 | Smolucha et al. |
| 2005/0130677 A1 | 6/2005 | Meunier et al. |
| 2005/0130728 A1 | 6/2005 | Nguyen et al. |
| 2005/0131815 A1 | 6/2005 | Fung et al. |
| 2005/0137014 A1 | 6/2005 | Vetelainen |
| 2005/0143169 A1 | 6/2005 | Nguyen et al. |
| 2005/0144484 A1 | 6/2005 | Wakayama |
| 2005/0159212 A1 | 7/2005 | Romney et al. |
| 2005/0170845 A1 | 8/2005 | Moran |
| 2005/0170886 A1 | 8/2005 | Miller |
| 2005/0170890 A1 | 8/2005 | Rowe et al. |
| 2005/0170892 A1 | 8/2005 | Atkinson |
| 2005/0181859 A1 | 8/2005 | Lind et al. |
| 2005/0181862 A1 | 8/2005 | Asher et al. |
| 2005/0181870 A1 | 8/2005 | Nguyen et al. |
| 2005/0187000 A1 | 8/2005 | Miller |
| 2005/0187020 A1 | 8/2005 | Amaitis et al. |
| 2005/0190901 A1 | 9/2005 | Oborn et al. |
| 2005/0192077 A1 | 9/2005 | Okuniewicz |
| 2005/0193118 A1 | 9/2005 | Le et al. |
| 2005/0193209 A1 | 9/2005 | Saunders et al. |
| 2005/0197189 A1 | 9/2005 | Schultz |
| 2005/0197190 A1 | 9/2005 | Amaitis et al. |
| 2005/0209002 A1 | 9/2005 | Blythe et al. |
| 2005/0215306 A1 | 9/2005 | O'Donnell et al. |
| 2005/0234774 A1 | 10/2005 | Dupree |
| 2005/0239523 A1 | 10/2005 | Longman et al. |
| 2005/0239524 A1 | 10/2005 | Longman et al. |
| 2005/0239546 A1 | 10/2005 | Hedrick et al. |
| 2005/0245306 A1 | 11/2005 | Asher et al. |
| 2005/0245308 A1 | 11/2005 | Amaitis et al. |
| 2005/0251440 A1 | 11/2005 | Bednarek |
| 2005/0261061 A1 | 11/2005 | Nguyen et al. |
| 2005/0277471 A1 | 12/2005 | Russell et al. |
| 2005/0277472 A1 | 12/2005 | Gillan et al. |
| 2005/0282638 A1 | 12/2005 | Rowe et al. |
| 2005/0288937 A1 | 12/2005 | Verdiramo |
| 2006/0005050 A1 | 1/2006 | Basson et al. |
| 2006/0009279 A1 | 1/2006 | Amaitis et al. |
| 2006/0016877 A1 | 1/2006 | Bonalle et al. |
| 2006/0019745 A1 | 1/2006 | Benbrahim |

## US 9,355,518 B2
Page 6

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2006/0035707 A1 | 2/2006 | Nguyen et al. |
| 2006/0040717 A1 | 2/2006 | Lind et al. |
| 2006/0040741 A1 | 2/2006 | Griswold et al. |
| 2006/0052153 A1 | 3/2006 | Vlazny et al. |
| 2006/0058102 A1 | 3/2006 | Nguyen et al. |
| 2006/0068917 A1 | 3/2006 | Snoddy et al. |
| 2006/0069711 A1 | 3/2006 | Tsunekawa et al. |
| 2006/0076404 A1 | 4/2006 | Frerking |
| 2006/0093142 A1 | 5/2006 | Schneier et al. |
| 2006/0095790 A1 | 5/2006 | Nguyen et al. |
| 2006/0100019 A1 | 5/2006 | Hornik et al. |
| 2006/0116198 A1 | 6/2006 | Leen et al. |
| 2006/0116199 A1 | 6/2006 | Leen et al. |
| 2006/0116200 A1 | 6/2006 | Leen et al. |
| 2006/0121970 A1 | 6/2006 | Khal |
| 2006/0121987 A1 | 6/2006 | Bortnik et al. |
| 2006/0121992 A1 | 6/2006 | Bortnik et al. |
| 2006/0131391 A1 | 6/2006 | Penuela |
| 2006/0135252 A1 | 6/2006 | Amaitis et al. |
| 2006/0135259 A1 | 6/2006 | Nancke-Krogh et al. |
| 2006/0136296 A1 | 6/2006 | Amada |
| 2006/0148560 A1 | 7/2006 | Arezina et al. |
| 2006/0148561 A1 | 7/2006 | Moser |
| 2006/0160626 A1 | 7/2006 | Gatto et al. |
| 2006/0163346 A1 | 7/2006 | Lee et al. |
| 2006/0165235 A1 | 7/2006 | Carlson |
| 2006/0166740 A1 | 7/2006 | Sufuentes |
| 2006/0173754 A1 | 8/2006 | Burton et al. |
| 2006/0178216 A1 | 8/2006 | Shea et al. |
| 2006/0183522 A1 | 8/2006 | Leen et al. |
| 2006/0184417 A1 | 8/2006 | Van der Linden et al. |
| 2006/0187029 A1 | 8/2006 | Thomas |
| 2006/0189382 A1 | 8/2006 | Muir et al. |
| 2006/0194589 A1 | 8/2006 | Saniska |
| 2006/0199649 A1 | 9/2006 | Soltys et al. |
| 2006/0205489 A1 | 9/2006 | Carpenter et al. |
| 2006/0205497 A1 | 9/2006 | Wells et al. |
| 2006/0209810 A1 | 9/2006 | Krzyanowski et al. |
| 2006/0224046 A1 | 10/2006 | Ramadas et al. |
| 2006/0229520 A1 | 10/2006 | Yamashita |
| 2006/0234631 A1 | 10/2006 | Dieguez |
| 2006/0234791 A1 | 10/2006 | Nguyen et al. |
| 2006/0236395 A1 | 10/2006 | Barker et al. |
| 2006/0246990 A1 | 11/2006 | Downes |
| 2006/0247026 A1 | 11/2006 | Walker et al. |
| 2006/0247039 A1 | 11/2006 | Lerner et al. |
| 2006/0247041 A1 | 11/2006 | Walker et al. |
| 2006/0247053 A1 | 11/2006 | Mattila |
| 2006/0252501 A1 | 11/2006 | Little et al. |
| 2006/0252530 A1 | 11/2006 | Oberberger et al. |
| 2006/0258429 A1 | 11/2006 | Manning et al. |
| 2006/0277098 A1 | 12/2006 | Chung et al. |
| 2006/0277308 A1 | 12/2006 | Morse et al. |
| 2006/0277413 A1 | 12/2006 | Drews |
| 2006/0281541 A1* | 12/2006 | Nguyen et al. .................. 463/25 |
| 2006/0287092 A1 | 12/2006 | Walker et al. |
| 2006/0287098 A1 | 12/2006 | Morrow et al. |
| 2006/0293965 A1 | 12/2006 | Burton |
| 2007/0001841 A1 | 1/2007 | Anders et al. |
| 2007/0003034 A1 | 1/2007 | Schultz et al. |
| 2007/0015564 A1 | 1/2007 | Walker et al. |
| 2007/0021213 A1 | 1/2007 | Foe et al. |
| 2007/0026939 A1 | 2/2007 | Asher et al. |
| 2007/0030154 A1 | 2/2007 | Aiki et al. |
| 2007/0032301 A1 | 2/2007 | Acres et al. |
| 2007/0054739 A1 | 3/2007 | Amaitis et al. |
| 2007/0060305 A1 | 3/2007 | Amaitis et al. |
| 2007/0060306 A1 | 3/2007 | Amaitis et al. |
| 2007/0060312 A1 | 3/2007 | Dempsey et al. |
| 2007/0060326 A1 | 3/2007 | Juds et al. |
| 2007/0060355 A1 | 3/2007 | Amaitis et al. |
| 2007/0060358 A1 | 3/2007 | Amaitis et al. |
| 2007/0066401 A1 | 3/2007 | Amaitis |
| 2007/0066402 A1 | 3/2007 | Amaitis |
| 2007/0087834 A1 | 4/2007 | Moser et al. |
| 2007/0087843 A1 | 4/2007 | Steil et al. |
| 2007/0093296 A1 | 4/2007 | Asher et al. |
| 2007/0099697 A1 | 5/2007 | Nelson |
| 2007/0099703 A1 | 5/2007 | Terebilo |
| 2007/0117604 A1 | 5/2007 | Hill |
| 2007/0117634 A1 | 5/2007 | Hamilton et al. |
| 2007/0130044 A1 | 6/2007 | Rowan |
| 2007/0136817 A1 | 6/2007 | Nguyen |
| 2007/0167237 A1 | 7/2007 | Wang et al. |
| 2007/0168570 A1 | 7/2007 | Martin et al. |
| 2007/0181676 A1 | 8/2007 | Mateen et al. |
| 2007/0190494 A1 | 8/2007 | Rosenberg |
| 2007/0191719 A1 | 8/2007 | Yamashita et al. |
| 2007/0213120 A1 | 9/2007 | Beal et al. |
| 2007/0233585 A1 | 10/2007 | Ben Simon et al. |
| 2007/0238443 A1 | 10/2007 | Richardson |
| 2007/0238507 A1 | 10/2007 | Sobel et al. |
| 2007/0241187 A1 | 10/2007 | Alderucci et al. |
| 2007/0243927 A1 | 10/2007 | Soltys |
| 2007/0243935 A1 | 10/2007 | Huizinga |
| 2007/0257101 A1 | 11/2007 | Alderucci et al. |
| 2007/0258507 A1 | 11/2007 | Lee et al. |
| 2007/0259717 A1 | 11/2007 | Mattice et al. |
| 2007/0275779 A1 | 11/2007 | Amaitis |
| 2007/0281782 A1 | 12/2007 | Amaitis |
| 2007/0281785 A1 | 12/2007 | Amaitis |
| 2007/0281792 A1 | 12/2007 | Amaitis |
| 2007/0282959 A1 | 12/2007 | Stern |
| 2008/0004121 A1 | 1/2008 | Gatto et al. |
| 2008/0009344 A1 | 1/2008 | Graham et al. |
| 2008/0015013 A1 | 1/2008 | Gelman et al. |
| 2008/0022089 A1 | 1/2008 | Leedom |
| 2008/0026829 A1 | 1/2008 | Martin et al. |
| 2008/0026844 A1 | 1/2008 | Wells et al. |
| 2008/0032801 A1 | 2/2008 | Brunet de Courssou |
| 2008/0039196 A1 | 2/2008 | Walther et al. |
| 2008/0051193 A1 | 2/2008 | Kaminkow et al. |
| 2008/0066111 A1 | 3/2008 | Ellis et al. |
| 2008/0076505 A1 | 3/2008 | Nguyen et al. |
| 2008/0076506 A1 | 3/2008 | Nguyen et al. |
| 2008/0076572 A1 | 3/2008 | Nguyen et al. |
| 2008/0096628 A1 | 4/2008 | Czyzewski et al. |
| 2008/0096659 A1 | 4/2008 | Kreloff et al. |
| 2008/0102956 A1 | 5/2008 | Burman et al. |
| 2008/0102957 A1 | 5/2008 | Burman et al. |
| 2008/0108423 A1 | 5/2008 | Benbrahim et al. |
| 2008/0113785 A1 | 5/2008 | Alderucci et al. |
| 2008/0113786 A1 | 5/2008 | Alderucci et al. |
| 2008/0113787 A1 | 5/2008 | Alderucci et al. |
| 2008/0113816 A1 | 5/2008 | Mahaffey et al. |
| 2008/0132251 A1 | 6/2008 | Altman et al. |
| 2008/0139306 A1 | 6/2008 | Lutnick et al. |
| 2008/0146323 A1 | 6/2008 | Hardy et al. |
| 2008/0150678 A1 | 6/2008 | Giobbi et al. |
| 2008/0182644 A1 | 7/2008 | Lutnick et al. |
| 2008/0195664 A1 | 8/2008 | Maharajh et al. |
| 2008/0207302 A1 | 8/2008 | Lind et al. |
| 2008/0214261 A1 | 9/2008 | Alderucci et al. |
| 2008/0218312 A1 | 9/2008 | Asher et al. |
| 2008/0220871 A1 | 9/2008 | Asher et al. |
| 2008/0221396 A1 | 9/2008 | Garces et al. |
| 2008/0224822 A1 | 9/2008 | Asher et al. |
| 2008/0254897 A1 | 10/2008 | Saunders et al. |
| 2008/0305856 A1 | 12/2008 | Walker et al. |
| 2008/0305867 A1 | 12/2008 | Guthrie |
| 2008/0311994 A1 | 12/2008 | Amaitis et al. |
| 2008/0318670 A1 | 12/2008 | Zinder et al. |
| 2009/0049542 A1 | 2/2009 | DeYonker et al. |
| 2009/0055204 A1 | 2/2009 | Pennington et al. |
| 2009/0088232 A1 | 4/2009 | Amaitis et al. |
| 2009/0098925 A1 | 4/2009 | Gagner et al. |
| 2009/0117989 A1 | 5/2009 | Arezina et al. |
| 2009/0149233 A1 | 6/2009 | Strause et al. |
| 2009/0163272 A1 | 6/2009 | Baker et al. |
| 2009/0178118 A1 | 7/2009 | Cedo et al. |
| 2009/0183208 A1 | 7/2009 | Christensen et al. |
| 2009/0197684 A1 | 8/2009 | Arezina et al. |
| 2009/0204905 A1* | 8/2009 | Toghia .......................... 715/753 |
| 2009/0209233 A1 | 8/2009 | Morrison |

## US 9,355,518 B2

Page 7

(56)　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2009/0312032 A1 | 12/2009 | Bornstein et al. |
| 2009/0325708 A9 | 12/2009 | Kerr |
| 2010/0023372 A1 | 1/2010 | Gonzalez |
| 2010/0062834 A1 | 3/2010 | Ryan |
| 2010/0069158 A1 | 3/2010 | Kim |
| 2010/0075760 A1 | 3/2010 | Shimabukuro et al. |
| 2010/0113143 A1 | 5/2010 | Gagner et al. |
| 2010/0127919 A1 | 5/2010 | Curran et al. |
| 2010/0153511 A1 | 6/2010 | Lin |
| 2010/0205255 A1 | 8/2010 | Alderucci |
| 2010/0211431 A1 | 8/2010 | Lutnick |
| 2010/0227691 A1* | 9/2010 | Karsten ............................ 463/42 |
| 2010/0240455 A1 | 9/2010 | Gagner et al. |
| 2011/0269520 A1 | 11/2011 | Amaitis et al. |
| 2012/0190452 A1 | 7/2012 | Weston et al. |
| 2013/0005486 A1 | 1/2013 | Amaitis et al. |
| 2013/0065672 A1 | 3/2013 | Gelman et al. |
| 2013/0065679 A1 | 3/2013 | Gelman et al. |
| 2013/0072295 A1 | 3/2013 | Alderucci et al. |
| 2013/0084933 A1 | 4/2013 | Amaitis et al. |
| 2013/0165212 A1 | 6/2013 | Amaitis et al. |
| 2013/0165213 A1 | 6/2013 | Alderucci et al. |
| 2013/0165221 A1 | 6/2013 | Alderucci et al. |
| 2013/0178277 A1 | 7/2013 | Burman et al. |
| 2013/0210513 A1 | 8/2013 | Nguyen |
| 2013/0244742 A1 | 9/2013 | Amaitis et al. |
| 2014/0057724 A1 | 2/2014 | Alderucci et al. |
| 2014/0113707 A1 | 4/2014 | Asher et al. |
| 2014/0200465 A1 | 7/2014 | McIntyre |
| 2014/0220514 A1 | 8/2014 | Waldron et al. |
| 2014/0228127 A1 | 8/2014 | Alderucci et al. |
| 2014/0288401 A1 | 9/2014 | Ouwerkerk |
| 2014/0300491 A1 | 10/2014 | Chen |
| 2015/0080111 A1 | 3/2015 | Amaitis et al. |
| 2015/0141131 A1 | 5/2015 | Gelman et al. |
| 2015/0243135 A1 | 8/2015 | Lutnick et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 37 36 770 A1 | 5/1989 |
| DE | 43 16 652 A1 | 11/1994 |
| DE | 19922862 | 12/2000 |
| DE | 19944140 | 3/2001 |
| DE | 19952691 | 5/2001 |
| DE | 19952692 | 5/2001 |
| DE | 10060079 | 6/2002 |
| EP | 0 840 639 B1 | 7/1996 |
| EP | 0 506 873 B1 | 3/2000 |
| EP | 1045346 | 10/2000 |
| EP | 1063622 | 12/2000 |
| EP | 1 066 868 A2 | 1/2001 |
| EP | 1066867 | 1/2001 |
| EP | 1120757 | 1/2001 |
| EP | 1 202 528 A3 | 5/2002 |
| EP | 1217792 | 6/2002 |
| EP | 1231577 | 8/2002 |
| EP | 1291830 A2 | 3/2003 |
| EP | 1 475 755 A1 | 12/2003 |
| EP | 1 475 756 A2 | 11/2004 |
| EP | 1480102 A2 | 11/2004 |
| EP | 1 531 646 A1 | 5/2005 |
| EP | 1259930 B1 | 6/2005 |
| EP | 1480102 A3 | 10/2008 |
| GB | 2 248 404 | 4/1992 |
| GB | 2 256 594 | 12/1992 |
| GB | 2 391 432 | 2/2004 |
| GB | 2 391 767 | 2/2004 |
| GB | 2394675 | 5/2004 |
| GB | 2 406 291 | 3/2005 |
| JP | H11-220766 | 1/1988 |
| JP | 5-317485 | 12/1993 |
| JP | H07-281780 | 10/1995 |
| JP | 2000-69540 | 8/1998 |
| JP | 2000049046 | 2/2000 |
| JP | 2000-160016 | 6/2000 |
| JP | 200218125 | 7/2000 |
| JP | 200326491 | 10/2000 |
| JP | 200345435 | 11/2000 |
| JP | 200387614 | 12/2000 |
| JP | 2001-70658 | 3/2001 |
| JP | 2001-204971 | 7/2001 |
| JP | 2001-204972 | 7/2001 |
| JP | 2001/212363 | 8/2001 |
| JP | 2001 236458 | 8/2001 |
| JP | 2001-340656 | 12/2001 |
| JP | 2001-344400 | 12/2001 |
| JP | 2001-526550 | 12/2001 |
| JP | 2002 032515 | 1/2002 |
| JP | 2002-049681 | 2/2002 |
| JP | 2002-056270 | 2/2002 |
| JP | 2002107224 | 2/2002 |
| JP | 2002-109376 | 4/2002 |
| JP | 2002-66144 | 5/2002 |
| JP | 2002 133009 | 5/2002 |
| JP | 2002-135468 | 5/2002 |
| JP | 2002-175296 | 6/2002 |
| JP | 2002 189831 | 7/2002 |
| JP | 2002-253866 | 9/2002 |
| JP | 2002-263375 | 9/2002 |
| JP | 2002-292113 | 10/2002 |
| JP | 2003-053042 | 2/2003 |
| JP | 2003-062353 | 3/2003 |
| JP | 2003 078591 | 3/2003 |
| JP | 2003-518677 | 6/2003 |
| JP | 2003166050 | 6/2003 |
| JP | 2003-210831 | 7/2003 |
| JP | 2003-210852 | 7/2003 |
| JP | 2002024979 | 8/2003 |
| JP | 2002 149894 | 5/2004 |
| JP | 2004-261202 | 9/2004 |
| JP | 2004-321558 | 11/2004 |
| JP | 2004-536638 | 12/2004 |
| JP | 2005-073711 | 3/2005 |
| JP | 2006-072468 | 3/2006 |
| JP | 2007-011420 | 1/2007 |
| RU | 2190477 | 10/2002 |
| WO | WO93/10508 | 5/1993 |
| WO | WO 94/10658 | 5/1994 |
| WO | WO 94/16416 | 7/1994 |
| WO | WO 95/30944 | 11/1995 |
| WO | WO97/44750 | 11/1997 |
| WO | WO 99/04873 A1 | 2/1999 |
| WO | WO 99/08762 A1 | 2/1999 |
| WO | WO 99/19027 | 4/1999 |
| WO | WO99/42964 | 8/1999 |
| WO | WO 99/52077 | 10/1999 |
| WO | WO 99/55102 | 10/1999 |
| WO | WO 00/77753 A1 | 12/2000 |
| WO | 01/20538 | 3/2001 |
| WO | WO 01/17262 A1 | 3/2001 |
| WO | WO 01/40978 A2 | 6/2001 |
| WO | WO 01/48712 A1 | 7/2001 |
| WO | WO 01/48713 | 7/2001 |
| WO | WO 01/48713 A1 | 7/2001 |
| WO | WO 01/54091 | 7/2001 |
| WO | 01/67218 | 9/2001 |
| WO | WO 01/82176 | 11/2001 |
| WO | WO 01/84817 A1 | 11/2001 |
| WO | WO 01/89233 A3 | 11/2001 |
| WO | WO 02/10931 A1 | 2/2002 |
| WO | WO 02/21457 A1 | 3/2002 |
| WO | WO 02/31739 | 4/2002 |
| WO | WO 02/37246 | 5/2002 |
| WO | WO 02/39605 A1 | 5/2002 |
| WO | WO 02/41199 A3 | 5/2002 |
| WO | WO 02/47042 | 6/2002 |
| WO | WO 02/065750 A2 | 8/2002 |
| WO | WO 02/071351 A2 | 9/2002 |
| WO | WO 02/077931 A1 | 10/2002 |
| WO | WO02/101486 | 12/2002 |
| WO | WO 03/005743 | 1/2003 |
| WO | 03/015299 A1 | 2/2003 |
| WO | WO 03/013678 A1 | 2/2003 |

**US 9,355,518 B2**

Page 8

(56)                **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | WO 03/015299 | | 2/2003 |
|---|---|---|---|
| WO | WO 03/021543 | | 3/2003 |
| WO | WO 03/027970 | A2 | 4/2003 |
| WO | 03/045519 | | 6/2003 |
| WO | 03/081447 | | 10/2003 |
| WO | WO 2004/000428 | A1 | 12/2003 |
| WO | WO 2004/003810 | A1 | 1/2004 |
| WO | WO 2004/013820 | | 2/2004 |
| WO | WO 2004/014506 | A1 | 2/2004 |
| WO | WO 2004/023253 | A3 | 3/2004 |
| WO | 2004/027689 | A2 | 4/2004 |
| WO | WO 2004/027689 | | 4/2004 |
| WO | WO 2004/034223 | | 4/2004 |
| WO | WO 2004/073812 | A2 | 9/2004 |
| WO | WO 2004/095383 | | 11/2004 |
| WO | WO 2004/104763 | A2 | 12/2004 |
| WO | WO 2004/114235 | A1 | 12/2004 |
| WO | WO 2005/001651 | | 1/2005 |
| WO | WO 2005/015458 | A1 | 2/2005 |
| WO | WO 2005/022453 | | 3/2005 |
| WO | WO 2005/026870 | A2 | 3/2005 |
| WO | WO 2005/031627 | A1 | 4/2005 |
| WO | WO 2005/031666 | A1 | 4/2005 |
| WO | WO 2005/036425 | A1 | 4/2005 |
| WO | WO 2005/050574 | A2 | 6/2005 |
| WO | WO 2005/082011 | | 9/2005 |
| WO | WO 2005/085980 | | 9/2005 |
| WO | WO 2005/098650 | | 10/2005 |
| WO | 2006/023230 | | 3/2006 |
| WO | WO 2007/008601 | A2 | 1/2007 |
| WO | WO97/19537 | | 5/2007 |
| WO | WO 2008/005264 | | 1/2008 |
| WO | WO 2008/016610 | | 2/2008 |

OTHER PUBLICATIONS

China Telecom; *Win Win Gaming Inc. announces agreement to provide wireless lottery and entertainment content in Shanghai*; vol. 11, No. 9; 2 pages; Sep. 2004.
Business Wire; *EA Announces Next Step Into Mobile Gaming; Digital Bridges Named as Strategic Partner for Distribution of Mobile Interactive Entertainment in Europe, North and South America*; 3 pages; Sep. 2, 2004.
Wireless News; *Mobile Casinos, Lotteries Good News for Mobile Revenues*; 2 pages; Feb. 23, 2005.
Business Wire; *MobileGamingNow, Inc. Announces the Launch of the First Ever Mobile Phone Interactive, Multi-Player Gaming System for Poker*; 2 pages; Apr. 4, 2005.
Business Wire; *InfoSpace's Golf Club 3D Scores Hole-in-One for Exciting and Realistic Game Play; InfoSpace's 3D Golf Captures the Challenge and Realism of the Sport With Real-Time 3D Animation, Weather Effects, and Customizable Characters*; 2 pages; Apr. 21, 2005.
Business Wire; *July Systems' Play2Win Interactive Game Service Launched on UK's MobileGaming.com; Speedy Customer Deployments Now Possible With July's New UK Mobile Retailing Infrastructure*; 2 pages; May 4, 2005.
Gaming Labs Certified™; Standard Series; *GLI-26: Wireless Gaming System Standards*; Version: 1.1; 28 pages; Jan. 18, 2007.
*Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration*, for International Application No. PCT/US06/26343, 8 pages, Jan. 19, 2007.
*Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration*, for International Application No. PCT/US06/26600, 8 pages, Jan. 19, 2007.
Gaming Labs Certified™; Standard Series; *GLI-11: Gaming Devices in Casinos*; Version: 2.0; 96 pages; Apr. 20, 2007.
*Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration* for International Application No. PCT/US06/26350, 8 pages, Apr. 27, 2007.

Gaming Labs Certified™; Standard Series; *GLI-21: Client-Server Systems*; Version: 2.1; 85 pages; May 18, 2007.
USPTO Office Action for U.S. Appl. No. 11/418,939, Dec. 17, 2007 (13 pages).
USPTO Office Action for U.S. Appl. No. 11/418,939, Aug. 20, 2008 (12 pages).
USPTO Office Action for U.S. Appl. No. 11/418,939, Apr. 10, 2007. *United States Patent and Trademark Office, Office Action* for U.S. Appl. No. 11/210,482; 26 pages; Jul. 27, 2007.
*Australian Patent Office; Examination Report* for Singapore Patent Application No. 0605830-9; 5 pages; Jul. 7, 2008.
*PCT Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority* for International Application No. PCT/US07/66873; 4 pages; Aug. 4, 2008.
*PCT Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority* for International Application No. PCT/US2008/057239; 8 pages; Aug. 7, 2008.
U.S. PTO Office Action for U.S. Appl. No. 11/199,831; 9 pages; Dec. 19, 2008.
U.S. PTO Office Action for U.S. Appl. No. 11/406,783; Feb. 9, 2009.
U.S. PTO Office Action for U.S. Appl. No. 11/686,354; Oct. 1, 2009; 9 pages.
Notice of Allowance for U.S. Appl. No. 11/406,783; 6 pages; 9/28/9.
Notice of Allowance for U.S. Appl. No. 11/199,831; 5 pages; Oct. 21, 2009.
USPTO Office Action for U.S. Appl. No. 11/559,829, mailed Nov. 3, 2009, 22 pp.
USPTO Office Action for U.S. Appl. No. 11/559,933, mailed Oct. 20, 2009, 17 pp.
USPTO Office Action for U.S. Appl. No. 11/559,484, mailed Nov. 3, 2009, 31 pp.
Notice of Allowance for U.S. Appl. No. 11/686,354; Apr. 29, 2010; 6 pages.
Notice of Allowability for U.S. Appl. No. 11/199,835; Apr. 10, 2009; 2 pages.
AU Examination Report for AU Application No. 2006269413; 2 pages; Apr. 29, 2009.
Canadian Examination Report for CA Application No. 2613335; 4 pages; Mar. 29, 2010.
AU Examination Report for AU Application No. 2007216729; 5 pages; Jan. 16, 2009.
U.S. PTO Office Action for U.S. Appl. No. 11/559,829; 29 pages; Jun. 22, 2010.
AU Examination Report for AU Application No. 2007319235; Jul. 6, 2010; 2 pages.
AU Examination Report for AU Application No. 2006269416; 4 pages; Jun. 10, 2009.
U.S. PTO Office Action for U.S. Appl. No. 11/559,484; 19 pages; Jul. 20, 2010.
U.S. PTO Office Action for U.S. Appl. No. 11/559,933; 37 pages; Jul. 20, 2010.
CA Examination Report for CA Application No. 2613333; Aug. 30, 2010; 4 pages.
NZ Examination Report for NZ Application No. 577177; Dec. 17, 2010; 2 pages.
CA Examination report for CA Application No. 2596474; Nov. 15, 2010; 6 pages.
UK Office Action for Application No. 0910202.1 dated Dec. 21, 2010; 7 pages.
Notice of Allowance for U.S. Appl. No. 11/686,354; Mar. 3, 2011; 8 pages.
U.S. PTO Office Action for U.S. Appl. No. 12/247,623; 10 pages; Mar. 21, 2011.
Notice of Acceptance for AU Application No. 2006269416 dated Mar. 9, 2011; 3 pages.
Notice of Acceptance for CA Application No. 2613335 dated Apr. 4, 2011; 1 pages.
JP Office Action for Application No. 2008-520391; Feb. 1, 2011; 7 pages total with English Translation.
Notice of Acceptance for AU Application No. 2006269413 dated Feb. 7, 2011; 3 pages.

**US 9,355,518 B2**

Page 9

(56)        **References Cited**

OTHER PUBLICATIONS

JP Office Action for Application No. 2008-520389; Jan. 18, 2011; 6 pages total with English Translation.

Notice of Allowance for U.S. Appl. No. 11/559,484; 8 pages; Nov. 23, 2010.

Notice of Allowance for U.S. Appl. No. 11/418,939; 27 pages; Mar. 9, 2009.

AU Examination Report for Application No. 2010214792 dated May 18, 2011; 2 pages.

EP Office Action for Application No. 07760844.6 dated Jan. 5, 2009; 7 pages.

Notice of Acceptance for Application No. 2010214792 dated Aug. 3, 2011; 3 pages.

U.S. PTO Office Action for U.S. Appl. No. 12/324,221; 13 pages; Aug. 10, 2011.

U.S. PTO Office Action for U.S. Appl. No. 12/324,269; 14 pages; Aug. 15, 2011.

U.S. PTO Office Action for U.S. Appl. No. 12/324,355; 14 pages; Aug. 18, 2011.

Notice of Allowance for U.S. Appl. No. 11/559,484; 8 pages; Jun. 20, 2011.

GB Office Action for Application No. GB0910202.1; 4 pages; Jul. 11, 2011.

Notice of Allowance for CA Application No. 2613333; 1 pages; Jul. 20, 2011.

Notice of Allowance for U.S. Appl. No. 12/324,221; 7 pages; Dec. 28, 2011.

Notice of Allowance for U.S. Appl. No. 12/324,269; 7 pages; Dec. 6, 2011.

Notice of Allowance for U.S. Appl. No. 12/324,355; 7 pages; Dec. 12, 2011.

AU Examination Report for Application No. 2011202267; 2 pages; Nov. 30, 2011.

Notice of Allowance for U.S. Appl. No. 11/559,484; 8 pages; Dec. 13, 2011.

Notice of Allowance for U.S. Appl. No. 12/247,623; Jan. 24, 2012; 8 pages.

U.S. PTO Office Action for U.S. Appl. No. 12/647,887; Jan. 23, 2012; 11 pages.

Notice of Allowance for U.S. Appl. No. 11/559,829; Jan. 10, 2012; 14 pages.

U.S. PTO Office Action for U.S. Appl. No. 12/792,361; Feb. 13, 2012; 14 pages.

Extended EP Search report for Application No. 07871467.2; Feb. 8, 2012; 8 pages.

U.S. PTO Office Action for U.S. Appl. No. 12/685,381; 8 pages; Feb. 28, 2012.

U.S. PTO Office Action for U.S. Appl. No. 11/559,933; 23 pages; Mar. 2, 2012.

JP Office Action for Application No. 2008-520389; Jan. 24, 2012; 5 pages (includes English Translation).

AU Examination Report for AU Application No. 2007319235; Mar. 13, 2012; 2 pages.

JP Office Action for Application No. 2008-520391; Apr. 10, 2012; 6 pages total with English Translation.

Notice of Acceptance for AU Application No. 2011202267; 3 pages; Mar. 6, 2012.

Notice of Allowance for U.S. Appl. No. 12/324,269; 9 pages; Mar. 22, 2012.

Notice of Allowance for U.S. Appl. No. 11/559,484; 17 pages; Jun. 1, 2012.

Notice of Allowance for U.S. Appl. No. 11/559,829; May 11, 2012; 10 pages.

AU Examination report for Application No. 2011203051; May 28, 2012; 4 pages.

CA Examination Report for Application No. 2754756; 6 pages; May 29, 2012.

EP Office Action for Application No. 06786486.8; 5 pages; May 14, 2012.

EP Office Action for Application No. 06786483.5; 7 pages; May 14, 2012.

Notice of Allowance for U.S. Appl. No. 12/324,355; 10 pages; Jun. 15, 2012.

U.S. PTO Office Action for U.S. Appl. No. 12/647,887; Aug. 3, 2012; 9 Pages.

NZ Examination Report for NZ Application No. 577177; Jun. 29, 2012; 2 pages.

Notice of Allowance for U.S. Appl. No. 12/685,381; 7 pages; Sep. 12, 2012.

U.S. PTO Office Action for U.S. Appl. No. 12/792,361; Sep. 26, 2012; 14 pages.

CA Examination report for CA Application No. 2596474; Mar. 20, 2012; 1 page.

Notice of Allowance for U.S. Appl. No. 11/559,484; 17 pages; Oct. 12, 2012.

U.S. PTO Final Office Action for U.S. Appl. No. 11/559,933; 24 pages; Dec. 6, 2012.

AU Examination Report for AU Application No. 2007319235; Apr. 16, 2012; 2 pages.

Yampolskiy et al., 2006, "Use of Behavioral Biometrics in Intrusion detection and Online Gaming", Biometric technology for Human Identification III, edited by Patrick J. Flynn, Sharath Pankanti, Proc. of SPIE vol. 6202, 62020U-1-10.

NZ Examination Report for NZ Application No. 577177; Oct. 12, 2012; 2 pages.

NZ Examination Report and Notice of Acceptance for NZ Application No. 577177; Nov. 6, 2012; 2 pages.

NZ Examination Report for NZ Application No. 600525; Jun. 14, 2012; 2 pages.

Notice of Allowance for U.S. Appl. No. 11/559,829; Oct. 9, 2012; 9 pages.

Notice of Allowance for U.S. Appl. No. 12/685,381; Jan. 9, 2013; 16 pages.

Notice of Allowance for U.S. Appl. No. 12/324,269; 27 pages; Oct. 17, 2012.

Notice of Allowance for U.S. Appl. No. 12/324,355; 34 pages; Jan. 16, 2013.

Notice of Allowance for Application No. 113/586,142; 8 pages; Dec. 24, 2012.

US PTO Office Action for U.S. Appl. No. 13/615,440; 17 pages; Jan. 15, 2013.

Notice of Allowance for U.S. Appl. No. 12/647,887; 35 pages; Mar. 13, 2013.

JP Office Action for Application No. 2009-506743 dated Jan. 22, 2013; 5 pages.

JP Office Action for Application No. 2009-537329 dated Feb. 26, 2013; 13 pages.

Notice of Allowance for U.S. Appl. No. 11/559,484; 11 pages; Mar. 26, 2013.

JP Office Action for Application No. 2008-520389; Apr. 9, 2013; 5 pages (includes English Translation).

Notice of Allowance for U.S. Appl. No. 11/559,829; Apr. 25, 2013; 13 pages.

USPTO Notice of Allowance for U.S. Appl. No. 13/070,893, 8 pages; Feb. 25, 2013.

U.S. Office Action for U.S. Appl. No. 13/070,893; 13 pages; Apr. 30, 2012.

U.S. Office Action for U.S. Appl. No. 13/080,098; 14 pages; May 25, 2012.

Australian Examination Report for AU Application No. 2011250750, 3 pages; May 22, 2013.

EP Communication for Application No. 07871467.2; Feb. 22, 2013; 7 pages.

JP Decision to Grant a Patent for Application No. 2008-520391, 4 pages; Jun. 12, 2013; (w/ English translation).

U.S. Notice of Allowance for U.S. Appl. No. 12/647,887; 9 pages; Jun. 7, 2013.

Hiroshi Kakii, Complete illustration for understanding the latest i-mode, Gijutsu-Hyohron Co. Ltd., Sep. 29, 2000. Second Print of the first edition, p. 36-37, 48-49, 62-63, 78-83, 94-95, and 108-111.

*Precision Marketing*; vol. 16, No. 11; ISSN 0955-0836; 2 pages; Jan. 9, 2004.

**US 9,355,518 B2**

Page 10

(56)           **References Cited**

OTHER PUBLICATIONS

Online Reporter; *GTECH Takes Lottery Mobile*; 1 page; Feb. 28, 2004.
Personal and Ubiquitous Computing; *Human Pacman: a mobile, wide-area entertainment system based on physical, social, and ubiquitous computing*; 12 pages; May 2004.
Solutions for Restaurants, Hotels & Resorts and Clubs—Guest bridge, Inc. (online). Guestbridge, Inc. Feb. 6, 2007 [retrieved on Aug. 21, 2008]. Retrieved from the Internet: <URL: http://web. archive.org/web/20070206134139/www.guestbridge.com/solutions.html, entire document especially p. 1.
*United States Patent and Trademark Office: Office Action* for U.S. Appl. No. 11/199,835, filed Aug. 9, 2005; in the name of Lee M. Amaitis, 17 pages; Mar. 2, 2007.
Janna Lindsjö, et al.; *GIGANT—an Interactive, Social, Physical and Mobile Game*; PDC 2002 Proceedings of the Participatory Design Conference; Malmö, Sweden; 5 pages; Jun. 23-25, 2002.
Stephan Neuert, et al.; The British Library; *Delivering Seamless Mobile Services Over Bluetooth*; 11 pages; date unknown.
Business Wire; *Home Gambling Network Inc., With U.S. Pat. No. 5,800,268—Business/Gambling—HGN and UUNET, a WorldCom/ MCI Company, Reach a Mutually Satisfactory Resolution in Patent Suit*; 2 pages; Mar. 19, 1999.
PR Newswire; *Nokia N-Gage (TM) Mobile Game Deck—The Revolutionary Gaming Experience; Major Global Games Publishers Excited to Publish on Wireless Multiplayer Platform*; 3 pages; Feb. 6, 2003.
Business Wire; *GoldPocket Interactive Launches EM Mobile Matrix, Industry's First Fully Synchronous Interactive Television and Massively Multi-Player Gaming Solution*; 2 pages; Mar. 17, 2003.
Brand Strategy; *The National Lottery has announced that UK consumers will be able to purchase tickets using the internet, TV and Mobile phones*. (Launches & Rebrands); ISSN 0965-9390; 1 page; Apr. 2003.
PR Newswire; *Ideaworks3D appointed by Eidos Interactive to Develop Blockbuster Line-up for Nokia N-Gage Mobile Game Deck*; 2 pages; May 23, 2003.
Telecomworldwire; *New mobile lottery service launched by mLotto*; 1 page; Oct. 30, 2003.
Singh, et al.; *Anywhere, Any-Device Gaming*; Human Interface Technology Laboratory; National University of Singapore; 4 pages; 2004.
Wu, et al; The Electronic Library; *Real Tournament—Mobile Context-Aware Gaming for the Next Generation*; vol. 22; No. 1; ISBN 0-86176-934-1; ISSN 0264-0473; 11 pages; 2004.
US Office Action for U.S. Appl. No. 11/559,933; Jul. 15, 2013; 32 pages.
US Office Action for U.S. Appl. No. 13/616,535; Jul. 9, 2013; 11 pages.
U.S. Notice of Allowance for U.S. Appl. No. 12/647,887; 6 pages; Jul. 19, 2013.
Notice of Allowance for U.S. Appl. No. 12/247,623; Aug. 2, 2013; 6 pages.
Notice of Allowance for U.S. Appl. No. 11/559,829; Aug. 23, 2013; 10 pages.
US Office Action for U.S. Appl. No. 13/616,588; Aug. 20, 2013; 17 pages.
Notice of Allowance for U.S. Appl. No. 11/559,829; Sep. 12, 2013; 10 pages.
U.S. Final Office Action for U.S. Appl. No. 13/615,440; 10; pages; Sep. 9, 2013.
US Office Action for U.S. Appl. No. 13/615,981; Sep. 13, 2013; 12 pages.
US Office Action for U.S. Appl. No. 13/616,492; Sep. 13, 2013; 13 pages.
US Notice of Allowance for U.S. Appl. No. 12/324,221; Sep. 20, 2013; 8 pages.
AU Examination Report No. 1 for Application No. 2012201974; Oct. 21, 2013; 3 pages.

US Notice of Allowance for U.S. Appl. No. 12/324,269; Oct. 30, 2013; 9 pages.
US Notice of Allowance for U.S. Appl. No. 13/586,142; Nov. 21, 2013; 7 pages.
CA Examination Report for App. No. 2,754,756; Dec. 30, 2013; 3 pages.
US Office Action for U.S. Appl. No. 13/616,414; Jan. 17, 2014; 11 pages.
US Office Action for U.S. Appl. No. 13/849,690; Jan. 14, 2014; 13 pages.
CA Examination Report for App. No. 2,596,474; Dec. 17, 2013; 2 pages.
NZ Examination Report for App. No. 618654; Dec. 20, 2013; 2 pages.
EP Examination Report for App. No. 06786486.8; Jan. 16, 2014; 5 pages.
EP Examination Report for App. No. 06786483.5; Jan. 16, 2014; 5 pages.
US Office Action for U.S. Appl. No. 11/686,354; Feb. 25, 2014; 10 pages.
AU Examination Report No. 1 for App. No. 2012258503; Feb. 24, 2014; 2 pages.
US Office Action for U.S. Appl. No. 12/792,361; Mar. 7, 2014; 13 pages.
EP Decision to Refuse a European Patent for App. No. 07871467.2; Mar. 3, 2014; 20 pages.
CA Examiners Report for App. No. 2,669,836; Feb. 24, 2014; 2 pages.
US Final Office Action for U.S. Appl. No. 13/616,535; May 8, 2014; 8 pages.
US Final Office Action for U.S. Appl. No. 13/616,492; May 15, 2014; 36 pages.
US Final Office Action for U.S. Appl. No. 11/559,933; May 21, 2014; 38 pages.
US Final Office Action for U.S. Appl. No. 13/616,588; May 15, 2014; 31 pages.
US Notice of Allowance for U.S. Appl. No. 13/615,440; May 12, 2014; 7 pages.
JP Final Notification for Reasons for Refusal for App. No. 2009-506743; May 7, 2014; 4 pages (w/English translation).
US Notice of Allowance for U.S. Appl. No. 13/616,535; May 30, 2014; 11 pages.
US Office Action for U.S. Appl. No. 13/615,981; Jun. 24, 2014; 13 pages.
CA Examiner's Requisition for App. No. 2,754,756; Sep. 3, 2014; 3 pages.
CA Examiner's Requisition for App. No. 2,669,836; Mar. 13, 2015; 4 pages.
CA Examiners Requisition for App. No. 2,754,756; May 12, 2015; 6 pages.
NZ First Examination Report for App. No. 706217; Apr. 9, 2015; 2 pages.
JP Final Decision for App. No. 2012-225097; Jul. 7, 2015; 12 pages (w/English translation).
JP Final Decision for App. No. 2013-165976; Jun. 30, 2015; 6 pages (w/English translation).
EP Communication for App. No. 07760844.6; Jun. 23, 2015; 7 pages.
JP Office Action for Application No. 2014-100471 dated Aug. 18, 2015; 6 pages.
JP Office Action for App. No. 2014-161395; Aug. 25, 2015; 6 pages (w/English translation).
AU Patent Examination Report No. For App. No. 2015200884; Mar. 15, 2016; 4 pages.
CA Notice of Allowance for App. No. 2,669,836; Apr. 6, 2016; 1 page.
AU Notice of Acceptance for App. No. 2011289295; Jan. 30, 2016; 3 pages.

* cited by examiner



*FIG. 1*



*FIG. 2*



*FIG. 3*

U.S. Patent

May 31, 2016

Sheet 2 of 5

US 9,355,518 B2

*FIG.* 4





*FIG. 5*



*FIG. 6*



*FIG. 7*



*FIG. 8*



*FIG. 9*



*FIG. 10*

US 9,355,518 B2

**1**

## GAMING SYSTEM WITH LOCATION DETERMINATION

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/247,623 (U.S. Patent Application Publication No. 20090029780), filed on Oct. 8, 2008 and entitled "System and Method For Wireless Gaming System with User Profiles, " which is a continuation of U.S. patent application Ser. No. 11/199,835 (now U.S. Pat. No. 7,534,169), filed on Aug. 9, 2005 and entitled "System and Method For Wireless Gaming System with User Profiles," which claims priority to U.S. Provisional Application Ser. No. 60/697,861 filed Jul. 8, 2005 and entitled "Enhanced Wireless gaming System," each of which is hereby incorporated by reference herein in its entirety.

This application is related to U.S. application Ser. No. 11/063,311, filed on Feb. 21, 2005 and entitled "System and Method for Convenience Gaming," is related to U.S. application Ser. No. 10/835,995 (now U.S. Pat. No. 8,092,303), filed on Apr. 29, 2004 and entitled "System and method for Convenience Gaming," is related to U.S. Provisional Application Ser. No. 60/547,507, filed on Feb. 25, 2004 and entitled "System and Method for Remote Gaming having Location Verification", and is related to U.S. Provisional Application Ser. No. 60/549,187, filed on Mar. 1, 2004 and entitled "System and Method for Remote Gaming having Location Verification", each of which is hereby incorporated by reference herein in its entirety.

### TECHNICAL FIELD

The present invention relates generally to the field of gaming and, more particularly to a gaming system and method incorporating a wireless network.

### BACKGROUND

The gaming industry allows people to participate in a variety of gaming activities within the limits of state and federal law. Possible gaming activities include gambling, such as that provided by casinos. Casino-type gambling activities include, but are not limited to, slot machines, table games, poker, keno, and other gaming activities that allow for the placement of bets. Events also may be wagered on and may include, for example, sporting events, such as horse or auto racing, and athletic competitions such as football, basketball, baseball, boxing, and golf. Gaming can also include non-wagering games and events, such as lottery contests. In a casino environment, the participation in such gaming activities is generally limited by a participant's physical location. For example, participants in casino-type gambling activities must be present at a gaming machine or at a gaming table within the casino in order to place a bet. Similarly, people interested in wagering on sporting events or athletic competitions in a casino environment must place bets through a sports book that is located in the casino.

### SUMMARY

Various embodiments of the invention are directed to gaming systems, which may be wireless gaming systems. According to certain embodiments, the gaming system is operable to make various gaming activities available to one or more users over a communications network and to display information associated with the activities to the users on gaming devices. The gaming devices may be mobile communication devices. Gaming activities may include any activities referred to or contemplated herein and are not limited to games. Gaming activities can include, for example, games, gambling activities, sporting events, purchase of goods or services, and accessing concierge services.

In accordance with an example embodiment, a gaming system includes at least one processor, at least one data storage device electronically coupled to the processor; and at least one gaming device in electronic communication with the processor. The at least one data storage device stores at least one user profile. The at least one user profile comprises at least one data set associated with a user of the gaming system. The at least one data set represents at least one characteristic of the user. The system is operable to recognize an event and update the at least one data set in response to the event.

In accordance with another example embodiment, a method is provided for maintaining a user profile in a gaming system. The method includes steps. One step includes establishing an initial profile. Another step includes storing at least a portion of the user profile on a data storage device. Another step includes recognizing the occurrence of an event. Another step includes updating the user profile in response to the event.

In accordance with another example embodiment, software is provided for managing a user profile in a gaming system. The software operable to establish an initial profile. The software is also operable to store at least a portion of the user profile on a data storage device. The software is also operable to recognize the occurrence of an event. The software is also operable to update the user profile in response to the event.

Various embodiments of the present invention may benefit from numerous advantages. It should be noted that one or more embodiments may benefit from some, none, or all of the advantages discussed below.

One advantage is that the system enables remote, wireless, mobile gaming over a secure network. Another advantage is that the system enables remote, wireless, mobile, gaming, while preventing gaming by unauthorized users and from unauthorized locations. Another advantage is the enablement of a gaming system accessible by remote, wireless, mobile users, wherein the system includes gaming communication devices used by the users and connected to a communication network, and wherein a portion of the communication network is movable.

Certain embodiments present the advantage of enabling an entity that provides wireless gaming services to track various gaming parameters related to one or more users of the gaming services. Among other things, this enables the entity to customize the gaming experience for the users. It also enables the gaming provider to more efficiently manage information associated with activities engaged in by the users. Among other things, this leads to more accurate and useable data for such things as tracking, management, service provision and back-end applications. Tracking of user profile information also allows for more efficient activities such as audits, reporting, system updates, and modification to the gaming services be provided.

Other advantages will be readily apparent to one having ordinary skill in the art from the following figures, descriptions, and claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention and for further features and advantages, reference is now

US 9,355,518 B2

3

made to the following description, taken in conjunction with the accompanying drawings, in which:

FIG. **1** illustrates a gaming system according to an embodiment of the present invention;

FIG. **2** illustrates a gaming system with a wireless network according to an embodiment of the present invention;

FIG. **3** is a block diagram of a gaming system illustrating various gaming activities in accordance with an embodiment of the present invention;

FIG. **4** illustrates a gaming system showing coverage areas in accordance with an embodiment of the present invention;

FIG. **5** illustrates a gaming system with a wireless network showing triangulation location determination in accordance with an embodiment of the present invention;

FIG. **6** is a flow chart depicting steps in a gaming method according to an embodiment of the present invention;

FIG. **7** depicts a gaming system showing a communication path in accordance with an embodiment of the present invention;

FIG. **8** illustrates a ship-based gaming system in accordance with an embodiment of the present invention;

FIG. **9** illustrates a wireless gaming system with user profiles in accordance with an embodiment of the present invention; and

FIG. **10** illustrates a method of providing user profiles in a wireless gaming system in accordance with an embodiment of the present invention.

DETAILED DESCRIPTION

A gaming system enables participants to engage in gaming activities from remote and/or mobile locations. The possible gaming activities include gambling, such as that provided by casinos. Gambling activities may include any casino-type gambling activities including, but not limited to, slot machines, video poker, table games (e.g., craps, roulette, blackjack, pai gow poker, Caribbean stud poker, baccarat, etc), the wheel of fortune game, keno, sports betting, horse racing, dog racing, jai alai, and other gambling activities. The gaming activities can also include wagering on any type of event. Events can include, for example, sporting events, such as horse or auto racing, and athletic competitions such as football, basketball, baseball, golf, etc. Events can also include such things that do not normally involve wagering. Such events may include, without limitation, political elections, entertainment industry awards, and box office performance of movies. Gaming can also include non-wagering games and events. Gaming can also include lotteries or lottery-type activities such as state and interstate lotteries. These can include all forms of number-selection lotteries, "scratch-off" lotteries, and other lottery contests. The gaming system may be implemented over a communications network such as a cellular network or a private wireless and/or wireline network. Examples of the latter include WiFi and WiMax networks. In one embodiment, the gaming system communications network is entirely independent of the Internet. In another embodiment, the gaming system operation makes minimal use of the Internet, such that only information for which there is no security issues is transmitted via the Internet and/or information may be encrypted. Preferably, the communications network enables users to participate in gaming from remote locations (e.g., outside of the gaming area of a casino). Also, the system may enable users to be mobile during participation in the gaming activities. Preferably, the system has a location verification or determination feature, which is operable to permit or disallow gaming from the remote location depending upon whether or not the location

4

meets one or more criteria. The criterion may be, for example, whether the location is within a pre-defined area in which gaming is permitted by law.

According to certain embodiments, the wireless gaming system can incorporate a user profile element. One or more user profiles may be created, maintained, and modified, for example, on one or more of the servers of the gaming system. Generally, the user profiles include information relating to respective users. The information may be maintained in one or more databases. The information may be accessible to the gaming server and/or to one or more mobile devices. The devices which may access the information may, according to certain embodiments, include gaming devices or gaming management devices. Gaming management devices may include wireless devices used by casino staff to provide gaming services or gaming management services.

At least certain embodiments include software and/or hardware to enable the provision, modification, and maintenance of one or more user profiles. Thus, one or more user profiles may each comprise a set of data maintained in a data storage device. The data set(s) for each respective user profile may reflect any of a number of parameters or pieces of information, which relate to the particular user(s) corresponding to the profile(s). Although not intended to be exhaustive, such information may include, for example, gaming activity preferences, such as preferred game and/or game configuration, preferred screen configuration, betting preferences, gaming location preferences, dining and other service preferences, and so forth. The information may also include user identity information, such as name, home address, hotel name and room number, telephone numbers, social security numbers, user codes, and electronic files of fingerprint, voice, photograph, retina scan, or other biometric information. User profile information may also include information relating to the user, but not determined by the user or the user's activities. Such information may include any information associated with, or made part of, a profile. For example, an entity such as a casino, may include as part of a profile certain rules governing the distribution of promotions or offers to the user. User profile information can include any codes, account numbers, credit information, approvals, interfaces, applications, or any other information which may be associated with a user. Thus, user profile information may include any information that is particular to a given user. For example, profile information may include the location(s) at which a particular user has played, skill levels, success levels, types of games played, and betting styles, and trends of information relating to the user's activities.

In particular embodiments, user profile information can include concierge or other service information that is associated with a user. Concierge services may include restaurant services, entertainment services, hotel services, money management services, or other appropriate services that may be offered to the user of a gaming device. For example, restaurant services may include, without limitation, services that allow the user to order drinks, order food, make reservations, or perform other restaurant related activities. As another example, entertainment services may include, without limitation, services that allow the user to purchase show tickets, arrange appointments or services, virtually shop, arrange transportation, or perform other entertainment related activities. Hotel services may include, for example, services that allow the user to check in, check out, make spa appointments, check messages, leave messages, review a hotel bill, or perform other guest-related activities. Money management ser-

US 9,355,518 B2

**5**

vices may include, for example, services that allow the user to transfer funds, pay bills, or perform other money management activities.

The gaming system may be configured to establish a new profile for any user who is using a gaming device for the first time. Alternatively, a new profile may be established for a prior user who has not played for a predetermined time period. The gaming system may set up the profile, monitor user activities, adjust the profile, and adjust information (such as graphics) displayed to the user. The gaming system may be configured to use the profile information to alter the presentation of gaming information to the user. For example, if a prior user has returned to the gaming system, the system may consult the profile for the user and determine that in the prior session of gaming the user lost money on craps but won money on blackjack. Based on this information, the system may adjust the default gaming screen and present a blackjack table for the user. As a further example, the profile information may indicate that the majority of the user's prior blackjack time was spent on $25 minimum tables. The system may, accordingly, make a further adjustment to the gaming environment and make the blackjack table being presented a $25 table. In this sense, the gaming system enables personalized wireless gaming based on one or more criteria maintained in a user profile.

The user profiles may be established, maintained, and periodically updated as necessary to enable a gaming provider to provide an enhanced, current, and/or customized gaming experience. Updates may be undertaken based on any suitable trigger, such as the occurrence of an event, the occurrence of a user activity, or the passage of a certain predetermined time period. Any or all of the profile information may be updated.

As shown in FIG. **1**, for example, gaming system **10** includes at least one user **12**. The system may include additional users such that there is at least a first user **12** and a second user **14**. Multiple users may access a first gaming system **10**, while other multiple users access a second gaming system (not shown) in communication with first gaming system **10**. Users **12** and **14** preferably access system **10** by way of a gaming communication device **13**. Gaming communication device **13** may comprise any suitable device for transmitting and receiving electronic communications. Examples of such devices include, without limitation, mobile phones, personal data assistants (PDAs), computers, mini-computers, etc. Gaming communication devices **13** transmit and receive gaming information to and from communications network **16**. Gaming information is also transmitted between network **16** and a computer **18**, such as a server, which may reside within the domain of a gaming service provider **20**. The location of computer **18** is not critical, however, and computer **18** may reside adjacent to or remote from the domain of gaming service provider **20**. Moreover, in certain embodiments, a gaming service provider is not required. The computer **18** and/or gaming service provider **20** may reside within, adjacent to, or remote from a gaming provider (not shown in FIG. **1**). The gaming provider may be an actual controller of games, such as a casino. As an example, a gaming service provider may be located on the grounds of a casino and the computer **18** may be physically within the geographic boundaries of the gaming service provider. As discussed, however, other possibilities exist for remote location of the computer **18** and the gaming service provider **20**. Computer **18** may function as a gaming service provider. Additional computers (not expressly shown) may function as database management computers and redundant servers, for example.

Preferably, software resides on both the gaming communication device **13** and the computer **18**. Software resident on

**6**

gaming communication device **13** is preferably operable to present information corresponding to gaming activities (including gambling and non-gambling activities discussed herein) to the user. The information includes, without limitation, graphical representations of objects associated with the activities, and presentation of options related to the activities and selectable by the user. The gaming communication device software is also preferably operable to receive data from the computer and data input by the user. Software resident on the computer is preferably able to exchange data with the gaming communication device, access additional computers and data storage devices, and perform all of the functions described herein as well as functions common to known electronic gaming systems.

Gaming information transmitted across network **16** may include any information, in any format, which is necessary or desirable in the operation of the gaming experience in which the user participates. The information may be transmitted in whole, or in combination, in any format including digital or analog, text or voice, and according to any known or future transport technologies, which may include, for example, wireline or wireless technologies. Wireless technologies may include, for example, licensed or license-exempt technologies. In particular embodiments, network **16** may include a Land Area Network (LAN), a Wide Area Network (WAN), a Metropolitan Area Network (MAN), a Personal Area Network (PAN), the Internet, an Intranet, an Extranet, or any combination of these or other suitable communication networks. Some specific technologies which may be used include, without limitation, Code Division Multiple Access (CDMA), Time Division Multiple Access (TDMA), Global System for Mobile Communication (GSM), General Packet Radio Service (GPRS), WiFi (802.11x), WiMax (802.16x), Public Switched Telephone Network (PSTN), Digital Subscriber Line (DSL), Integrated Services Digital Network (ISDN), Blue Tooth, or cable modem technologies. These are examples only and one of ordinary skill will understand that other types of communication techniques are within the scope of the present invention. Further, it will be understood that additional components may be used in the communication of information between the users and the gaming server. Such additional components may include, without limitation, lines, trunks, antennas, switches, cables, transmitters, receivers, computers, routers, servers, fiber optical transmission equipment, repeaters, amplifiers, etc.

In at least one embodiment, the communication of gaming information takes place without involvement of the Internet. However, in certain embodiments, a portion of the gaming information may be transmitted over the Internet. Also, some or all of the gaming information may be transmitted partially over an Internet communications path. In certain embodiments, some information is transmitted entirely or partially over the Internet, but the information is either not gaming information or is gaming information that does not need to be maintained secretly. For instance, data that causes a graphical representation of a table game on the user's gaming communication device might be transmitted at least partially over the Internet, while wagering information transmitted by the user might be transmitted entirely over a non-Internet communications network.

Certain user profile aspects are depicted in FIGS. **9** and **10**, for example. As shown in FIG. **9**, certain embodiments of the gaming system may include software and hardware to enable the provision of user profiles. Accordingly, system **910** includes at least one user **912**. Users **912** preferably access system **910** by way of gaming communication devices **913**. Gaming communication devices **913** transmit and receive

US 9,355,518 B2

7

gaming information to and from communications network **916**. Gaming information is also transmitted between network **916** and a computer **918**, such as a server, which may reside within the domain of a gaming service provider **920**. As with the description of system **10** in connection with FIG. **1**, this is an example illustration only and it will be readily understood that system **910** may be modified in any number of ways within the scope and spirit of the detailed description. For example, the computer **918** may comprise multiple servers, which may be centralized or distributed. Preferably, system **910** includes at least one database **922**. The database(s) **922** may be any suitable database capable of receiving, storing, and/or distributing electronic data.

One or more user profiles **924** are maintained within database **922**. Each user profile **924** preferably consists of one or more data files. It should be, however, that the user profiles may be maintained in any form that allows establishment, maintenance, and or updating of the profiles via the transfer of electronic information. It should also be understood that the user profile information may be centralized or distributed and certain portions of user profile information may be maintained at different elements within or without system **910**. A graphic user interface ("GUI") **926** may also be provided to enable or assist in the management of information within user profiles **924**.

According to at least one embodiment, at least one user profile includes various information corresponding to at least one user of system **910**. Such information may include, for example, user-specific information and non-user specific information. User-specific information may include any information that is determined in whole or in part by some characteristic of the user. For example, user-specific information may include information relating to user preferences, activities, habits, location, identity, etc. Non-user specific information may include any information that is not necessarily dictated by user characteristics. Non-user specific information may, however, be associated with one or more users. For example, non-user specific information may include gaming configurations, promotional information, activity schedules, etc.

Preference information may include any information which is at least partially determinative of a user's preferences with respect to at least one aspect of the gaming services. As such, preference information may be at least partially determinative of gaming presentation, gaming configuration, screen or display configuration, available activities, betting limits, service availability, service preferences, notifications, communication preferences, personnel and staff preferences, etc. Activity information may include any information reflecting a user's activities, whether they be gaming or service activities. As such activity information may include such things as indications of activity types during a particular time period, services and or games accessed by the user, applications for credit, funds transfers, service activities (e.g., dining, room service, laundry, car rental, etc.), bets made, win and loss information, cashing out activities, communication with staff, etc. Habit information may include any information reflecting an indication of a habit or trend of activity of a user. Such information may include, for example, increases or decreases in gaming times, bet amounts, frequency of activities, transfer of funds, times in which activities are undertaken, associations between two or more activities, etc. Location information may include any information related to a user's location within a predetermined space. The space may be a jurisdiction, state, region, country, city, casino property, casino gaming area, race track, sports venue, store, hotel, recreation area, restaurant, theater, or any other relevant

8

space. The location information may include associated information such as date, time of day, or other information associated with the location of the user. The location information may include information to reflect location over a certain time period or multiple time periods. The location information may indicate a series of locations, a route, a preferred destination, etc. Identify information may include any information indicative of the identity of the user. Such information may include, for example, name, address, phone number, codes, social security numbers, passwords, user names, login identifications, and biometric information (e.g., retain scan, fingerprint, and voice print information).

Non-user specific information is intended to encompass any information that does not necessarily correspond to a particular user. Such information can include gaming configurations, schedules, available gaming activities or services, displays, menus, announcement content, promotional content, information about other users or non-users (e.g., staff), and the like.

FIG. **10** illustrates an example method **1010** for establishing, maintaining, modifying, and acting on, a user profile. According to a first step **1012**, a user profile is initially established. The establishment of the user profile may comprise the creation of one or more data files to include one or more pieces of profile information. The profile information may include, for example, user-specific information such as name, credit information, and identity information. The user information may be any type of information considered or discussed herein. At step **1014**, an event occurs, which impacts at least one piece of information within the user profile. At step **1016**, the user profile is updated as a result of the event. In certain cases, the user profile is updated to reflect and/or record the occurrence of the event. In other instances, the occurrence of the event merely causes a piece of information to be updated. At step **1018**, the user profile is queried to determine the existence of one or more parameters. A parameter may be any suitable piece of information. For example, the query may determine whether any portion of the user profile information matches a piece of information specified by the query. At step **1020**, if the response to the query is affirmative, then a response action is initiated. Otherwise, the method returns to step **1014** to accept additional updates of the user profile.

Step **1012** may be accomplished in any number of ways. For example, initial profile information may be entered (e.g., through a GUI), by a data entry person. Initial profile information may include certain base level information necessary for the user to be able to operate a remote gaming device. For instance, initial information may include a name and password. Other information, such as credit information and additional verification information, may be required to access certain gaming activities and services. The profile may be initially created by data entry techniques, or by transfer of information from an external system or application. For example, a casino or hotel may have an existing system to collect certain information about a guest. A casino, for instance, may have a system that maintains information about certain users for purposes of managing comps. A hotel may collect certain information about its guests (e.g., upon check in). The gaming system may be configured to initiate and/or accept a transfer of information from such an external system to the profile data fields.

The event at step **1014** may be any suitable event, which can serve as a trigger to change the profile information. The change may be an addition or deletion of information, or a change to existing information. The event may be, for example, the occurrence of a particular day of the week, or

**9**

time of day, or a certain time within every hour. The event may be other types of events such as an action by a user. For example, a user event may include such things as a user arriving at a certain location, such as a particular casino or a particular area (e.g., casino floor, pool area, lobby, hotel room, restaurant, theater, store, etc.) within a casino property, a certain jurisdiction (e.g., crossing a particular state border), or a particular game (e.g., a certain slot machine or gaming table). The event may also be the selection, by a user, of a particular gaming activity or service. The event may also be the selection of any menu item offered by the gaming system. For example, the event may be the user's entry of a particular type of bet or a bet amount, or the selection of a particular game, the purchase of services or merchandise, or the attendance of an event such as a show. The event may also be an administrative event, such as check in, check out, establishment of a credit line, the deposit or transfer of gaming funds, or the registration of a user or a device. Any event described or contemplated herein, or which enables or relates to any of the activities described herein, may serve as an event. Events may also include occurrences that are not directly related to user activities. For example, an event may be the start of a tournament or sporting event, or the arrival of a particular staff person at a particular gaming table or other location within a casino property.

Step **1016** may comprise any updating scenario in which any portion of the profile information is updated. Updates may include additions, deletions, or modifications. Updates may be made to information that directly corresponds to the event. For example, a portion of the profile may indicate a user's last bet amount. Thus, a subsequent user bet that is a different amount may cause the last bet amount to be updated. Updates may also be made, however, to portions of the profile that do not directly correspond to the event. For example, a portion of the profile may indicate an average bet amount for a certain time period. A new bet may cause the average bet amount to be updated. The relationship between the event and the portion of the profile being updated may be even more remote. For example, a bet by a user may result in a total amount of bets placed by the user during a certain time period to reach a predetermined amount. This might, in turn, trigger a comp or promotion.

Step **1018** may comprise any suitable type of query scenario. A query may be initiated by an operator, staff person, user, or other individual. The query may be automatically generated based on a certain event. The query may be made at a desired, predetermined time, or at a randomly-selected time. The query may correspond to a particular event. For example, a user's selection of a $100 minimum blackjack table may initiate a query regarding the user's credit limit or past betting styles or preferences. Information entered by a user or another entity may form all or part of a query, or may cause a predetermined query to be initiated. The query may be made to determine what is indicated by a particular portion of the profile. Alternatively, the query may determine whether the profile portion matches a predetermined value (e.g., text, numeric, or other).

At step **1020**, the action may comprise any suitable action. An action may also comprise taking no action. An action may directly correspond to the event, or to the portion of the profile being queried. Alternatively, the action may have no direct connection to the event and/or may affect a portion of the profile not being queried. Actions may comprise, for example, enabling or disabling a device, extending credit, accepting an activity selection by a user, accepting a user's bet, updating a profile, generating a report, activating an alert or alarm, establishing a telecommunications link, sending a

**10**

message, making an offer, conducting a transaction, providing an indication (e.g., win or lose), changing a gaming parameter, initiating or altering a presentation of information to a user, providing a service, etc.

In at least one embodiment, the existence of a certain piece of information (e.g., a trigger) within a given user profile, will cause a modification of the gaming environment, which may be, for example, an alteration of at least one aspect of the gaming activities. For example, a portion of a profile may indicate the last type of game played by a user prior to a user logging off from the system. When the user logs back on, a query may indicate that the last game played by the user was blackjack. The system may, as a result, be triggered to present a blackjack table to the user as a possible activity. As another example, the profile may indicate that the user has always played blackjack at a certain time of day. If a query indicates that the time of day is appropriate, the system may present a blackjack table to the user. Modifications of the gaming environment can comprise any decision or method by which certain activities are presented to the user, as well as the format or way in which those activities are presented. As such, a modification may include enablement, disablement, addition, deletion, modification, etc. of any gaming activity or service described or contemplated herein.

In at least one embodiment, the existence of a piece of profile information will cause a modification of a different piece of the profile. A modification can include any addition, alteration, or deletion of any user profile or portion thereof.

In at least one embodiment, the profile indicates a characteristic, and an action is taken that relates to the characteristic. For example, according to one aspect, the user profile indicates a betting pattern. A betting pattern is intended to encompass any set of data that indicates at least two pieces of information relating to betting. According to one aspect, the betting patter will reflect a betting trend. That is, the betting pattern will reflect an upward or downward movement in the amount of bets. This can include movement in the amount, average amount, acceleration of an increase or decrease, and the like. The pattern can indicate certain betting habits (e.g., amounts bet) at certain times or corresponding to one or more other parameters represented by information within or without the user profile. For instance, the user might make an average $100 minimum blackjack bet between the hours of 8 p.m. and midnight on Saturday nights. These betting patterns and habits may be maintained, cross-linked, reported, or otherwise manipulated to extract intelligence from the raw information contained therein. As with the occurrence of certain pieces of information, the existence of a pattern can trigger any of the various actions discussed elsewhere herein including, for example, a re-verification requirement or the disablement of a gaming device if the betting pattern meets one or more parameters, such as a certain threshold.

According to at least one embodiment, the gaming system is operable to track various debts related to a user's activities. This debt information may be maintained as part of a user profile or may be maintained as a separate data component. The debts can include any type of debt owed by the user to any entity. For example, debts can include money owed as a result of losing at one or more games. Debt can also include bills for merchandise, entertainment (e.g., shows), hotel invoices, restaurant and bar tabs, or any other goods or services which might be associated with or related to a user's activities in connection with the gaming system. The system may be configured to prompt the user, at one or more predetermined or random times, to make a bet regarding all or a portion of the various debts. For example, the prompt may come at a specific time daily (e.g., 1:00 am), or at the occurrence of a specific

US 9,355,518 B2

**11**

event (e.g., upon checking out of the hotel). The prompt may allow for the bet to be made according to any number of games. For example, the user might choose to make a bet of 50% of his hotel invoice on a single hand of blackjack. The user might split up the amount(s) being wagered between blackjack and a spin on the roulette wheel.

According to another embodiment, another concept related to user profiles is the maintenance of one or more panic codes are established and maintained for one or more users. The code may be an alpha-numeric code, or a signal triggered by depressing a particular button or series of buttons on the gaming device. The code may be an electronic signal generated by a voice recognition unit ("VRU") in response to a voice command from the user. The code may be a signal generated in response to the unit moving into or out of one or more predetermined locations. The code may be used in any number of ways to initiate a suitable response. For example, security, police, or an emergency response unit may be dispatched automatically to the location of the gaming device. Alternatively, the code may initiate a dialog between a dispatcher and the user of the gaming device. Panic codes may be maintained as part of the user profiles.

According to another embodiment, verification, or re-verification may be based on user profile information. For example, re-verification may be required if the user profile information indicates a change in betting style that falls within or without a certain range or otherwise meets a certain threshold. Similarly, certain activities may be enabled or disabled (or modified) based on user profile information. For example, during a process of cashing out, a user might be required to inform the cashier as to certain details regarding the user's gaming activities. For instance, the user might be required to inform the cashier as to the location and type of game that the user last played. The cashier then compares this information to information stored in the user profile. If the information matches, then the cashing out process may continue. If the information does not match, the cashier may halt the cashing out process and/or request additional information from the user.

As part of a user profile element, the system may be configured to provide certain users with certain information based on the profile information. The information provided to the users may include such things as game rules, strategy and tips (e.g., blackjack optimal play card), payout and odds information, and other ancillary information (e.g., stock ticker information).

According to at least one embodiment, a matching "house" bet may be enabled and may be based on user profile information. For example, the system may be configured to prompt a user (e.g., at a predetermined or random time) to make a bet that the house (or other sponsoring entity) will match. For instance, the house might match a bet, up to a certain amount, for a certain time limit. This can be based on user profile information and/or location. This is an improvement over a scenario that involves sending a mailer to a prospective user, which offers a matching bet on a certain day, when there is no indication whether the prospective user even intends to be in the gaming jurisdiction on that particular day.

According to at least one embodiment, the system and/or the device may include a disabling function. Accordingly, the gaming device may be remotely disabled. This may occur, for instance, if the device is lost or stolen. The device may also be disabled if user profile information indicates a certain set of circumstances. As an example, a drastic change in betting styles may indicate that the user is "out of control," and the device may be configured to terminate playing privileges as a result. As another example, a user might predetermine that he

**12**

does not want to be able to use the gaming device to gamble during certain times or at certain locations. Alternatively, the house, or other sponsoring entity, might want to disallow certain activities when the user profile information indicates that certain criteria are met. This might be the case, for example, if the user is attending a show, or is in a hotel room. The user profile information may be configured to indicate the user's location. The casino might want to disallow gambling on the device while the user is at the show in order to avoid the user disrupting the show for other attendees. Moreover, jurisdictional requirements may dictate that a user not be able to participate in certain gaming activities if the user is in a certain location, such a casino hotel room.

According to at least one embodiment, an actual and/or virtual casino are configured based on user profile information. Additionally, staff activities may be initiated, or halted based on user profile information.

User profile information may also be used as an element in a fraud detection process. For example, one or more elements of a user's past profile information may be compared to current information. If a difference is detected and falls within a certain range, fraud may be realized.

Other aspects of the various embodiments of the wireless gaming system are shown in FIGS. **2-8**. According to one embodiment, as shown in FIG. **2** for example, the communications network comprises a cellular network **22**. Cellular network **22** comprises a plurality of base stations **23**, each of which has a corresponding coverage area **25**. Base station technology is generally known and the base stations may be of any type found in a typical cellular network. The base stations may have coverage areas that overlap. Further, the coverage areas may be sectorized or non-sectorized. The network also includes mobile stations **24**, which function as the gaming communication devices used by users to access the gaming system and participate in the activities available on the gaming system. Users are connected to the network of base stations via transmission and reception of radio signals. The communications network also includes at least one voice/data switch, which is preferably connected to the wireless portion of the network via a dedicated, secure landline. The communications network also includes a gaming service provider, which is likewise connected to the voice/data switch via a dedicated, secure landline. The voice/data switch may be connected to the wireless network of base stations via a mobile switching center (MSC), for example and the landline may be provided between the voice/data switch and the MSC.

Users access the gaming system by way of mobile stations which are in communication with, and thus part of, the communications network. The mobile station may be any electronic communication device that is operable in connection with the network as described. For example, in this particular embodiment, the mobile station may comprise a cellular telephone.

Preferably, in the case of a cellular network for example, the gaming system is enabled through the use of a private label carrier network. Each base station is programmed by the cellular carrier to send and receive private secure voice and/or data transmissions to and from mobile station handsets. The handsets are preferably pre-programmed with both gaming software and the carrier's authentication software. The base stations communicate via Private T-1 lines to a switch. A gaming service provider leases a private T-1 or T-3 line, which routes the calls back to gaming servers controlled by the gaming service provider. Encryption can be installed on the telephones if required by a gaming regulation authority, such as a gaming commission.

US 9,355,518 B2

**13**

The cellular network is preferably a private, closed system. Mobile stations communicate with base stations and base stations are connected to a centralized switch located within a gaming jurisdiction. At the switch, voice calls are transported either locally or via long distance. Specific service provider gaming traffic is transported from the central switch to a gaming server at a host location, which can be a casino or other location.

As subscribers launch their specific gaming application, the handset will only talk to certain base stations with cells or sectors that have been engineered to be wholly within the gaming jurisdiction. For example, if a base station is close enough to pick up or send a signal across state lines, it will not be able to communicate with the device. When a customer uses the device for gaming, the system may prohibit, if desired, the making or receiving voice calls. Moreover, voice can be eliminated entirely if required. Further, the devices are preferably not allowed to "connect" to the Internet. This ensures a high level of certainty that bets/wagers originate and terminate within the boundaries of the gaming jurisdiction and the "private" wireless system cannot be circumvented or bypassed. Although in certain embodiments some data and/or voice traffic may be communicated at least partially over the Internet, it is preferred that the communication path does not include the Internet. Alternatively, in some embodiments, certain non-gaming information may be transported over a path which includes the Internet, while other information relating to the gaming activities of the system is transported on a path that does not include the Internet.

As shown in FIG. **3**, a gaming communication device **32** is in communication with a gaming service provider over a network **34**. The gaming service provider preferably has one or more servers, on which are resident various gaming and other applications. As shown in FIG. **3**, some example gaming applications include horse racing and other sports, financial exchange, casino and/or virtual casino, entertainment and other events exchange, and news and real time entertainment. Each of these applications may be embodied in one or more software modules. The applications may be combined in any possible combination. Additionally, it should be understood that these applications are not exhaustive and that other applications may exist to provide an environment to the user that is associated with any of the described or potential gaming or related activities.

In another embodiment, as shown in FIG. **4**, for example, the communications network comprises a private wireless network. The private wireless network may include, for example, an 802.11x (WiFi) network technology to cover "Game Spots" or "Entertainment Spots." In FIG. **4**, various WiFi networks are indicated as networks **41**. Networks **41** may use other communications protocols to provide a private wireless network including, but not limited to, 802.16x (WiMax) technology. Further, networks **41** may be interconnected. Also, a gaming system may comprise a combination of networks as depicted in FIG. **4**. For example, there is shown a combination of private wireless networks **16**, a cellular network comprising a multi-channel access unit or sectorized base station **42**, and a satellite network comprising one or more satellites **46**.

With respect to the private wireless network, because certain embodiments of the technology cover smaller areas and provide very high-speed throughput, the private wireless network is particularly well-suited for gaming commission needs of location and identity verification for the gaming service provider products. The gaming spots enabled by networks **41** may include a current casino area **48**, new areas such as swimming pools, lakes or other recreational areas **49**,

**14**

guest rooms and restaurants such as might be found in casino **48** or hotels **45** and **47**, residential areas **40**, and other remote gaming areas **43**. The configuration of the overall gaming system depicted in FIG. **4** is intended only as an example and may be modified within the scope of the present invention.

In one embodiment, the system architecture for the gaming system includes:

(1) a wireless LAN (Local Access Network) component, which consists of mostly 802.11x (WiFi) and/or 802.16x WiMax technologies; robust security and authentication software; gaming software; mobile carrier approved handsets with Windows® or Symbian® operating systems integrated within; and

(a) CDMA-technology that is secure for over-the-air data protection;

(b) at least two layers of user authentication, (that provided by the mobile carrier and that provided by the gaming service provider);

(c) compulsory tunneling (static routing) to gaming servers;

(d) end-to-end encryption at the application layer; and

(e) state-of-the-art firewall and DMZ technologies;

(2) an MWAN (Metropolitan Wireless Access Network), which consists of licensed and license-exempt, point-to-point links, as well as licensed and license-exempt, point-to-multi-point technologies;

(3) private MAN (Metropolitan Access Network) T-1 and T-3 lines to provide connectivity where wireless services cannot reach; and

(4) redundant private-line communications from the mobile switch back to the gaming server.

Each of the "Game Spots" or "Entertainment Spots" is preferably connected via the MWAN/MAN back to central and redundant game servers. For accessing the private wireless networks **41**, the gaming communication devices are preferably WiFi- or WiMax-enabled PDAs or mini-laptops, and do not have to be managed by a third-party partner.

Preferably, the gaming system includes a location verification feature, which is operable to permit or disable gaming from a remote location depending upon whether or not the location meets one or more criteria. The criterion may be, for example, whether the location is within a pre-defined area in which gaming is permitted by law. As another example, the criterion may be whether the location is in a no-gaming zone, such as a school. The location verification technology used in the system may include, without limitation, "network-based" and/or "satellite-based" technology. Network-based technology may included such technologies as multilateration, triangulation and geo-fencing, for example. Satellite-based technologies may include global positioning satellite (GPS) technology, for example.

As previously discussed, the cellular approach preferably includes the use of at least one cellular, mobile, voice and data network. For gaming in certain jurisdictions, such as Nevada for example, the technology may involve triangulation, global positioning satellite (GPS) technology, and/or geo-fencing to avoid the potential for bets or wagers to be made outside Nevada state lines. In one embodiment, the network would not cover all of a particular jurisdiction, such as Nevada. For instance, the network would not cover areas in which cellular coverage for a particular base station straddled the state line or other boundary of the jurisdiction. This is done in order to permit the use of location verification to insure against the chance of bets originating or terminating outside of the state. Triangulation may be used as a method for preventing gaming from unapproved locations. Triangulation may be accomplished, for example, by comparing the signal strength from a

US 9,355,518 B2

15

single mobile station received at multiple base stations, each having GPS coordinates. This technology may be used to pinpoint the location of a mobile station. The location can then be compared to a map or other resource to determine whether the user of the mobile station is in an unapproved area, such as a school. Alternatively, GPS technology may be used for these purposes.

As shown in FIG. **5**, the gaming system includes a plurality of gaming communication devices **54**, **55**, and **56**. Device **54** is located outside the gaming jurisdiction **58**. Devices **55** and **56** are both located inside gaming jurisdiction **58**. However only device **56** is located within geo-fence **57**, which is established by the coverage areas of a plurality of base station **53**. Thus, geo-fencing may be used to enable gaming via device **56** but disable gaming via devices **54** and **55**. Even though some gaming communication devices that are within the gaming jurisdiction **58**, such as device **55**, are not permitted access to the gaming system, the geo-fence **57** ensures that no gaming communication devices outside jurisdiction **58**, such as device **54**, are permitted access.

Geo-fencing does not specify location. Rather, it ensures that a mobile station is within certain boundaries. For instance, geo-fencing may be used to ensure that a mobile station beyond state lines does not access the gaming system. Triangulation on the other hand specifies a pinpoint, or near-pinpoint, location. For example, as shown in FIG. **5**, device **56** is triangulated between three of the base stations **53** to determine the location of device **56**. Triangulation may be used to identify whether a device, such as a mobile station, is located in a specific spot where gambling is unauthorized (such as, for example, a school). Preferably, the location determination technology utilized in conjunction with the present invention meets the Federal Communication Commission's (FCC's) Phase 2 E911 requirements. Geological Institute Survey (GIS) mapping may also be utilized to compare identified coordinates of a gaming communication device with GIS map features or elements to determine whether a device is in an area not authorized for gaming. It should be noted that any type of location verification may be used such as triangulation, geo-fencing, global positioning satellite (GPS) technology, or any other type of location determining technology, which can be used to ensure, or provide an acceptable level of confidence, that the user is within an approved gaming area.

In another embodiment, location verification is accomplished using channel address checking or location verification using some other identifying number or piece of information indicative of which network or portion of a network is being accessed by the gaming communication device. Assuming the using of an identifying number for this purpose, then according to one method of location checking, as an example, a participant accesses the gaming system via a mobile telephone. The identifying number of the mobile telephone, or of the network component being accessed by the mobile telephone, identifies the caller's connection to the mobile network. The number is indicative of the fact that the caller is in a defined area and is on a certain mobile network. A server application may be resident on the mobile telephone to communicate this information via the network to the gaming service provider. In a related embodiment, the identifying number or information is passed from a first network provider to a second network provider. For example, a caller's home network may be that provided by the second provider, but the caller is roaming on a network (and in a jurisdiction) provided by the first provider. The first provider passes the identifying information through to the second provider to enable the second provider to determine whether the caller is in a defined area that does or does not allow the relevant gaming activity.

16

Preferably the gaming service provider either maintains, or has access to, a database that maps the various possible worldwide mobile network identifying numbers to geographic areas. The invention contemplates using any number or proxy that indicates a network, portion of a network, or network component, which is being connected with a mobile telephone. The identifying number may indicate one or more of a base station or group of base stations, a line, a channel, a trunk, a switch, a router, a repeater, etc.

In another embodiment, when the user connects his mobile telephone to the gaming server, the gaming server draws the network identifying information and communicates that information to the gaming service provider. The software resident on the gaming communication device may incorporate functionality that will, upon login or access by the user, determine the user's location (based at least in part on the identifying information) and send a message to the gaming service provider. The identifying number or information used to determine location may be country-specific, state-specific, town-specific, or specific to some other definable boundaries.

In connection with any of the location determination methods, the gaming system may periodically update the location determination information. This may be done, for example, during a gaming session, at pre-defined time intervals to ensure that movement of the gaming communication device to an unauthorized area is detected during play, and not just upon login or initial access.

Thus, depending on the location determination technology being used, the decision whether to permit or prohibit a gaming activity may be made at the gaming communication device, at the gaming server, or at any of the components of the telecommunication network being used to transmit information between the gaming communication device and the gaming server (such as at a base station, for example).

An aspect of the private wireless network related to preventing gaming in unauthorized areas is the placement of sensors, such as Radio Frequency Identification (RFID) sensors on the gaming communication devices. The sensors trigger alarms if users take the devices outside the approved gaming areas. Further, the devices may be "tethered" to immovable objects. Users might simply log in to such devices using their ID and password.

In connection with FIG. **6**, an example embodiment of a method according to the present invention can be described as follows. As discussed, software is preferably loaded on a gaming communication device and is operable to receive input data for gaming. The input data may originate at associated gaming software resident on the gaming server, or it may be input by the user of the gaming communication device. The software on the device is operable to present a representation of a gaming environment. This can include, among other things, a representation of a table game such as a blackjack table or a slot machine. Other examples of the representation of a gaming environment include graphical representations of any of the other applications described herein.

In the example method shown in FIG. **6**, in a first step **602**, the gaming communication device is activated. This may take place as a function of turning on a phone, PDA, or other communication device as described elsewhere herein. Preferably, activation comprises connecting the gaming communication device to a private data network. Part of the activation includes logging in at a prompt. This may be considered as a first level of authentication of a user of the gaming communication device. A second level of user authentication comprises authentication of the gaming communication device itself. This may occur, for example, by authentication of a

US 9,355,518 B2

**17**

mobile station by a mobile carrier. A third level of user identification may comprise biometrics. Various examples of biometrics may include, but are not limited to, fingerprint identification, photo identification, retina scanning, voice print matching, etc.

In a next step **604**, the user is presented with the gaming environment. The gaming environment may be presented in various stages. For instance, in a first stage, the gaming environment may comprise a casino lobby where the user is presented with certain gaming options including, for example, table games, slots, sports book, video poker, and a casino cashier. In a subsequent stage, the user may be presented with optional instances of the type of activity selected from the casino lobby.

In a next step **606**, the user selects an activity, such as a particular casino table game. In step **608**, the user is presented with one or more options related to the selected activity. In step **610**, the user selects an option. For instance, at this point, the user might place a wager, draw a card, select a restaurant or restaurant menu item, select a news source or a news story, place a buy or sell order on a financial exchange, place a bet on a certain box office performance over/under amount for a given movie, etc. The options for user input are myriad. In step **612**, the software resident on the gaming communication device accepts the option input by the user and transmits the input data to the software resident at the gaming server. In step **614**, the gaming server software acts on the input data.

Actions at this point, may include, without limitation, determining an outcome and/or amount, accessing another server and/or software application, retrieving information, preparing a response to the user, etc. The action of determining an outcome and/or amount might take place, for example, if the user is using the device to place wagers in connection with a gambling activity. For certain gambling activities, such as a table game or slot machine, a random number generator may be incorporated to determine the outcome (i.e., whether the user won or lost) and the gaming server software would also determine an amount won or lost based on the amount wagered and any applicable odds. The action of accessing another server and/or software application might occur, for example, in the event the user is engaging in a services activity such as accessing news services, making reservations and placing food and beverage orders at a restaurant, or making a retail purchase. The action of retrieving information might occur when the gaming server software is prompted to access another server for the purpose of retrieving a certain type of information requested by the user.

Preferably, the gaming server software prepares a response to the user's input data and in step **616**. In step **618**, the user acknowledges the response. For example, in the case of gambling, the user might acknowledge that he won a hand of blackjack because the dealer busted and that his payout was $100 based on a $50 bet at even odds. In step **620**, the user logs out.

In the situation where the user is gambling, after the series of steps described in connection with FIG. **6**, (or a subset or modified series of steps), the user physically enters a casino and goes to a casino cashier for payout and/or settlement (which can include, for example, extensions of credit or advance deposits). In one embodiment, there is a waiting period (e.g., twenty-four hours) before the user can collect winnings. The purpose of the waiting period is to allow time for fraud monitoring. The waiting period may depend on the amount of the balance. For example, if the user is owed less than $5,000 the waiting period may be twelve hours. If the user is owed between $5,000 and $10,000 the waiting period

**18**

may be twenty-four hours. If the user is owed more than $10,000 the waiting period may be forty-eight hours.

The duration of activation of the gaming communication device, the duration of a particular session, and/or the duration of a particular activity may be controlled according to any number of different parameters. For example, the duration may be based on a predetermined amount of time or period of time. Activation of the gaming communication device may terminate upon the expiration of a predetermined time period. As another example, an activity may only be permitted until the occurrence of a particular time of day. According to an alternative, an administrator, or another party to a transaction within any of the various activities, may determine the time period or amount of time. According to yet another alternative, the duration may end upon the occurrence of an event such as the user entering or leaving a particular location. The duration of activation may be dynamically determined based on a period of non-use. In other words, after a predetermined time without being used, the device may "time out" and be deactivated. The period of time, or amount of time, may be cumulatively determined. For example, an activity may only be permitted for a period of five hours, collectively. Time counting toward the five hours might stop and start depending upon the location of the user. As another example, an activity might only be permitted so long as the user does not enter or leave a particular location for longer than a predetermined period of time.

Similarly, activation of the gaming communication device and/or the ability for a user to engage in a particular activity may only be permitted during a specified time of day, or for a particular period of time prior to an event, or for a particular period of time after notification to the user. Also, activation and/or access may be controlled based upon the location of the user. For example, if a user is in a particular casino in which a particular show will take place that evening, the user might be notified that tickets to the show are available for a specified period of time prior to the show. The user might only be permitted to engage in the activity of purchasing tickets for the show if the user is in the casino and during the specified period of time prior to the show. For example, the user might only be able to purchase tickets while in the casino and up to five minutes before the start time of the show. Similarly, the activation of the device may be restricted based on the location of the user and a corresponding period of time. For example, if a user is in a location where a show is occurring, or is going to occur, the device may be deactivated (either automatically, or by a party other than the user) during a period beginning five minutes prior to the show and ending five minutes after the end of the show.

According to another alternative, the duration or enablement of one activity might be determined by the participation of the user in another activity. For example, a user might be allowed to make dinner reservations at a popular restaurant if the user has been gambling enough at a given casino. In this way, bonuses or comps may be determined or managed based on the activity of the user via the gaming communication device.

Preferably, data is transmitted back and forth during the gaming activities between the gaming communication device and a server controlled by the gaming service provider. An example of the path of communication is shown in FIG. **7**. Gaming data, such as a wager placed by the user, is transmitted from gaming communication device **701** to a base station **702** (or a transmitter in the case of a private wireless network such as a WiFi or WiMax network). Base station **702** routes the data through network **703** to a hub or gateway **704**, which in turn routes the data to a gaming server **705** operated by a

US 9,355,518 B2

19

gaming service provider. Preferably, the communication from gaming communication device **701** to the network **703** comprises wireless communication. This may be any type of known wireless communication or any type of wireless communication available in the future. Examples of acceptable wireless communication protocols include CDMA, GSM, and GPRS.

Preferably, the communication from the network **703** to the gateway **704** and to the server **705** is conducted over secure land lines. FIG. **7** is an example communication network only and the present invention should be understood to cover other networks in which data may be transmitted from gaming communication device **701** to server **705**. Preferably, data in response to data being transmitted from gaming communication device **701** to server **705** is transmitted back to gaming communication device **701** along a path essentially opposite to the path of the first transmission. It should be noted that in at least certain embodiments of the methods and systems described herein, a user is not actually playing a game on the gaming communication device. Rather, the user is actually playing the game on the server controlled by the gaming service provider, which may be located within a casino.

With respect to payment and/or receipt of winnings and losses, one possible approach is as follows. Upon check-in at a casino hotel, a hotel representative may query a guest as to whether the guest wants access to a gaming communication device. If the guest does want such access, the hotel representative may provide the guest with a gaming communication device in exchange for a credit-card type deposit or other deposit. The guest then deposits money into an account for wireless gaming. The guest's account balance information is loaded onto the guest's account file, which is preferably maintained on the gaming server. The user may load money into his gaming account by establishing a credit account, for example, at a casino cashier and/or by paying cash to the casino cashier. Many other alternatives exist and this process is an example only. Guest accounts or gaming communication devices may be preloaded with funds. Funds may be deposited during a gaming session. This may occur, for example, if a user selected a casino cashier activity from the gaming environment and instructed the cashier to add funds to the account. The finance subsystem may also utilize account card technology (such as ATM cards, credit cards, stored value cards, gift cards, etc) in order to conduct financial transactions associated with a user's account. Moreover, the user may receive or make payments remotely, by way of inputting instructions via the gaming communication device or by another remote device such as an automatic teller machine (ATM), which is in electronic communication with the gaming server or other server operated by the casino, hotel, gaming service provider or other entity involved in the gaming activities. For example, a user might remotely (via the gaming communication device) place an order at a restaurant. Then, the user might make advance payment for the meal at an ATM-type machine which is operable to receive instructions corresponding to the financial transaction requirements of the gaming activity of ordering food.

A unique aspect of the present invention includes establishing an electronic record of the gaming transactions undertaken by a user. Preferably, this is accomplished by utilization of a keystroke log, which is an electronic record of all keystrokes made by the user. Utilization of a keystroke log in this context allows for unprecedented monitoring of a user's gaming activity. In the event of a dispute, one may refer to the keystroke log and readily determine whether, in fact, a user placed a particular wager, for example.

20

An additional possible aspect of the electronic record is to allow a gaming control board or other regulatory authority, access to the electronic record in a direct manner in order to conduct periodic independent monitoring of the gaming activities conducted over the system. Another possible aspect is to allow policing against rigged machines. For instance, it is possible that the gaming control board (or other regulatory authority) could obtain a gaming communication device and compare their test results over time against records in the electronic record database (e.g., by comparing the results shown in the keystroke log). This essentially comprises electronic access for testing.

In another embodiment of the invention, as shown in FIG. **8**, a ship-based gaming system is provided. The system preferably comprises passenger vessel **802**, such as a cruise liner for example. The system includes one or more gaming communication devices **806** connected to a communication network. The network shown in FIG. **8** comprises a mobile network with base stations **808** connected via a LAN to a base station controller (BSC) **810**. BSC **810** is connected via a T1 interface to a first Very Small Aperture Terminal (VSAT) modem **812**, which is in communication with a first satellite **814**. First satellite **814** is operable to transmit and receive signals from second satellite **814**, which is in communication with second VSAT modem **812**. Second VSAT modem **812** is in communication with a gaming server **818** located at gaming service provider **816**. Gaming server is coupled to gaming database **820**. Again, the network configuration depicted in FIG. **8** is for example purposes only, and other configurations are within the scope of the present invention. An on-board back office **822** is preferably provided. Data is communicated by the on-board VSAT modem and transmitter to the first satellite for relay to the second (preferably land-based) VSAT receiver and modem. The data is then communicated to a server and/or centralized database via a mobile station controller (not shown).

A corresponding business model involves the gaming service provider contracting with a cruise line, which agrees to allow the gaming service provider to provide coverage throughout the cruise line's ship(s), by using repeaters for example. The gaming service provider may provide a private wireless network, in which case any revenue generated from use of or access to the private wireless network, and revenue from gaming activities, may be allocated among all or any subset of the cruise line and the gaming service provider. Alternatively, the gaming service provider may contract with a mobile carrier and a satellite provider, in which case revenue from the mobile calls, and revenue from gaming activities, may be allocated among all or any subset of the cruise line, the mobile carrier and the gaming service provider.

There are several scenarios for a user's activity relative to transactions conducted over the gaming system. In one example scenario the user is in a fixed, but remote, location from the gaming server, which may be located on the premises of a casino. This may be include, for instance, a situation in which the gaming communication device is a kiosk or some other communication device which is in a fixed position or which is tethered to a fixed position so that the gaming communication device cannot be moved beyond a certain area. In another example scenario, the user starts a gaming transaction at a first location and ends the transaction at a second location different from the first location. In another example scenario, the user is mobile during a single gaming transaction. In another example scenario, the user is mobile within a first approved area then (during the gaming transaction) the user moves outside the first approved area, through an unapproved area, to a remote second approved area.

US 9,355,518 B2

**21**

In an alternative embodiment, the gaming system may be configured to operate as a "curb-to-curb" gaming system. In such a system, a communication path may be established between the device and a particular server, based upon whether the user is in a location corresponding to that particular server. For example, the user might enter a first casino, or an authorized area associated with the first casino, and thereby activate the establishment of a communication path between the device and a server located at and/or controlled by the first casino. While the user is on the premises of the first casino, the user might be able to participate in activities, such as playing blackjack, at the first casino. Then, if the user leaves the first casino, the gaming system might be configured to terminate the first communication path (i.e., between the device and the first casino's server), or otherwise deactivate the device and/or terminate the user's ability to use the device to participate in activities associated with the first casino. When the user enters a second casino, or an authorized area associated with the second casino, a second communication path (e.g., between the device and a second server located at or controlled by the second casino) may be established. Thus, the user would now be able to play blackjack (or engage in other activities) at the second casino, rather than the first casino.

As another example, a particular casino is often related to other casinos within a jurisdiction or specified area. Under such a scenario, if a user entered any of the related casinos, then the appropriate communication path or paths could be established between the gaming communication device and one or more of the casinos in the group of related casinos, thereby enabling the user to play casino games (or engage in other activities) at the one or more casinos in the group of related casinos. Depending on regulatory requirements, the preferred configuration might be to establish a communication path with a server at a particular casino within the group at which the user wants to play. Then, a different communication path could be established at a subsequent casino if the user wants to play at another casino. Under certain circumstances, and again depending on regulatory requirements, some information associated with user activity might be maintained at a centralized server accessible by more than one casino within the group.

In another example embodiment, the gaming system may be used to enable gaming activities involving multiple wireless users who interact with one another. For instance, the system may enable a table game (such as blackjack) in which a first user and a second user are conducting gaming transactions on the same table and in which options selected by the first user directly impact outcomes and options relative to the second user. Preferably, the gaming environment presented on the gaming communication devices of both the first and second users will indicate the existence and activity of the other respective user. Another example of multiple users interacting on the gaming system is the provision of a poker game in which users place bets against one another instead of, or in addition to, placing bets against the house. Another example of interaction between users is when a first user makes restaurant reservations or purchases event tickets, thereby reducing the options available to the second user.

Preferably, the gaming service provider provides at least the following functions. First the gaming service provider provides and controls the one or more gaming servers. These servers may be physically located within the confines of the gaming service provider or may exist at a remote location. As mentioned, the gaming servers may also be located at or near a games provider such as a casino, casino hotel, racino, cruise ship, race track, etc. The gaming service provider may also

**22**

provide monitoring services such as transaction monitoring and key stroke logging services. The gaming service provider may also provide data management and security services. These services are not intended to be exhaustive and the gaming service provider may provide other services which facilitate the gaming process.

It should be noted that the invention can be implemented in connection with any gaming environment or an environment for any other activity, which may be conducted electronically. The invention is not limited to Nevada or any other particular gaming jurisdiction. For instance, the invention can be employed in connection with casinos in Atlantic City, N.J., international jurisdictions, Native American gaming facilities, and "racinos" which are race tracks that also have slot machines, video lottery terminals, or other gambling devices. For example, in connection with "racinos," the invention might be used by participants who wish to play slot machine games while they are viewing race horses in the paddock area. This might be desirable in the event that the slot machine area does not allow smoking and a participant wishes to gamble from an outdoor smoking area. Alternatively, the slot machine area might permit smoking and the gambler wishes to play the slot machines from an area where he or she can avoid breathing second-hand smoke. Numerous other scenarios can be envisioned in which the gaming participant can use the invention to participate in remote gaming, while enjoying some other primary activity in a location remote from the gaming facility. Further, the invention is not limited to gaming, but can include other applications, such as trading financial instruments, and wagering on other types of events, such as elections, award events, or any other activity.

Another example embodiment involves the application of one or more of the methods and systems described herein to the activity of conducting financial transactions. Thus, the gaming communication device may be configured to enable a user to conduct such financial transactions, which may include, without limitation, any transaction involving a financial institution, such as banking, trading securities, or managing 401K or other investment fund assets. Preferably, a communication path would be established between the user and any of the servers or other computers necessary to conduct the financial transaction. As with certain other embodiments the ability to engage in this activity may be controlled by one or more parameters including location and/or identity verification and time or duration limits

Conducting financial transactions may be one of the activities presented to the user of the gaming communication device. Any of the possible financial transactions might be presented as sub-activities. As an example, a user might want to trade securities listed on a particular exchange. Regulations might require the trader to be located within a certain jurisdiction to execute trades on the exchange. The exchange might have its own rules and could require that the trader be located on the premises. With the location verification techniques described elsewhere herein, the particular financial transaction activity might only be enabled if the user is located in a particular geographic area, for example.

As a related feature, the system may be configured to provide a credit verification feature, according to which a user's creditworthiness may be checked by a party to a transaction, or by which the user might apply for credit. For example, if a user wants to purchase $10,000 worth of a particular stock, then a communication path might be established between the user and a server located at and/or controlled by an exchange upon which the stock is being traded. An additional communication path might be established between the exchange server and a server of an account man-

US 9,355,518 B2

23

ager that manages the user's account. These communication paths would enable the basic transaction—that of the user purchasing the stock. Yet another communication path, however, might be established between a seller's server, the exchange server, and/or the account manager server and a server located at and/or controlled by a credit agency. This path would enable an interested party to the transaction to check and/or approve the user's credit to prior enabling the transaction.

According to one aspect of certain embodiments, a user of the gaming communication device can connect from the device to a financial service provider's server to provide a "Push to Trade" feature. In order to enable this feature, the device is configured to be capable of facilitating a "Push to Talk" protocol, whereby the device behaves like a walkie-talkie. Thus, the device may include any suitable program or application that enables the Push to Talk feature. As used herein, the phrase "Push to Talk" includes any protocol that allows for a direct connection feature for an end user. Included are all such protocols (e.g. Instant Talk, Fastchat, etc.) within the broad rubric of "Push to Talk" including those that provide wide-area, instantaneous contact.

The Push to Talk protocol allows a given device to instantly connect to any number of other devices, such as any other telephone (mobile or landline-based), personal computer, laptop, etc. The connection for the end user does not have to be spawned by any conventional dialing or by triggering some form of automatic dialing. A simple button can be depressed to provide the requisite connection. In the context of timing, Nextel (who developed the original Push to Talk technology) suggests that their Push to Talk protocol should connect within 2 seconds.

A related technology is Push to Talk Over Cellular (PoC). PoC service is a form of interactive voice messaging that combines walkie-talkie and cellular phone connectivity, allowing users to quickly connect with another person or an entire group of friends and contacts at the push of a button on a PoC-enabled handset.

The Push to Talk protocol allows users to use the walkie-talkie paradigm over an IP or a cellular network, which diminishes the boundary limitations of a conventional two-way radio. The Push to Talk service is based on a disruptive technology. Latency is an issue during some traditional mobile telephone conversations. One appeal of the Push to Talk platform, as compared to executing a traditional telephone call, is being able to talk to an individual or to a group of individuals instantly, without waiting for someone to answer due to latency issues. Another benefit of the Push to Talk feature is a shorter than normal phone call, which cuts down on dialing costs for corresponding end users. Nextel estimates that the average Push to Talk call lasts forty seconds. Push to Talk technology is compatible with virtually any network communications; for example, the Push to Talk protocol may readily be used in conjunction with cellular telephone networks, including GSM and CDMA. The network equipment used for the Push to Talk feature is currently being offered by companies such as Ericsson Motorola, Siemens, Sony Ericsson, and Nextel.

Because Push to Talk effectively turns the handheld device into a walkie-talkie, it not only successfully enables end users to send voice messages, it also enables immediate data texts (commonly referred to as "direct messaging"). Push to Talk messaging represents a significant improvement over short messaging systems in bypassing the slow and clumsy process of entering text via a phone keypad. This makes text messaging quicker and more effective.

24

According to the "Push to Trade" feature, once the end user initiates the call, the financial service provider is instantly connected to the end user. In one embodiment, the financial service provider has one or more electronic trade desks that are dedicated to this feature for their clients. Thus, all "Push to Trade" requests may be received at this location. In other embodiments, any suitable entity, broker, standard trading desk, or electronic device may receive such Push to Trade communications.

Once the connection has been established, the financial service provider may then simply conduct the trade as prescribed by the end user. For example, upon connection, the end user may be presented with the financial or market environment in which he seeks to participate. The trade desk representative or device can query the end user to execute an electronic or a broker-assisted trade. In addition, the financial environment may be presented in various stages. For instance, in a first stage, the financial environment may comprise a financial summary of all markets where the user is presented with certain financial options including, for example, specific market summaries, specific prices for selected assets (e.g. commodities, stocks, bonds, etc.), current positions, buying power, etc. In a subsequent stage, the user may be presented with optional instances of the type of activity selected from the market platform.

From this platform, the end user can select an activity, such as a particular type of trade. Thus, the user is presented with one or more options related to the selected activity. For instance, at this point, the user might place a buy or a sell order on a financial exchange. The software, which may be resident on the device, on the server, or on a combination of both, accepts the option input by the user and transmits the input data to the financial service provider. Subsequently, the financial service provider acts on the input data. The Push to Talk technology readily accommodates a voice log of the transaction for audit or confirmation purposes. Hence, a digital voice storage may be provided, whereby the transaction (e.g., inclusive of bid and ask prices) is recorded. In addition, the automatic voice log can then relay this information back to the end user (e.g., via his e-mail or via a conventional postal mail service). This could occur as a matter of course such that the end user is routinely provided with a suitable confirmation receipt for all of his trading activity.

Actions at this point may include, without limitation, determining an outcome and/or amount for the trade, accessing another server and/or software application, retrieving additional information, preparing a suitable response to the user, etc. The action of determining an outcome and/or amount might take place, for example, if the user is using the device to place trades in conjunction with his account and a given exchange. Hence, this could include a formal tallying of the executed trade, inclusive of the charged commission, the amount debited from the account to cover the trade, etc. The action of accessing another server and/or software application might occur, for example, in the event the user is engaging in a services activity such as accessing news services. The action of retrieving information might occur when the financial software is prompted to access another server for the purpose of retrieving a certain type of information requested by the user. The financial service provider can then prepare a response to the user's input data. Once this activity has concluded, the user can acknowledge the response and then log out and terminate his session.

It should be noted that the "Push to Trade" feature can be used in other applications of the gaming technology described herein. For example, in an application where the user of the gaming communication device is playing black-

US 9,355,518 B2

25

jack from an authorized area outside the casino gaming area, the Push to Trade feature would enable the user to participate audibly in the blackjack game actually taking place within the casino gaming area. The Push to Talk technology would allow the user to immediately and virtually "sit down" at an actual blackjack table without the delay caused by the conventional setup and tear down process of certain traditional telecommunication protocols. Also, once the user is participating in the game, the user can communicate orally with the dealer, or other users that are physically at the table, without the latency issues of certain mobile telecommunication systems.

In at least one embodiment, the invention provides jurisdictional controls, which limit gaming to approved geographical areas. The invention may also include an age/identity verification feature. This can be accomplished through any applicable technique including retina scanning, finger print identification, voice print matching, or other biometrics. Identity verification can also be accomplished by having a customer take a picture of himself (e.g., by use of a digital picture phone) and transmitting the picture to the gaming service provider for comparison to a stored picture of the pre-approved user. Identity verification can also be accomplished by way of comparison of participant provided data to stored data, and execution of electronic agreements or contracts by the participant. Identity verification can also be accomplished by monitoring a keystroke characteristic (e.g., rhythm, patterns, or cadence) of the user, or any other method in which a parameter uniquely associated with the user can be observed. The invention may also provide for the logging of keystrokes. In at least one embodiment, all communications are accomplished without accessing the Internet.

Mobile, remote gaming may be desirable for many reasons, some of which have already been described. The invention may allow supplementation of existing in-house gaming revenue by allowing bettors to place bets while enjoying other leisure activities such as golf, swimming, dining and shows. The invention may complement the new coinless wagering environment as bettors can play their favorite games outside the casino. The invention provides a high-speed, reliable, accurate, and secure mobile gaming environment that complies with regulatory requirements for identification and location verification of the bettor with the ability to generate key stroke logs. The invention may restrict unauthorized usage from a geographic perspective and is capable of implementation using location verification technology (e.g., geo-fencing) to conform the gaming activities to legal parameters.

Consumers may benefit from an increased choice of gaming environments. Consumers will be able to bet in whatever surroundings they prefer, benefiting from the knowledge that the product is regulated, fair and secure while enjoying the gaming experience at the speed they choose without external influences, such as that which might occur within the in-house casino environment. The gaming businesses can use the invention to increase their revenue base through a new, regulated, mobile, remote channel. Customers wanting to be entertained during downtime or outside a casino will be able to play games on their gaming communication device and customers intimidated by a traditional casino environment will be able to play in private. The gaming jurisdictions may benefit from an increase in gaming an ancillary revenue growth because customers will have a more enjoyable experience.

The invention may also be used to deliver content at an increased speed compared to traditional telecommunications systems. The content may include, for example, live reports, entertainment, news, promotions and advertising.

26

As mentioned, the invention provides a mobile gaming environment that complies with regulatory requirements for identification and location verification of the bettor. Moreover, the system is designed to be one hundred percent "clean" from a regulatory perspective. The software is clean in that it has not been and will not be licensed to anyone who does business illegally or otherwise operates in a "gray" area. For example, in a preferred embodiment, the software is not licensed to an entity that will illegally operate the software, or otherwise illegally do business, on the Internet. This may be desirable in that certain gaming jurisdictions will not grant gaming permits or licenses to companies that do business with, or license technology to or from, other entities known to be engaging in illegal operations.

Preferably, the system is designed such that the gaming software (or other application software operating on the system) is also one hundred percent clean from a regulatory perspective. For instance, before granting a license, a gaming jurisdiction may require that the software being used is not tainted in that it has not been used by the license applicant in violation of any laws and has not been licensed or otherwise distributed or disseminated to others who have used the software for illegal purposes, or who have been engaging in illegal activity. Therefore, it is preferred that the gaming software be clean and untainted from this perspective.

The systems and methods described herein may also be used to deliver and/or access "Rich Media" content such as, for example, sports video (live or nearly live) and audio commentary. Such may often only be distributed within specific jurisdictions. Therefore, the distribution may benefit from the inventive aspects discussed herein, particularly the location verification aspect, such as geofencing.

The gaming system and methods described herein may permit, among other things, pari-mutuel wagering, sports betting, and dissemination of news and other content. The invention also enables a casino or other gaming provider to advertise ancillary services such as shows, bars, and restaurants. The invention also enables remote reservations and purchases in connection with such services.

According to an embodiment of the invention, the gaming system provides for the dissemination of real-time odds to users accessing the system.

In another embodiment, an outcome in one transaction can trigger the presentation to the user of options for a second transaction. For example, if a user wins a predetermined amount of money playing blackjack, the user might be presented with an option to purchase retail items at a casino store or to make reservations for certain services at a club. As another example, if a user uses the system to purchase show tickets, the user might be offered to make reservations at one of several restaurants within a certain proximity to the show.

Although this disclosure has been described in terms of certain embodiments and generally associated methods, alterations and permutations of these embodiments and methods will be apparent to those skilled in the art. Accordingly, the above description of example embodiments does not define or constrain this disclosure. Other changes, substitutions, and alterations are also possible without departing from the spirit and scope of this disclosure.

What is claimed is:

1. A method for supporting multiple users in an electronic gaming system, the method comprising:

establishing for a user of the electronic gaming system a user profile on a data storage device, wherein the user accesses the electronic gaming system via an electronic device;

US 9,355,518 B2

27

receiving by at least one processor via a communications network from the electronic device location data of the electronic device, wherein:

the electronic device comprises sensor for detecting location,

the electronic device obtains the location data from the sensor, and

the electronic device communicates the location data via the communications network;

recognizing by the at least one processor an occurrence of an event;

updating by the at least one processor the user profile in response to the event,

wherein recognizing the occurrence of the event comprises determining, based on the location data, an existence of the user in a particular location, and

wherein updating the user profile in response to the event comprises storing the particular location; and

based on determining the existence of the user in the particular location, initiating by the at least one processor a gaming session, wherein initiating the gaming session includes communicating via the communications network information to the electronic device, wherein the information causes the electronic device to present via a display of the electronic device a gaming environment to the user or to present via the display to the user a modified gaming environment that indicates to the user a last gaming activity of a plurality of gaming activities accessed by the user during a prior gaming session, a determination as to whether to display the gaming environment or the modified gaming environment being based on whether there is or is not a stored indication of a last one of the plurality gaming activities accessed by the user during the prior gaming session.

**2**. The method of claim **1**, wherein the electronic gaming system enables users to at least one of:

wager on games and/or events, and

engage in non-wagering games and/or events;

engage in gaming activities from electronic devices.

**3**. The method of claim **1**, further comprising storing for the particular location at least one of a date and a time of day when the user is at the particular location.

**4**. The method of claim **1**, further comprising:

determining an existence of the user in a plurality of locations in response to recognizing an occurrence of a plurality of respective events, and

updating the user profile to include the plurality of locations.

**5**. The method of claim **4**, further comprising:

storing for the respective plurality of locations at least one of a date and a time of day when the user is at the respective location.

**6**. The method of claim **4**, wherein the plurality of locations are all within at least one of:

a given state, and

a given casino property.

**7**. The method of claim **1**, wherein establishing the user profile includes transferring information from a hotel system to the electronic gaming system, wherein the information transferred from the hotel system is collected upon the user checking into the hotel.

**8**. The method of claim **1**, wherein recognizing the occurrence of an event comprises recognizing an occurrence of a particular time of day.

**9**. An apparatus for supporting multiple users in electronic gaming, the apparatus comprising:

28

at least one processor; and

a memory electronically coupled to the at least processor and having software stored thereon that when executed by the at least one processor directs the at least one processor to:

establish for a user of the apparatus a user profile on a data storage device, wherein the user accesses the apparatus via an electronic device;

receive via a communications network from the electronic device location data of the electronic device, wherein:

the electronic device comprises sensor for detecting location,

the electronic device obtains the location data from the sensor, and

the electronic device communicates the location data via the communications network;

recognize an occurrence of an event;

update the user profile in response to the event;

wherein to recognize the occurrence of the event comprises to determine, based on the location data, an existence of the user in a particular location, and

wherein to update the user profile in response to the event comprises to store the particular location; and

based on determining the existence of the user in the particular location, initiate a gaming session, wherein to initiate the gaming session includes to communicate via the communications network information to the electronic device, wherein the information causes the electronic device to present via a display of the electronic device a gaming environment to the user or to present via the display to the user a modified gaming environment that indicates to the user a last gaming activity of a plurality of gaming activities accessed by the user during a prior gaming session, a determination as to whether to display the gaming environment or the modified gaming environment being based on whether there is or is not a stored indication of a last one of the plurality gaming activities accessed by the user during the prior gaming session.

**10**. The apparatus of claim **9**, wherein the electronic gaming system enables users to at least one of:

wager on games and/or events, and

engage in non-wagering games and/or events;

engage in gaming activities from electronic devices.

**11**. The apparatus of claim **9**, wherein the software, when executed by the at least one processor, further directs the at least one processor to:

store for the particular location at least one of a date and a time of day when the user is at the particular location.

**12**. The apparatus of claim **9**, wherein the software, when executed by the at least one processor, further directs the at least one processor to:

determine an existence of the user in a plurality of locations in response to recognizing an occurrence of a plurality of respective events, and

update the user profile to include the plurality of locations.

**13**. The apparatus of claim **12**, wherein the software, when executed by the at least one processor, further directs the at least one processor to:

store for the respective plurality of locations at least one of a date and a time of day when the user is at the respective location.

**14**. The apparatus of claim **12**, wherein the plurality of locations are all within at least one of:

a given state, and

a given casino property.

**15**. The apparatus of claim **9**, wherein to establish the user profile includes to transfer information from a hotel system to

US 9,355,518 B2

29

the electronic gaming system, wherein the information transferred from the hotel system is collected upon the user checking into the hotel.

**16**. A method for supporting multiple users in an electronic gaming system, the method comprising:

establishing profile for a user of the electronic gaming system, wherein the user accesses the electronic gaming system via an electronic device;

determining by at least one processor that the user is located within a particular location in which the user is permitted to engage in gaming activities provided by the electronic gaming system, wherein the determining comprises:

receiving via a communications network an identifier that indicates a network, a portion of a network, or a network component the electronic device is connected to in order to communicate with the electronic gaming system, and wherein the identifier is mapped via a database to a geographic area, and a determination is made that the geographic area is within the particular location in which the user is permitted to engage in gaming activities;

storing by at least one processor in the profile of the user at least one of a date and a time of day when the user is at the particular location; and

based on determining that the user is located in the particular location, initiating by the at least one processor a gaming session, wherein initiating the gaming session includes communicating via the communications network information to the electronic device, wherein the information causes the electronic device to present via a display of the electronic device a gaming environment to the user or to present via the display to the user a modified gaming environment that indicates to the user a last one of the gaming activities accessed by the user during a prior gaming session, a determination as to whether to display the gaming environment or the modified gaming environment being based on whether there is or is not a stored indication of a last one of the gaming activities accessed by the user during the prior gaming session.

**17**. The method of claim **16**, wherein the electronic gaming system enables users to at least one of:

wager on games and/or events, and

engage in non-wagering games and/or events;

engage in gaming activities from electronic devices.

**18**. The method of claim **16**, further comprising:

determining that the user has selected, at a plurality of times, one or more gaming activities provided by the electronic gaming system;

in response to determining that the user has selected, at a plurality of times, one or more gaming activities, determining a respective location of the user for each selection; and

storing in the profile of the user the determined locations.

**19**. The method of claim **18**, wherein the plurality of locations are all within a given jurisdiction.

**20**. The method of claim **18**, wherein the plurality of locations are all within at least one of:

a given state, and

a given casino property.

**21**. An apparatus for supporting multiple users in electronic gaming, the apparatus comprising:

30

at least one processor; and

a memory electronically coupled to the at least processor and having software stored thereon that when executed by the at least one processor directs the at least one processor to:

establish a profile for a user of the apparatus, wherein the user accesses the apparatus via an electronic device;

determine that the user is located within a particular location in which the user is permitted to engage in gaming activities provided by the electronic gaming system wherein the determining comprises to:

receive via a communications network an identifier that indicates a network, a portion of a network, or a network component the electronic device is connected to in order to communicate with the apparatus, and wherein the identifier is mapped via a database to a geographic area, and a determination is made that the geographic area is within the particular location in which the user is permitted to engage in gaming activities;

store in the profile of the user at least one of a date and a time of day when the user is at the particular location; and

based on determining that the user is located in the particular location, initiate a gaming session, wherein to initiate the gaming session includes to communicate via the communications network information to the electronic device, wherein the information causes the electronic device to present via a display of the electronic device a gaming environment to the user or to present via the display to the user a modified gaming environment that indicates to the user a last one of the gaming activities accessed by the user during a prior gaming session, a determination as to whether to display the gaming environment or the modified gaming environment being based on whether there is or is not a stored indication of a last one of the gaming activities accessed by the user during the prior gaming session.

**22**. The apparatus of claim **21**, wherein the electronic gaming system enables users to at least one of:

wager on games and/or events, and

engage in non-wagering games and/or events;

engage in gaming activities from electronic mobile devices.

**23**. The apparatus of claim **21**, wherein the software, when executed by the at least one processor, further directs the at least one processor to:

determine that the user has selected, at a plurality of times, one or more gaming activities provided by the gaming system;

in response to determining that the user has selected, at a plurality of times, one or more gaming activities, determine a respective location of the user for each selection; and

store in the profile of the user the determined locations.

**24**. The apparatus of claim **23**, wherein the plurality of locations are all within a given jurisdiction.

**25**. The apparatus of claim **23**, wherein the plurality of locations are all within at least one of:

a given state, and

a given casino property.

\*    \*    \*    \*    \*

# EXHIBIT P



# PTAB Trial Statistics FY23 End of Year Outcome Roundup IPR, PGR

Patent Trial and Appeal Board
Fiscal Year 2023



# Petitions filed by trial type
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



Trial types include Inter Partes Review (IPR) and Post Grant Review (PGR).



3

# Petitions filed by technology
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



# Petitions filed by month
## (September 2023 and Prior 12 Months: Sept. 1, 2022 to Sept. 30, 2023)



# Institution rates by petition
## (FY19 to FY23: Oct. 1, 2018 to Sept. 30, 2023)



# Institution rates by patent
## (FY19 to FY23: Oct. 1, 2018 to Sept. 30, 2023)



# Institution rates by technology
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



Institution rate for each technology is calculated by dividing petitions instituted by decisions on institution (i.e., petitions instituted plus petitions denied). The outcomes of decisions on institution responsive to requests for rehearing are excluded.



8

# Settlements
## (FY19 to FY23: Oct. 1, 2018 to Sept. 30, 2023)



Settlement rate is calculated by dividing total settlements by concluded proceedings in each fiscal year (i.e., denied institution, settled, dismissed, requested adverse judgment, and final written decision), excluding joined cases.

9

# Outcomes by petition
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



FWD patentability or unpatentability reported with respect to the claims at issue in the FWD. Joined cases are excluded.



10

# Outcomes by patent
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



FWD patentability or unpatentability reported with respect to the claims at issue in the FWD. "Mixed Outcome" is shown for patents receiving more than one type of outcome from the list of: denied, settled, dismissed, and/or req. adverse judgement only. A patent is listed in a FWD category if it ever received a FWD, regardless of other outcomes.



11

# Outcomes by claim challenged
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)





# Claim outcomes
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



"No DI" and "No FWD" mean the claim was challenged but not addressed in a DI/FWD, e.g., due to settlement.

30% of challenged claims and 51% of instituted claims were found unpatentable by a preponderance of the evidence.

13

# All patents: Fiscal Year 2023
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



~3,800,000 live patents

1,117 patents with AIA proceedings that ended in FY23

392 patents at least partially invalidated by PTAB

133 patents fully invalidated by PTAB

- 12% of patents with proceedings ending in FY23 were fully invalidated by PTAB (133 out of 1,117).

- Less than 0.004% of all live patents in FY23 were fully invalidated (133 out of ~3,800,000).

Events that end an AIA proceeding include final written decisions (FWD), settlements, dismissals, requests for adverse judgment, and denials of institution. A patent is listed in an FWD category if it ever received an FWD.



# All patents: All time
## (All time: Sept. 16, 2012 to Sept. 30, 2023)



10,363 patents challenged

3,170 patents at least partially invalidated by PTAB

1,037 patents fully invalidated by PTAB

10% of challenged patents were fully invalidated by PTAB (1,037 out of 10,363).



15

